## Case No. 22-1980

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

SENTIUS INTERNATIONAL, LLC,
*Appellant*

v.

APPLE INC.,
*Appellee*

---

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board in No. IPR2020-01646*
Administrative Patent Judge Steven Michael Amundson  ·  Administrative Patent Judge David C. McKone
Administrative Patent Judge Christopher L. Ogden

# PRINCIPAL BRIEF OF APPELLANT
# SENTIUS INTERNATIONAL, LLC

ROBERT J. YORIO
**CARR & FERRELL LLP**
411 Borel Avenue, Suite 603
San Mateo, CA 94402
Telephone: (650) 812-3453
yorio@carrferrell.com

SANDEEP SETH
**SETH LAW**
1200 Smith Street, Suite 1600
Houston, TX 77002
Telephone: (818) 444-9273
ss@sethlaw.com

*Attorneys for Appellant,*
*Sentius International, LLC*

November 10, 2022



# CLAIM LANGUAGE AT ISSUE

## U.S. Patent No. 7,672,985

**Claim 1**.     A computer implemented method for processing data- base content, the method comprising the steps of:

syndicating one or more data objects associated with a term database to one or more remote computers, wherein the one or more data objects contain data associated with one or more terms;

parsing one or more documents to identify at least one term based on at least one rule;

identifying content for the at least one term;

and associating the at least one term with the identified content;

wherein the one or more data objects associated with the term database provide a representation of at least a portion of the term database at the one or more remote computers and are used to link the identified content with the at least one term.

**Claim 5**.     The method of claim **1**, wherein the content comprises one or more of definitions, related products, related services, sponsorship information, translation, and reference works.

**Claim 11**.     A computer implemented system for processing database content, the system comprising:

a term module for parsing one or more documents to identify at least one term based on at least one rule;

a processing module for identifying content for the at least one term; and

a term database for storing the identified content in association with the at least one term; wherein one or more data objects associated with the term database are syndicated to one or more remote computers for providing a representation of at least a portion of the term database at the one or more remote computers and for linking the identified content with the at least one term, wherein the one or more data objects contain data associated with one or more terms.

**Claim 15**.     The system of claim **11**, wherein the content comprises one or more of definitions, related products, related services, sponsorship information, translation, and reference works.

**Claim 20**.     A computer implemented system for processing database content, the system comprising:

means for parsing one or more documents to identify at least one term based on at least one rule;

means for identifying content for the at least one term; and

means for associating the at least one term with the identified content;

wherein one or more data objects associated with the term database are syndicated to one or more remote computers for providing a representation of at least a portion of the term database at the one or more remote computers and for linking the identified content with the at least one term.

**Claim 21**.    A computer implemented method for processing database content, the method comprising the steps of:

syndicating one or more data objects associated with a database to one or more remote computers;

parsing one or more source documents to identify at least one term based on one or more predetermined rules;

identifying content for the at least one term;

linking the content with the at least one term; and automatically associating the at least one term in the one or more source documents with at least one link;

wherein the at least one link denotes an association between the at least one term and the linked content;

wherein the one or more data objects associated with the database provide a representation of at least a portion of the database at the one or more remote computers; and

wherein the linked content is displayed on a user interface based upon a user interaction with at least a portion of the one or more source documents.

**Claim 36**.    A computer implemented system for processing database content, the system comprising:

a term module for parsing one or more source documents to identify at least one term based on one or more predetermined rules; and

a processing module for identifying content for the at least one term, linking the content with the at least one term, and automatically associating the at least one term in the one or more source documents with at least one link;

wherein the at least one link denotes an association between the at least one term and the linked content;

wherein one or more data objects associated with a database are syndicated to one or more remote computers for providing a representation of at least a portion of the database at the one or more remote computers; and

wherein the linked content is displayed on a user interface based upon a user interaction with at least a portion of the one or more source documents.

**Claim 39.**    The method of claim **2**, wherein the source comprises one or more of a dictionary, customer created data, advertising content and reference work.

**Claim 41**.    The system of claim **11**, wherein the identified content is displayed on a user interface in response to a selection of the at least one term by a user.

**Claim 43**.    The system of claim **12**, wherein the source comprises one or more of a dictionary, customer created data, advertising content and reference work.

## CERTIFICATE OF INTEREST

In accordance with Fed. Cir. R. 47.4(a), counsel for Appellant Sentius International, LLC certifies the following:

1.      The full name of every party or amicus represented by me is: Sentius International, LLC.

2.      The name of real party in interest represented by me is: None.

3.      The parent corporation or publicly held company that owns 10% or more of stock in Sentius International, LLC is: NONE.

4.      The names of all law firms and the partners and associates that have appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are: NONE.

5.      The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: *Zoho Corporation v. Sentius International, LLC,* United States District Court, NDCA - Oakland Division, Case No. 4:19-cv-00001-YGR; *Sentius International, LLC v. Apple Inc.*, United States District Court, NDCA – Oakland Division, Case No. 4:20-cv-00477-YGR.

6.    The information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees) are: NONE.

/s/ *Robert J. Yorio*
Robert J. Yorio (Bar No. 93178)

*Counsel for Appellant*
*Sentius International, LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ iv

STATEMENT OF RELATED CASE ........................................................x

I.     STATEMENT OF JURISDICTION .................................................1

II.    STATEMENT OF THE ISSUES ON APPEAL ............................1

III.   STATEMENT OF THE CASE AND FACTS ...............................2

       A.     Procedural History...............................................................2

       B.     Related Matters....................................................................3

       C.     Technical Background..........................................................3

              1.     Commercial Development .........................................3

              2.     The First Patent Family............................................5

              3.     The Problems of the Prior Art Solved by the '985 Patent .........7

              4.     The '985 Patent's Solution.......................................9

       D.     Overview of the Challenged '985 Patent (Ex. 1001) .........10

       E.     Asserted Grounds of Unpatentability..................................18

       F.     Representative Independent Claims ....................................18

       G.     The Final Written Decision ................................................21

IV.    SUMMARY OF ARGUMENT....................................................22

V.     ARGUMENT................................................................................24

       A.     Standard of Review .............................................................24

       B.     The Proper Construction of the Terms Identified Content
              in Claims 1, 11, 20 and 41 and Linked Content in Claims 21
              and 36 Warrant a Remand...................................................26

              1.     Linked Content Is Stored in the Term Database.......................26

              2.     Identified Content and Linked Content are Content for
                     Display ...................................................................29

       C.     The Preambles of the Independent Claims in the '985 Patent Are
              Limiting ...............................................................................32

D.    The Board's Finding That Independent Claims 21 and 36 and Their Respective Dependent Claims Would Have Been Obvious Based on van Hoff and Rodkin Was Not Supported by Substantial Evidence ............................................................37

    1.    van Hoff Disclosed a Point-to-Point System ............................37

    2.    Rodkin Did Not Supply the Missing Disclosure in van Hoff Regarding Syndicating Database Content for Display .............44

E.    The Board's Finding That Dependent Claim 41 Would Have Been Obvious Based on van Hoff and Rodkin Was Not Supported by Substantial Evidence. ...........................................................45

F.    The Board's Finding That There Was an Apparent Reason or Motivation to Combine the van Hoff Reference with Rodkin (and Ingram) Despite the Contrasting Inventive Approaches in Each Reference Was Not Supported by Substantial Evidence. ..........48

G.    The Board's Finding That Claims 5, 15, 39 and 43 Would Have Been Obvious Was Erroneous ....................................................51

    1.    The Board's Analysis of Claims 5, 15, 39 and 43 is in Conflict With the Claim Language ......................................51

    2.    Claims 39 and 43 are Not Obvious Over van Hoff in View of Rodkin....................................................................57

VI.    CONCLUSION...........................................................................58

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Applied Materials, inc. v. Advance Semiconductor Materials Am., Inc.,*
  98 F.3d 1563, 1572-73 (Fed. Cir. 1996)........................................................32

*Bio-Rad Laboratories, Inc. v 10XGenomics, Inc.,*
  967 F. 3d 135, 1369 Fed. Cir. 2017) ..................................................... 32, 34

*Eidos Display, LLC v. AU Optronics Corp.,*
  779 F.3d 1360, 1364-65 (Fed. Cir. 2015)......................................................25

*Eli Lilly and Company v. Teva Pharmaceuticals International GmbH,*
  8 F.4th 1331, 1340 (Fed. Cir. 2021) ........................................... 24, 34, 36, 50

*Henny Penny Corp. v. Frymaster LLC,*
  938 F. 3d 1324, 1331-32 (Fed. Cir. 2019)......................................................49

*Howmedica Osteonics Corp. v. Zimmer, Inc.,*
  822 F.3d 1312, 1323 (Fed. Cir. 2016) ...........................................................48

*In re Chapman,*
  595 F.3d 1330, 1336-37 (Fed. Cir. 2010)......................................................25

*In re Kotzab,*
  217 F.3d 1365, 1369 (Fed. Cir. 2000) ...........................................................25

*In re Magnum Oil Tools Int'l, Ltd.,*
  829 F.3d 1364, 1367, 1381 (Fed. Cir. 2016) .................................................46

*In re Sullivan,*
  498 F.3d 1345, 1350 (Fed. Cir. 2007) ...........................................................25

*InterDigital Communications, LLC v. Int'l Trade Commission,*
  696 F.3d 1318, 1324-35 (Fed. Cir. 2012)................................................ 55, 56

*Phillips v. AWH Corp.,*
  415 F.3d 1303, 1315 (Fed. Cir. 2005) ............................................... 28, 54, 55

*Princeton Vanguard, LLC v. Frito-Lay North America, Inc.,*
  786 F.3d 960, 964 (Fed. Cir. 2017) .................................................. 25, 26, 41

*Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*,
566 F.3d 989, 994 (Fed. Cir. 2009) ...............................................................50

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
856 F.3d 1019, 1021 (Fed. Cir. 2017) ............................................. 29, 31, 58

*Shoes by Firebug LLC v. Stride Rite Children's Group, LLC*,
962 F.3d 1362, 1366 (Fed. Cir. 2020) .................................................... 24, 35

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech.*,
983 F.3d 1367, 1374 (Fed. Cir. 2021) .................................................... 24, 25

*Teva Pharms. v. Sandoz, Inc.*,
574 U.S. 318, 331-33 (2015) ................................................................. 24, 25

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F. 3d 1295, 1305 (Fed. Cir. 2007) .........................................................31

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F. 3d 1576, 158384 (Fed. Cir. 1996) .......................................................31

*Winner Int'l Realty Corp. v. Wang*,
202 F.3d 1340, 1349 (Fed. Cir. 2000) .................................................... 48, 49

**Statutes**

5 U.S.C. § 706(2) ........................................................................................25

5 U.S.C. § 706(2)(E) ...................................................................................25

28 U.S.C. § 1295(a)(4)(A) .............................................................................1

35 U.S.C. § 141 ..............................................................................................1

35 U.S.C. § 142 ..............................................................................................1

35 U.S.C. § 314 ..............................................................................................1

35 U.S.C. § 319 ..............................................................................................1

**STATEMENT OF RELATED CASE**

The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: *Zoho Corporation v. Sentius International, LLC,* United States District Court, NDCA - Oakland Division, Case No. 4:19-cv-00001-YGR; *Sentius International, LLC v. Apple Inc.*, United States District Court, NDCA – Oakland Division, Case No. 4:20-cv-00477-YGR.

# I.   STATEMENT OF JURISDICTION

This appeal arises from an *inter partes* review determination of the Patent Trial and Appeal Board ("Board") of the United States Patent and Trademark Office ("Office"), IPR2020-01646. The Board had jurisdiction over IPR2020-01646 under 35 U.S.C. § 314. A panel of Administrative Law Judges McKone, Ogden and Amundson issued a Final Written Decision on May 4, 2022.

Sentius International, LLC timely filed a notice of appeal on July 1, 2022. *See* 35 U.S.C. §§ 141, 142 and 319. This Court has jurisdiction to review the Final Written Decision under 28 U.S.C. § 1295(a)(4)(A).

# II.   STATEMENT OF THE ISSUES ON APPEAL

The issues raised on appeal are as follows:

(1)   Did the Board commit legal error in its construction of claim terms "identified content" in claims 1, 11, 20 and 41 and "linked content" in claims 21 and 36?

(2)   Did the Board commit legal error in its claim construction determination that the preambles of the independent claims in the '985 patent were not limiting?

(3)   Was the Board's finding that independent Claims 21 and 36 and their respective dependent claims were obvious based on van Hoff and Rodkin supported by substantial evidence?

-1-

(4)    Was the Board's finding that dependent claim 41 was obvious based on van Hoff and Rodkin supported by substantial evidence?

(5)    Was the Board's finding that Claims 5, 15, 39 and 43 were obvious supported by substantial evidence when the Board had not instituted trial on those claims in its Institution Decision?

### III.    STATEMENT OF THE CASE AND FACTS

**A.    Procedural History**

On October 1, 2020, Apple, Inc. ("Apple" or "Petitioner") filed a petition requesting *inter partes* review of claims 1-23, 25-29, and 35-46 of U.S. Patent No. 7,672,985 B2 (Ex. 1001, "the '985 patent"). Paper 1 ("Pet." or "Petition"). (Appx0135-0208). Sentius International, LLC. ("Sentius" or "Patent Owner") filed a Preliminary Response. Paper 5. (Appx0218-0281). The Board instituted review of claims 1-23, 25–29, 31, 32, and 35-46 on the two grounds set forth in the Petition. Paper 6. (Appx0282-0325). In its Institution Decision, the Board found that Apple had not satisfied its burden to show a reasonable likelihood that it would prevail on proving the unpatentability of Claims 5, 15, 39 and 43. Institution Decision (Appx0316-0317, Appx0321-0322). *Id*. at 35-36 and 40-41.

Sentius filed its Response on July 30, 2021. Paper No. 8 (Appx0338-0405) supported by a Declaration from its expert, Dr. Vijay Madisetti. Exhibit 2002 (Appx1537-1624). Apple filed its Reply to the Patent Owner's Response on

October 21, 2021. Paper No. 10 (Appx0409-0436). Sentius filed its Sur-Reply to Apple's Reply on December 2, 2021. Paper No. 11 (Appx0437-0464). The Board conducted the Oral Hearing on February 3, 2022, and oral arguments were presented by Apple and Sentius. Paper No. 17 (Appx0524-0591) Record of Oral Hearing).

The Board issued its Judgment and Final Written Decision on May 4, 2022. Paper No. 18. (Appx0001-0061). Sentius filed a timely Notice of Appeal on June 28, 2022. (Appx0592-0598).

## B.     Related Matters

The '985 patent is the subject of the ongoing litigation: *Sentius Int'l, LLC v. Apple Inc.*, No. 4:20-cv-00477-YGR (N.D. Cal. filed Jan. 22, 2020), *transferred from No.* 1:19-cv-01444-MN (D. Del. filed July 31, 2019); and *Zoho Corp. v. Sentius Int'l, LLC*, No. 4:19-cv-00001-YGR (N.D. Cal. Filed Jan. 1, 2019).

## C.     Technical Background

### 1.     Commercial Development

The '985 patent technology follows Sentius's real-word development of commercial data management systems used to enrich web documents by linking words contained therein with annotation content to be displayed to the user maintained by the system in databases and distributed via syndicated data objects.

Sentius first started that work in the early/mid-1990s when it first developed a linking system to address communication problems encountered in reading Japanese e-mail at Sony Corporation.  They were issued a first patent, U.S. Patent No. 5,822,720, (later RE43,633), and attempted to address the problem of being able to refer to multiple content sources to better understand foreign texts. It was particularly useful in linking words and phrases in documents to additional information associated with such words and phrases, such as dictionary materials related to such words or phrases, etc. so that the associated content can be displayed in a pop-up window when needed by an end-user. Ex. 2002, Declaration of Professor Vijay Madisetti, Ph.D. ("Madisetti Decl.") Exhibit 2002, ¶ 46. (Appx1556-1557).

Further improvements were made and patented in the '985 patent family that centralized the dictionaries containing the associated content and syndicated the most up to date content to authorized remote applications performing the linking so that such remote applications could automatically receive and use the most up to date content for display to the end-user. *Id.*, ¶ 47. (Appx1557).

The technology is applicable to a wide variety of productivity tools including desktop and web applications. The technology is used to facilitate the linking of parsed terms in web documents to reference materials maintained by the system in a database so that they may be interactively displayed to end-users. The

-4-

technology is also used to facilitate and automate the delivery of such reference materials to remote applications for use in such linking. *Id.*, ¶ 48. (Appx1557-1558).

## 2. The First Patent Family

Because it is referenced in the '985 patent as a preferred linking engine to be used, a brief description of the technology of the first patent family (first issued at U.S. Patent No. 5,822,720) is warranted. See, Ex. 1001, 7:35-39 (Appx0613) ("Terms from the database are tagged in source documents **760** using the RichLink Processor or other automated methods such as those disclosed in U.S. Pat. No. 5,822,720, System and method for linking streams of multimedia data for reference material for display, Oct. 13, 1998, Bookman et al.") *See also*, Ex. 2002, Madisetti Decl, ¶ 49. (Appx1558).

As shown in Figure 3 of the 5,822,720 Patent ("the '720 patent"), reproduced below, the system links terms in a document to annotation content associated with that term to be retrieved from a database and displayed in a pop-up window near the term. *Id.*, ¶ 50. (Appx1558).



*FIG. 3*

As shown in Figure 2 of the '720 patent for the exemplary embodiment, the starting and ending character position offsets of the Kanji characters forming Japanese words within a parsed document are recorded as discrete entries in a look- up table and linked to the associated content for display from a given system database. Exhibit 2002, ¶ 51. (Appx1559).



*FIG. 2*

As reflected in Figure 2, when a user clicks on a word at a display address (100, 75), the system converts the display address to an offset position (25) within the document and looks up an index value (200) in the TEXT database to retrieve the content to be displayed. Exhibit 2002., ¶ 52. (Appx1559).

### 3.    The Problems of the Prior Art Solved by the '985 Patent

Latency was a huge problem for the internet back in 2001, indeed even today latency remains a problem. Yet there was ever an increasing need to content in a given webpage to additional annotated content. Prior art systems, such as van Hoff and Rodkin, provided point-to-point navigation by inserting URLs as hypertext links into a webpage for a given word to navigate the user who clicked

on that word to the content of another webpage. Such systems created huge latency disadvantages because the entire webpage located at the URL would have to be downloaded by the browser. Back then, the transfer of data on the internet came with a high cost, and such systems required a large amount of data to be transferred. Exhibit 2002, ¶ 53. (Appx1560).

The capacities of the asserted prior art systems were very limited. The systems did link to content for display but did not include the content for display or many of the features that made the RichLink system successful in practice. They provided no control over the content for display because they did not provide an interface for experts to enter the content for display (as well as metadata) into the system. Because these systems use URLs to retrieve the content from sources outside of the system, the system had no efficient or practical control over what content was displayed. Content retrieved from the URL could have been changed by the host, and the system operator would have no way to know. There would be no way to enforce content standards, for example. URLs could be broken or outdated and perhaps no display content delivered. Formatting standards also could not be enforced in any practical manner because such systems provided no effective control over the type or format of the content either that was hosted at the end of the URL. Such systems could not enforce content or formatting standards because such systems provided no effective control over the type for format that

was hosted at the end of the URL. There was no control over the amount of

content for display because such systems retrieved data of an unknown or variable

size pointed to by the URL which could not be minimized. Moreover, such systems

forced the user to open another browser window to review the linked webpage.

Exhibit 2002, ¶ 54. (Appx1560-1561).

###    4.    The '985 Patent's Solution

The '985 patent overcame all of these problems by disclosing a network-

based database system for storing and syndicating content for display across the

internet via data objects generated from the database content. By providing a

central server with databases that are used to accept and review content for display,

the system allows complete content control including the size of the data that is

displayed. Furthermore, because the content for display is syndicated via data

objects that can be used for faster retrieval of the database content for display, the

system has less latency. Because the type and amount of display content is

controlled by the system, the system minimizes necessary data transfer. Instead of

just pointing a user to another webpage at a given URL, forcing the user to

download, and be presented with the entire webpage at that URL, the '985 patent

system displays concise focused content which is displayed when a user mouses

over a linked word. Because of these advantages, the commercial embodiment of

the '985 patent system, commercially known as the RichLink system, was used by

companies such as IBM, Oracle, Reuters Health, Asahi, various pharmaceutical companies, and medical publications who wanted to annotate their webpage content with relevant materials for display in the document. Exhibit 2002 , ¶¶ 55-56. (Appx1561-1562).

## D.    Overview of the Challenged '985 Patent (Ex. 1001)

At the time of the '985 patent's invention, the internet was rapidly growing and systems that could process and present advertising content to users browsing webpages was of extreme commercial importance; the technology to provide such systems was nascent. For example, the Google AdSense system would not launch until 2003. AdSense is a system in which advertisers can enter text, images, video, or interactive media advertisements into the AdSense system which would then be served by the AdSense system for display on subscribed websites within the network, targeted to the site content and audience. These advertisements are administered, sorted, and maintained by Google's system. Now over 38.3 million websites use AdSense. Exhibit 2002, ¶ 57. (Appx1563).

Web ads were images or text that, for example, promoted an advertiser's webpage, generally formatted in HTML with textual or image content for display and metadata comprising an unseen hyperlink with a URL and linked to the advertiser's website address so that a user presented with the web ad could click on it and be taken to the advertiser's website. The '985 patent provided a system in

which an advertiser could enter such ads (e.g., text, image, video ads) into the

database for subsequent service and display by the system to a remote user surfing

the web. Exhibit 2002, ¶ 58. (Appx1563-1564).

The ads (or any other content for display) could be served from the central

database or preferably were syndicated via data objects to remote subscribed

computers. The data objects also included processing rules so that a connection to

the central database was not needed. A linking engine, for example the RichLink

Processor or the linking engine disclosed in the '720 patent (as referenced in the

'985 patent), used the processing rules to parse the document, identify terms for

which ads should be displayed, identify the ad to be displayed for the each

identified term, and link the ad to the term so that it would be retrieved from the

database or a data object locally syndicated to the remote computer from the

database and displayed in a pop-up window upon user request. Thus, the most

updated data is used in linking and the most updated content is displayed by the

remote application. Exhibit 2002, ¶ 59. (Appx1564).

Figure 1, reproduced below, is a block diagram depicting a content

processing system and method, according to one embodiment of the invention. Ex.

1001, '985 patent, 4:5-6. (Appx0611).



Figure 1

Submitted content 150 is entered and maintained at a content server 135 and syndicated from system databases 105 to a processor 130 to create an enhanced page 175 where such content can be displayed in a content window 170. The submitted content 150 is entered through a RichLink Content Editor 1130 module (not shown in Figure 1), which "is a workflow and editing application that enables editing of content within the Term Database [240], administration of dictionaries, and management of a virtual team of content submitters 150 to build dictionary content." *Id.,* 11:13-17. "For example, content sponsors can use this module to assign lists of terms they are sponsoring to the advertising agencies or internal creative services teams responsible for submitting sponsored content for those terms." *Id.,* 11:25-28. (Appx0615). "The group or individual assigned terms in this

way will have an editing interface that enables them to submit content for their list

of terms. The types of content that may be submitted include text, links, images,

movies, sound files, response forms, or mixtures of some or all of these." *Id.,*

11:35-39. (Appx0615). The display content can also be previewed, edited, and

accepted or rejected through this interface, including links that may be presented.

*See id.*, 11:46-12:5. (Appx0615). See also, Ex. 2002, Madisetti Decl., ¶¶ 60-61.

(Appx1565-1566).

The RichLink Content Window editor 1120 "enable[d] the manual creation

of term-specific content windows, which will be added to a processed file in

addition to content windows generated by page-level rules specified in the

template. This way, a product name such as 'Microsoft Word' could have a content

window with a different set of links than 'Pokemon' inserted during the same

processing run." *Id.,* 10:65-11:5 (Appx0614-0615); Ex. 2002, Madisetti Decl.,

¶ 62. (Appx1566).

This purpose is also described in connection with the RichLink Content

Delivery Servlet 1050, which "retrieves and displays content by constructing and

serving the RichLink Content Window 170. A request is made to the RichLink

Contextual Content Server which contains information such as the ID of the term

clicked on, the ID of the template used in processing the page, page-level metadata

settings, and the customer ID. This module interacts with the Term Database and

the Template Manager *to select and display* the appropriate content, navigation

elements, and display elements in the RichLink Content Window." *Id.*, 12:6-15

(Appx0615) (emphasis supplied); Ex. 2002, Madisetti Decl., ¶ 63. (Appx1566-

1567).

Thus, as the '985 patent describes with respect to the RichLink Content

Window 170/1110, "[w]hen a user clicks on a word or phrase, content is displayed

in a RichLink Content Window that is typically placed in a pop-up window, but

which can also be embedded into a page. The RichLink Content Window may be

formatted for single or multi pane display of content. Menu options listing

available content are presented in a Navigation Pane while content associated with

the term and menu item chosen appears in a Content Pane." *Id.*, 12:57-65

(Appx0615); Ex. 2002, Madisetti Decl., ¶ 64. (Appx1567).

As the '985 patent further describes, "[t]erms from the database are tagged

in source documents 760 using the RichLink Processor or other automated

methods such as those disclosed in U.S. Pat. No. 5,822,720, 'System and method

for linking streams of multimedia data for reference material for display' Oct. 13,

1998, Bookman et al. The tag can serve functions such as linking to a RichLink 40

Content Window containing additional information or marking the term for an

application performing further processing of the page. The final result 770 is

a tagged and annotated enhanced document 175." *Id.*, 7:35-44 (Appx0613);
Ex. 2002, Madisetti Decl., ¶ 65. (Appx1567-1568).

In the preferred embodiment, "[t]he RichLink Processor interacts with the
Template Object 930 to identify the rules that should be used in processing and the
Lexicon Object 920 to identify what terms should be tagged in the source text.
Tags in the page identify whether a page should be processed by the RichLink
Processor or not, denote sections of a page to be processed, and indicate the
template that should be used in processing that page/section." *Id.*, 8:51-59
(Appx0613); Ex. 2002, Madisetti Decl., ¶ 66. (Appx1568).

"The Template Object provides a local representation of the Template that
contains the rules for processing and linking a file so a direct connection to the
Template Database is not required and the Template Database may be on a remote
server from the RichLink Processor." *Id.*, 9:36-41 (Appx0614). The Template
Object contains, amongst other items, "any code required to be placed into the
page to enable operation of the RichLink Content Window or other applications."
*Id.*, 9:36-51. (Appx0614). "The template defines parameters such as dictionaries
and filters, meta data criteria, look and feel of the content window, and source page
tag structure." *Id.*, 10:23-25 (Appx0614); Ex. 2002, Madisetti Decl., ¶ 67.
(Appx1568).

The Lexicon Object 920 "provides a local representation of the content of the Term Database" and "contains data required to match terms and create tags such as a representation of the terms in the database optimized for fast matching by the RichLink Processor, the TermID from the Term Database, the DictionaryID from the Term Database, and other Term Database content for which fast access is required, such as annotation content." *See* '985 patent, 9:19-29 (Appx0614); Ex. 2002, Madisetti Decl., ¶ 68. (Appx1568-1569).

Fig. 9B depicts this aspect of the system's preferred architecture.



**Figure 9B**

A "Lexicon and Template Manager" module "insures that the Lexicon Object 920 and Template Object 930 are synchronized with the Term and

Template Databases" by "access[ing] the Term Database to obtain the latest version of the Lexicon Object for that server and access[ing] the Template Database to obtain the latest version of the Template Object for that server." *See* '985 patent, 9:60-67 (Appx0614); Ex. 2002, Madisetti Decl., ¶¶ 69-70. (Appx1569).

RichLink Dictionary Content Settings include, inter alia, "the dictionaries to be used for linking in that layer," "whether the dictionary should be used as a filter or not," "whether page-level metadata criteria will be used with this dictionary," "the Citation string to be used for this dictionary," and "a custom query to be used to fetch content for this dictionary." *See* '985 patent, 11:41-52. (Appx0615). The RichLink Template Manager 1010 provides "layout settings" and "layer settings," with the latter further described as "setting the order of appearance for layers, styles for text in the layer, and specifying the elements which appear in either the content or navigation area for a layer." *See id.*, 10:33-36. (Appx0614) *See also,* Ex. 2002, Madisetti Decl., ¶ 71. (Appx1570).

Prior art systems in the field did not provide a sufficiently robust syndication and annotation system to meet the ever-growing content linking needs of the Internet age. '985 patent, 1:54-58 (Appx0610). ("The problem with all current techniques and systems for analyzing and organizing documents is that none can claim the ability to automatically create consistent, high quality links and

associations between concepts and pieces of knowledge in a cost effective

manner.”). “The invention is hence an attempt to create a scalable system for

managing the process of creating richly linked associations between terms and

related content.” '985 patent, 1:64-66 (Appx0610); Ex. 2002, Madisetti Decl., ¶ 72.

(Appx1570-1571).

Despite many patents and database products that existed at the time of the

invention, finding a scalable, cost-efficient system for automatically creating and

managing richly linked associations between terms and related content was an

immense problem at the time of the application. Ex. 2002, Madisetti Decl., ¶ 73.

(Appx1571).

**E.    Asserted Grounds of Unpatentability**

| I | § 103 | Van Hoff In View of Rodkin | 1–23, 25–29, 31, 32, and 35–46 |
|---|---|---|---|
| II | § 103 | Van Hoff in view of Rodkin in further view of Ingram | 25 |

**F.    Representative Independent Claims**

| Claim 1 (and 37) | Claim 21 |
|---|---|
| a.      A computer implemented method for processing database content, the method comprising the steps of: | 21. A computer implemented method for processing data- base content, the method comprising the steps of: |
| b.      syndicating one or more data objects associated with a term database to one or more remote computers, wherein the one or more data objects | syndicating one or more data objects associated with a database to one or more remote computers; |

-18-

| Claim 1 (and 37) | Claim 21 |
|---|---|
| contain data associated with one or more terms; | |
| c.      parsing one or more documents to identify at least one term based on at least one rule; | parsing one or more source documents to identify at least one term based on one or more predetermined rules; |
| d.      identifying content for the at least one term; and | identifying content for the at least one term; |
| e.      associating the at least one term with the identified content; | linking the content with the at least one term; and |
| f.      wherein the one or more data objects associated with the term database provide a representation of at least a portion of the term database at the one or more remote computers and are used to link the identified content with the at least one term. | automatically associating the at least one term in the one or more source documents with at least one link; |
| 37. The method of claim 1, wherein the identified content is displayed on a user interface in response to a selection of the at least one term by a user. | wherein the at least one link denotes an association between the at least one term and the linked content; and |
| | wherein the one or more data objects associated with the database provide a representation of at least a portion of the database at the one or more remote computers; |
| | wherein the linked content is displayed on a user interface based upon a user interaction with at least a portion of the one or more source documents. |

| Claim 20 | Claim 11 | Claim 36 |
|---|---|---|
| A computer implemented system for processing database content, the system comprising: | A computer implemented system for processing database content, the system comprising: | |
| means for parsing one or more documents to identify at least one term based on at least one rule; | a term module for parsing one or more documents to identify at least one term based on at least one rule; | a term module for parsing one or more source documents to identify at least one term based on one or more predetermined rules; and |
| means for identifying content for the at least one term; | a processing module for identifying content for the at least one term; and | a processing module for identifying content for the at least one term, linking the content with the at least one term, and automatically associating the at least one term in the one or more source documents with at least one link; |
| means for associating the at least one term with the identified content; | **a term database for storing the identified content in association with the at least one term**; | wherein the at least one link denotes an association between the at least one term and the linked content; |
| wherein one or more data objects associated with the term database are syndicated to one or more remote computers for providing a representation of at least a portion of the term database at the one or more remote computers | wherein one or more data objects associated with the term database are syndicated to one or more remote computers for providing a representation of at least a portion of the term database at the one or more remote computers and for | wherein one or more data objects associated with a database are syndicated to one or more remote computers for providing a representation of at least a portion of the database at the one or more remote computers; and |

| Claim 20 | Claim 11 | Claim 36 |
|---|---|---|
| and for linking the identified content with the at least one<br><br>term. | linking the identified content with the at least one term, wherein the one or more data objects contain data associated with one or more terms. | |
| | 41. The system of claim 11, wherein the identified content is displayed on a user interface in response to a selection of the at least one term by a user. | wherein the linked content is displayed on a user interface based upon a user interaction with at least a portion of the one or more source documents. |

## G.    The Final Written Decision

In the Final Written Decision, the Board issued constructions of the following disputed claim terms, identified content/linked content (Appx0012-0015), term database (Appx0016-0018) and database content (preambles of the independent claims) (Appx0018-0020). The Board then considered Ground 1 of Apple's Petition wherein Apple contended that claims 1-23, 26-39, 31, 32 and 35-46 of the'985 patent are unpatentable under § 103(a) as obvious over van Hoff in view of Rodkin. (Appx0020-0057). The Board concluded that the aforementioned challenged claims are unpatentable as obvious over the combination of van Hoff and Rodkin. (Appx0057).

Of particular relevance to the issues raised on this appeal are the Board's findings on obviousness on independent claims 1 and 11 (Appx0026-0038), independent claims 21 and 36 and dependent claims 37, 41 and 45 (Appx0038-0041), dependent claims 5, 15, 39 and 43. (Appx0044-0046) and dependent claims 22, 26-29, 31, 32, and 35 (depending from claim 21). (Appx0052-0055).

The Board also ruled in favor of Apple on Ground 2 of the Petition finding that claim 25 is unpatentable as obvious over van Hoff in view of Rodkin, and Ingram. (Appx0057-0059).

## IV.    SUMMARY OF ARGUMENT

There were several claim construction errors committed by the Board in the Final Written Decision. The Board gave the same construction for the term "linked content" as it did for the term "identified content" despite the fact that linked content appears only in claims 21 and 36 (which do not include identified content). Claims 21 and 36 have different claim elements than claims 1, 11, and 20 and linked content is a different term that is used differently in those claims. There are no claims that depend from claims 21 and 36 that have a "stored in the database" limitation. The Board erroneously construed linked content as if such dependent claims were in the '985 patent.

Another claim construction error occurred with respect to identified content and linked content when the Board concluded that the content in those terms was

not "for display". The Board reasoned that because dependent claims 37, 41 and 45 contain an "identified content is displayed," clause, the identified content in claims 1, 11 and 20 cannot be "for display" That reasoning improperly equated content for display with content that is displayed despite the differing meanings of the two and was inconsistent with the claim language and the patent specification. In addition, there are no similar "content is displayed" terms that depend from claims 21 and 36 where linked content appears so there is no basis for grafting a not for display component onto the construction of linked content.

The Board also erred in concluding that the preambles of the independent claims were not limiting despite the many specific references to "database content" in the '985 patent ranging from the title of the patent and the specification and the prosecution history. This error was particularly significant with respect to the method claims in the '985 patent in view of applicable Federal Circuit precedent.

The Board misconstrued claims 21, 36 and 41 in finding them obvious over van Hoff in light of Rodkin, ignoring intrinsic evidence showing that those claims required database content linked for display syndicated via data objects. No substantial evidence showed that either van Hoff or Rodkin disclosed the invention(s) disclosed by these claims. The Board also erred because no substantial evidence supported either a motivation to combine the references or a reasonable expectation of success in arriving at the claimed invention(s).

The Board erred in finding dependent claims 5, 15, 39 and 43 obvious over the same combination when it had not instituted trial on these claims, and the findings conflicted with the language of those claims which is limited to specific categories of content and links is not one of those enumerated categories. The Board declined to apply claim differentiation principles to claims 5, 15, 39, and 43 when it had applied the same principles (and the attendant presumption) to its construction of identified content and linked content.  Claims 39 and 43 also include the word "source" rather than "content" in the wherein clause and the Board ignored that difference in claim language.  Finally, no substantial evidence supported the finding that either reference (van Hoff or Rodkin) or the combination thereof, disclosed the very specific content category requirements of these claims.

## V.    ARGUMENT

### A.    Standard of Review

"Claim construction is a matter of law that [this Court] reviews de novo." *Eli Lilly and Company v. Teva Pharmaceuticals International GmbH,* 8 F.4th 1331, 1340 (Fed. Cir. 2021). If the Board's claim constructions were based solely on evidence intrinsic to the patent in question, the constructions are reviewed de novo. *Shoes by Firebug LLC v. Stride Rite Children's Group, LLC,* 962 F.3d 1362, 1366 (Fed. Cir. 2020). *Teva Pharms. v. Sandoz, Inc.,* 574 U.S. 318, 331-33 (2015); *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech.,* 983 F.3d 1367,

1374 (Fed. Cir. 2021). And even if the Board relied on extrinsic evidence, when "the meaning of the claim at issue is clear in view of the intrinsic record and undisputed facts," this Court reviews the Board's claim construction de novo. *See, e.g., Eidos Display, LLC v. AU Optronics Corp.,* 779 F.3d 1360, 1364-65 (Fed. Cir. 2015) (citing *Teva,* 574 U.S. at 331-33).

"The Patent and Trademark Office ("PTO") is governed by the Administrative Procedure Act ("APA"), and PTO decisions are reviewed under the APA standard." *In re Chapman,* 595 F.3d 1330, 1336-37 (Fed. Cir. 2010). This Court must "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2).

Obviousness is a question of law based on underlying facts. *In re Kotzab,* 217 F.3d 1365, 1369 (Fed. Cir. 2000). This Court reviews the Board's compliance with the governing legal standards and ultimate obviousness conclusion *de novo,* while the Board's factual findings are reviewed for substantial evidence. 5 U.S.C. § 706(2)(E); *In re Sullivan,* 498 F.3d 1345, 1350 (Fed. Cir. 2007).

"Substantial evidence requires more than a mere scintilla and is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Princeton Vanguard, LLC v. Frito-Lay North America, Inc.,* 786 F.3d

960, 964 (Fed. Cir. 2017) (internal quotations omitted). "Substantial evidence review requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Id.* This Court's substantial evidence review "can only take place when the agency explains its decisions with sufficient precision, including the underlying fact findings and the agency's rationale." *Id.* (internal quotations and citations omitted).

**B.    The Proper Construction of the Terms Identified Content in Claims 1, 11, 20 and 41 and Linked Content in Claims 21 and 36 Warrant a Remand.**

**1.    Linked Content Is Stored in the Term Database**

The Board treated these two (2) terms, identified content and linked content, as if they were interchangeable in its claim construction analysis and that materially affected the findings of the Board on the claims in which these terms appear. However, these terms are different and appear in different claims and the terms should be given separate constructions.

The Board found that the only difference between method claim 1 and method claim 21 was the presence in claim 21 of the additional wherein clause at the end of the claim "where the linked content is displayed on a user interface …." Final Written Decision (Appx0038). The Board's reading of these 2 claims is erroneous as claim 21 has a number of different steps that appear nowhere in claim 1. The Board also ignored differences between system claim 20, on one hand, and

system claims 36 and 41, on the other. Because of these differences, the claim differentiation argument used by the Board to find claims 1, 11 and 20 unpatentable (Final Written Decision) (Appx0015) does not apply to claims 21, 36 and 41.

There are four (4) steps in method claim 1 (syndicating, parsing, identifying, and associating). Method claim 21, on the other hand, has five (5) steps (syndicating, parsing, identifying, linking, and automatically associating). Unlike claim 1, the linking step in claim 21 links identifying (not identified) content with a specific term or terms, and it is that linked content (as opposed to some other content that is linked to that content) that is displayed on the user interface. As disclosed in the preferred embodiment, those terms and associated content are contained in a module that is referred to as the RichLink Term Database which is also shown in Figure 7 of the patent. '985 patent, 4:13-17 (Appx0611). The specification further explains that information from the database needed to create such links and the rules for linking to database content are syndicated to remote servers. '985 patent, 2:14-16. (Appx0610).

The prosecution history is also consistent with Sentius's position on the construction of linked content. The Examiner noted in an October 27, 2009 Interview with Sentius's patent counsel that "the term database stores the content related to the identified term." ('985 Patent File History, Part 2 at p. 403)

Appx1020). This is directly relevant to the step of linking the content with at least one term in claims 21 and 36. Therefore, the linked content in claims 21 and 36 necessarily resides in the term database.

In its Final Written Decision, the Board did correctly note that the patent specification indicates that content is stored in the RichLink Term Database. However, the Board determined that that the "explicit requirement in claims 38, 42 and 46 that 'the identified content is stored in the term database" suggested to a person of ordinary skill in the art that respective independent claims 1, 11 and 20 do not include that requirement," relying on *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*). Final Written Decision (Appx0018). Using that analysis, the Board concluded that the term database would be accorded its ordinary and customary meaning, but that the meaning does not require that the database necessarily include identified content. *Id.* That conclusion was limited to the term identified content; it did not address the term linked content.

The distinction is important. Dependent claims 38, 42 and 46 depend from claims 1, 11 and 20, respectively, but there are no similar (stored in the database) claims in the '985 patent that depend from claims 21 and 36. The absence of the same or similar (stored in the database) dependent claims should therefore suggest to a person of ordinary skill in the art that in independent claims 21 and 36 that linked content (as opposed to identified content) is stored in the term database.

The claim language and the patent specification support that conclusion.

An additional error was committed by the Board in conflating linked content with identified content. The Board made no findings and presented no reasoning for impliedly concluding that claims 21 and 36 did not require that linked content be stored in the term database. The Board just summarily concluded that linked content should have the same construction as linked content. *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG,* 856 F.3d 1019, 1021 (Fed. Cir. 2017). By itself, this error requires a remand.

### 2.    Identified Content and Linked Content are Content for Display

There is another problem associated with the Board's construction of identified content and linked content and this pertains to the content identified for display part of Sentius's proposed construction. The Board overlooked the difference between content identified for display (claims 1, 11 and 20) and identified content that is displayed …. (claims 37, 41 and 45) by ignoring the limiting language that follows: "identified content is displayed on user interface …" in claims 37, 41, and 45. The Board improperly concluded that the "limitation in the dependent claims suggests that there are examples of identified content that are never displayed." Final Written Decision (Appx0015). The Board's conclusion is in conflict with the claim language.

The three (3) dependent claims do not suggest what the Board assumed. These claims state that identified content is displayed on a user interface *in response to a selection of the at least one term by a user.* Because of that clause, these claims actually suggest that certain identified content is displayed even if it is not in response to a user selection rather than that identified content is never displayed. Moreover, the specification provides examples of content that is displayed other than in response to a user selection such as the use of RichLink Dictionary Content settings that can be customized through the use of filters or metadata criteria or settings that include rules-based content generation. '985 patent, 10:42-63. (Appx0614). The application of such settings does not require user selection to display identified content.

The Board's claim construction that the terms identified content and linked content need not be content for display was legally erroneous for another reason as well. The Board's construction that these terms need not be content for display was based on its application of the "is displayed" limitation in claims 37, 41 and 45 to all independent claims in the patent. However, that construction is directly at odds with the intrinsic evidence in the '985 patent. The Board's construction effectively excludes disclosed embodiments which describe the entry of annotation content for display into a database and instead interprets the claim term in a manner not disclosed in any embodiment in the specification. This is improper claim

construction. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F. 3d 1576, 158384 (Fed. Cir. 1996). *See also Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1305 (Fed. Cir. 2007).

In addition, the Board failed to provide its reasoning for construing "linked content" as also not requiring content for display. *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG, supra,* 856 F.3d at 1021. This failure to explain its reasoning was particularly prejudicial to the Patent Owner because, unlike claims 1, 11 and 20, claims 21 and 36 each have separate wherein clauses that explicitly recite that the linked content is displayed on a user interface. Claims 37, 41 and 45 do not depend from claims 21 and 36. Therefore, the principle relied upon by Board on p. 15 of the Final Written Decision  indicating that that a dependent claim which adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim is wholly inapplicable to claims 21 and 36. They do expressly contain that limitation, but the Board failed to recognize that critical distinction and did not provide any rationale for its summary claim construction of "linked content." The proper construction for linked content should be identified content linked with at least one term identified for display.

The Board likewise ignored the differences between claim 20 and claim 41, which led to the same error as the Board committed with claims 21 and 36. While

claim 11 (from which claim 41 depends) does not use the term linked content, the claim explicitly recites that a term database is used to store the identified content. '985 patent, 14:57-58 (Appx0616). Moreover, dependent claim 41 explicitly further recites that the identified content is displayed. Therefore, the Board committed the same error with its treatment of claim 41 as it did for claims 21 and 36. ('985 patent, 16:50-52) (Appx0617).

## C.    The Preambles of the Independent Claims in the '985 Patent Are Limiting

The principles governing the analysis of preambles are well established. The test of whether a preamble is limiting is "determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history." *Bio-Rad Laboratories, Inc. v 10XGenomics, Inc.,* 967 F. 3d 135, 1369 Fed. Cir. 2017) (quoting *Applied Materials, inc. v. Advance Semiconductor Materials Am., Inc.,* 98 F.3d 1563, 1572-73 (Fed. Cir. 1996)). "A preamble limits the claimed invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality" to the claim. *Bio-Rad* at 1369. Sentius chose to use both the preambles and bodies of the claims to describe the subject matter of the claimed invention rather than simply using the preambles to state a purpose or intended use for the invention. Exhibit 2002, Madisetti Decl., at ¶¶ 59, 85, 86, 96, 98 and 128. (Appx1564, Appx1579-1580, Appx1585-1586, Appx1596). The preambles of the independent claims read

as follows: "A computer implemented method (or system) for processing database content, the method (or system) comprising…" While the bodies of the independent claims do not specifically repeat the term database content, they are replete with references to databases and content and all of them recite steps and modules for processing content. Claim 1, for example, contains 2 references to database and 3 references to content in a 4 step claim. Indeed, the title of the '985 patent is "Automated Creation and Delivery of Database Content."

The patent specification also describes the invention in terms of processing database content. For example, the Field of the Invention indicates that the invention relates to database building and the delivery of database content and the syndication of content from that database to remote application installations. '985 patent, 1:14-19. (Appx0610). The Summary of the Invention discusses the use of rules for linking to database content and the use of tags or other identifiers to provide a means to access the database content. '985 patent, 2:14-19. (Appx0610).

Figure 7 in the '985 patent depicts a diagram illustrating the steps performed to automatically, create, syndicate and link to database content. In the Description of the Preferred Embodiment, the patent discloses a network of modules that perform functions that automatically create and deliver database content as illustrated in Figure 1. '985 patent, 3:33-36. (Appx0611). The Lexicon Object 920 provides a local representation of the content of the Term Database and contains

data required to match terms and create tags in the database optimized for matching terms and other database content by certain modules. '985 patent, 9:23-29. (Appx0614).

The prosecution history is to the same effect. As referenced in Section III (B) (1), *supra,* the Examiner specifically noted in an October 27, 2009 Interview with Sentius's patent counsel that the claims would be allowable if clarified to "further define the limitations of the claim by including more specific information regarding [how] the clients download the objects to parse the term in the documents based one (sic) pre-defined rules and associate the term with its content in the term database (i.e. the term database stores the content related to the identified term" and making an Examiner amendment to further define the claims accordingly. '985 Patent File History, Part 2. (Appx1020, Appx1027-1028). *See Bio-Rad, supra,* 967 F.3d at 1369 (noting the significance of reliance on the preamble in patent prosecution to distinguish the claimed invention from the prior art).

This Court has recognized that the presence of extensive discussions in every section of the patent specification, as here, is a strong indicator that the preambles to the independent claims of that patent are limiting. *Eli Lilly Co, supra,* 8 F.4th at 1342-43. For all of these reasons, the independent claims of the '985

patent do rely on the processing of database content for antecedent basis. *Shoes by Firebug v. Stride Rite Children's Group*, *supra*.

Sentius's proposed construction is supported by extrinsic evidence as well. As Dr. Madisetti testified, "[e]ach claim of the '985 patent states in its preamble that it [is] claiming either a method or a system for processing 'database content.' The manner of processing of the database content is then recited in the claim body either as method steps or system components." Ex. 2002 at ¶ 85. (Appx1579-1580). *See also id*. at ¶ 86 (Appx1580) ("In accordance with the claim language, the identified content is database content") (Appx1580); ¶ 59 ("In accordance with the '985 system, the ads (or any other content for display) could be served from the central database or preferably were syndicated via data objects to remote subscribed computers. The data objects also included processing rules so that a connection to the central database was not needed.") (Appx1564); ¶ 96 ("Thus, in accordance with the '985 patent's specification, the data objects are generated from data contained in a system database, whether that database is a term database or another. The '985 patent explains the data objects generated from the database may include both metadata and display content for faster access and so that a connection to the database is not needed.") (Appx1585); ¶ 98 ("Claims 1, 11 and 20 do not require that the identified content be specifically stored in a term database. Rather, the identified content may have been stored in a data object that

was created from a term database. In other words, claim 1 requires that the content being processed is database content and also leaves open whether the identified content for display is stored in a data object associated with a term database (and therefore still database content), or stored in the term database itself.") (Appx1585-1586).

This Court also observed in *Eli Lilly* that, unlike apparatus and composition claims, "claims to methods of using such apparatuses or compositions typically rely entirely on what the method 'does'. And what a method does is usually recited in its preamble."(*Id.* 1341). That principle applies to the present case because the preambles of claims 1 and 21 of the '985 patent recite computer implemented methods of processing content for a patent entitled "Automated Creation and Delivery of Database Content." Preambles such as these for claims 1 and 21 therefore qualify "not [as] merely statements of effect, but rather statements of the intentional purpose for the which the methods must be performed." *Eli Lilly* at 1342). Accordingly, the preambles of the independent claims (and particularly method claims 1 and 21) should be properly construed as limiting.

In the Final Written Decision, the Board determined that the preambles of the challenged claims were not limiting, but even if the Board were to agree that the preambles are limiting, van Hoff disclosed the preambles. Final Written Decision. (Appx0020). Sentius disagrees with that conclusion.

As detailed further *infra*, van Hoff did not disclose a system in which database content is processed in the manner claimed in independent claims 21, 36 (and their respective dependent claims), or in dependent claim 41. In particular, van Hoff disclosed a point-to-point system in which a URL is inserted into a webpage. The van Hoff system did not store or syndicate display content in any manner; the system only stored metadata. Rodkin did not supplement the missing material. Like van Hoff, Rodkin also only propagated and inserted URLs into webpages and did not store display content in any manner. Therefore, the combination of van Hoff and Rodkin could not suggest the methods and systems of claims independent claims 21 and 36 nor dependent claim 41.

**D.    The Board's Finding That Independent Claims 21 and 36 and Their Respective Dependent Claims Would Have Been Obvious Based on van Hoff and Rodkin Was Not Supported by Substantial Evidence**

**1.    van Hoff Disclosed a Point-to-Point System**

U.S. Patent No. 5,822,539 to van Hoff et al. ("van Hoff") discloses a system which inserts various URLs into webpages as hypertext links that are associated with respective words in the webpage. When a user requests a webpage through his or her browser, the system intercepts the "as-served" webpage, uses system metadata to parse the words contained therein and adds specific URLs as metadata into the webpage for certain parsed words before relaying the annotated webpage back to the browser. Ex. 1004, 3:3-21. (Appx1203); Exhibit 2002, ¶ 75.

(Appx1572).

```
URLX1, *music synthesi** w/10 *signal process**
URLX2, *GPS*
...
```

**FIG. 3**

```
Similar signal processing techniques are used in
music synthesizers <link to CR=URLX1>, as
well as in ....
```

Hypertext link to specified URL

**FIG. 4**

```
Similar signal processing techniques are used in
music synthesizers <link to CR=URLX1, RI=2>,
as well as in ....
```

Hypertext link to specified URL with RI=2

**FIG. 5**

As shown in van Hoff's FIGS. 3-5 above, the system propagates URLs with various rules defining where URLs should be placed as metadata into the HTML code of the webpage. For example, the system may place the URL X2 as a hypertext link to the webpage term "GPS" as well as certain formatting instructions to indicate that the annotated webpage term is hyperlinked to another webpage. The system uses paired entries that identify the URL to be inserted into the hypertext link along with additional system information that specifies where the URL should be added to the webpage. There is no disclosure in van Hoff of storing and syndicating any

database content for display. To the contrary, van Hoff just discloses the URLs and other data needed to create and locate the inserted hypertext links. Ex. 1004, 7:12-23, 64-65. (Appx1205); Exhibit 2002, ¶¶76-77. (Appx1573-1574).

The Board determined that van Hoff does syndicate database content for display when it rejected Sentius' argument that van Hoff's URLs are only hypertext links that are not displayed and concluding that, "we disagree that the term identifying content and other 'content' terms in the challenged claims are limited to content 'for display.'" Final Written Decision. (Appx0034-0035).) [1] But this conclusion was legally incorrect as discussed in Section III(B)(2) above because claims 21 and 36 and 41 are expressly directed to identifying and/or linking database content that is displayed.

As discussed above, when analyzing claims 21, 36 and 41, the Board simply grouped them together with claims 1 and 20. Final Written Decision. (Appx0038-0039). ("Independent claim 21 is a method claim substantially the same as claim 1, except that it adds the following "wherein limitation…"; "Similarly, independent claim 36 is a system claim substantially the same as claim 11, except that it adds

---

[1] *See also* Final Written Decision Appx0034-0035). ("…we determine the term 'identified content' has its ordinary and customary meaning and does not require the content to be 'for display.' *Based upon this interpretation* we find Apple's argument persuasive that van Hoff discloses limitation 1(d) *because the system inserts term-related hyperlink annotations into the document being processed*.") (emphasis supplied)

the same wherein limitation…"; "A similar 'wherein' limitation appears in…claim 41 (which depends from claim 11) …").

In particular, the Board ignored the specific requirements of claims 21 and 36 that the linked database content is displayed. Ex. 1001, '985 patent. 15:50-52 and 16:38-40. (Appx0617). Claim 11 from (which claim 41 depends) expressly recites the function of the term database as "storing the identified content in association with the at least one term." Ex. 1001, '985 patent,14:57-58 (Appx0616). Moreover, claim 41 expressly requires that "the identified content is displayed on a user interface." *Id.* at 14:57-58 (Appx0616). Therefore, it was similarly erroneous for the Board to treat the term "identified content" as having the same meaning in claim 41 as it did in claim 1, when claim 41 also was limited to identified content that is displayed.

Because of its claim construction approach, the Board did not believe any finding was necessary regarding whether van Hoff disclosed a system in which processed database content was displayed. Instead, the Board agreed with Apple's argument that the explicit limitations in these claims were met because the URL pointed to webpage outside of the system that was displayed when the user clicked on the hyperlinked word. *See* Final Written Decision. (Appx0039-0041).

But the Board was only able to arrive at this conclusion based upon its erroneous reasoning that because "'content' as claimed in claim 1 is broad enough

-40-

to include both the URL stored in Van Hoff's annotation directory … and the document linked via the hypertext annotation," this should also apply to the linked content of claims 21 and 36 as well as the identified content of claim 41. *Id.* (Appx0040).

Therefore, the Board did not include in its obvious analysis any finding that either van Hoff or a combination of van Hoff and Rodkin suggested to a person of ordinary skill in the art a system in which display content was entered into a database and syndicated to remote computers for display. The Board's decision should be reversed because no substantial evidence could have supported such a finding. *Princeton Vanguard, LLC, supra,* 786 F.3d at 964 (substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion and the Board was required to examine the record as a whole taking into account both the evidence that justifies and detracts from an agency's opinion). The Board's reasoning and its conclusion failed to comply with this standard.

For example, Apple's expert, Dr. Terveen, never testified that van Hoff disclosed or suggested a system in which such database content was displayed. On the contrary, Dr. Terveen's testimony confirmed that van Hoff's system only stored and disseminated URLs for insertion of hypertext links into webpages. *See, e.g.,* Ex. 1003 at ¶¶ 40, 42, 64, 86 (explaining annotation directory contains a URL

which is inserted as a hypertext link into the webpage being enhanced) (Appx1109-1110, Appx1128-1129, Appx1147). Indeed, when addressing "display" of the identified/linked content elements of claims 21, 36 and 41, all Dr. Terveen could point to in van Hoff were the "documents linked via the inserted hyperlink" and that a person of ordinary skill in the art would understand from Rodkin that it was the "content of the linked document [that] is displayed." Ex. 1003 . at ¶¶ 87, 88 (Appx1148-1149).

The Board committed further error by misreading the '985 patent specification when it concluded in regard to the "display" element of claims 21, 26 and 31 that "the '985 patent … regards 'links' to content as, itself, a category of identified or linked 'content.'" Final Written Decision (Appx0040-0041). This was a misreading of the '985 patent specification because, as the Board simultaneously acknowledged, the '985 system actually displayed a link to additional outside content, e.g., a text advertisement that linked to the advertiser's webpage.

The Board's conclusion was contrary to the '985 patent's specification, which always explicitly describes that the display content was entered into and syndicated from a database, even if t that display content links to additional information located outside of the system.

As illustrated in FIG. 1 of the '985 patent, submitted content 150 is entered and maintained in system databases 105 connected to a content server 135 and

syndicated from the system databases 105 to a remote processor 130 to create an

enhanced page 175 where such content can be displayed in a content window 170

at client browser 145. The submitted content 150 is entered through a RichLink

Content Editor 1130 module (not shown in Figure 1), which is described as "a

workflow and editing application that enables editing of content within the Term

Database, administration of dictionaries, and management of a virtual team of

content submitters 150 to build dictionary content." Ex. 1001, '985 patent, 11:13-

17 (Appx0615); Ex. 2002, Madisetti Decl., ¶ 61(Appx1565-1566). The '985 patent

describes an exemplary embodiment, a module called the RichLink Content

Delivery Servlet 1050, that "retrieves and displays content by constructing and

serving the RichLink Content Window 170. A request is made to the RichLink

Contextual Content Server which contains information such as the ID of the term

clicked on, the ID of the template used in processing the page, page- level

metadata settings, and the customer ID. This module interacts with the **Term

Database** and the Template Manager ***to select and display*** the appropriate content,

navigation elements, and display elements in the RichLink Content Window." Ex.

1001, '985 patent, 12:6-15. (Appx0616). (emphasis supplied), Ex. 2002, Madisetti

Decl., ¶ 63 (Appx1566-1567).

Consistent with the language of claims 21, 36 and 41, the '985 patent further

emphasizes that the syndicated data objects that provide a local representation of at

least part of the database include the display content. *See* Ex. 1001, '985 patent,

9:13-29 (Appx0614); Exhibit 2002, Madisetti Decl., ¶ 68. (Appx1568-1569)

(describing the Lexicon Object 920 "provides a local representation of the content

of the Term Database" and "contains data required to match terms and create tags

such as a representation of the terms in the database optimized for fast matching by

the RichLink Processor, the TermID from the Term Database, the DictionaryID

from the Term Database, and other Term Database content for which fast access is

required, such as annotation content.")

### 2.    Rodkin Did Not Supply the Missing Disclosure in van Hoff Regarding Syndicating Database Content for Display

As with van Hoff, Apple made no argument that Rodkin taught or suggested

a system in which database content was syndicated though data objects for display,

nor did the Board make any such finding.  Like van Hoff, both Dr. Terveen and

Dr. Madisetti acknowledged that Rodkin also describes a point-to-point system in

which URLs are inserted as metadata into webpage hypertext links which point to

documents located outside of the system. *Cf.* Declaration of Dr. Terveen, Ex. 1003,

¶¶ 33-35 (summarizing Rodkin) (Appx1101-1104) with the Declaration of Dr.

Madisetti, Ex. 2002, ¶¶ 78-80. (Appx1574-1576). Apple does not contend that

Rodkin discloses a system that stores or syndicates database content for display.

Rather, as with van Hoff, the Board only concluded that claims 21, 36 and 41 were

rendered obvious by van Hoff in view of Rodkin because the URLs in hypertext

links led to content for display. *See* Final Written Decision (Appx0039-0041) (finding only that claims 21, 36 and 41 were met because a person of ordinary skill in the art would understand from a combination of van Hoff and Rodkin that "when a user clicks on or otherwise selects the hypertext link in the on-line article, the user's browser communicates with a third-party server which then delivers the relevant designated webpage to the user's browser in the form of a designed Web page" and therefore yields the predictable result of "delivering the relevant destination webpage to the browser of van Hoff for display upon the user clicking the hypertext link…"). This was erroneous for the reasons set forth above and the Board's decision should be reversed.

**E.    The Board's Finding That Dependent Claim 41 Would Have Been Obvious Based on van Hoff and Rodkin Was Not Supported by Substantial Evidence.**

The Board separately erred in its treatment of claim 41 by performing no analysis of whether the prior art references disclosed or suggested claim 11's requirement of a term database for storing the identified content, which claim 41 limited to being display content. Final Written Decision and fn. 10. (Appx0018). The Board's only analysis in this regard again grouped claims 1, 11 and 20 together although claims 1 and 20 did not recite claim 11's "term database for storing the identified content." The Board reasoned that because claim 38 (dependent from claim 1), claim 42 (dependent from claim 11) and claim 46

(dependent from claim 20) all included a wherein clause that "the identified content is stored in the term database," this "suggests to a personal of ordinary skill in the art that the respective independent claims 1, 11 and 20 do not include that requirement." *Id.* (Appx0018).

The Board committed two interrelated but discrete errors here. First, regardless of its conclusion that claim 11 did not actually require the identified content to be stored in the term database, the Board should have addressed how the prior art rendered obvious its "term database for storing the identified content" element." By not addressing this element, the Board committed reversible error. Moreover, claim 41 specifically narrowed claim 11 to limit the "identified content" in the element or "a term database for storing the identified content" to identified content that is displayed. Ex. 1001, '985 patent, 16:50-52. (Appx0617). Because Apple presented no evidence that either van Hoff or Rodkin disclosed or rendered obvious a term data for storing identified content *that is displayed* in response to a user input, no substantial evidence could have supported the Board's conclusion that the asserted prior art rendered claim 41 obvious. This finding should be reversed. *See, e.g., In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1367, 1381 (Fed. Cir. 2016) (reversing where Board's factual findings regarding the alleged motivation to combine lacked substantial evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.")

Second, the Board provided no separate claim differentiation analysis for claim 42 than it applied to claims 38 and 46, notwithstanding the fact that claim 11 (from which claim 42 depends) has the specific requirement of a "term database for storing the identified content" whereas independent claims 1 and 20 do not. Ex. 1001. '985 patent, 16:53-54. (Appx0617). Importantly, the Board ignored the '985 patent specification and file history and the unrebutted? evidence presented by Sentius that the '985 patent system utilized a database for entering the display content and also optionally syndicated data objects to the remote application for off-line or faster identification of and access to that display content, so the system identifies display content that is stored either in the database or in the data object during the linking. *See* Ex. 2002, Madisetti Decl., ¶¶ 93, 98, 100, 101, 118, 123, 125 (Appx1584-1587, Appx1593-1595); Sentius's Response, p. 26 (Appx0368) and Sentius's Sur-Reply, pp. 4-10 (Appx0446-0450).

Instead of addressing Sentius's proffered claim differentiation argument, the Board chose to read the term database limitation of claim 11 as not requiring identified content to be stored in the term database. Final Written Decision. (Appx0018). The Board justified this conclusion by adopting Apple's argument that claim 42, which included an equating? requirement, and the principles of claim differentiation, must mean that the term identified content in claim 11 was not stored in the database. *Id.* "However, claim differentiation is a rebuttable

presumption that may be overcome by a contrary construction dictated by the written description or prosecution history." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1323 (Fed. Cir. 2016). "Although it is a useful tool, claim differentiation does not require that the "dependent claim tail … wag the independent claim dog…" *Id.* (internal citations omitted.)

Here, that presumption has been rebutted. As previously discussed, the written description and prosecution history shows that the identified display content refers to database content, and not content outside of the system that may also be linked to the display content, whether that database content is stored in the database or in a data object at the time of identification. Therefore, notwithstanding claim 42, the Board's conclusion that claim differentiation applied to claim 11, and for the same reason to claims 1 and 20, should be reversed.

**F.    The Board's Finding That There Was an Apparent Reason or Motivation to Combine the van Hoff Reference with Rodkin (and Ingram) Despite the Contrasting Inventive Approaches in Each Reference Was Not Supported by Substantial Evidence.**

The Board separately erred in finding an apparent reason or motivation to combine the van Hoff reference with Rodkin (and Ingram) despite the contrasting inventive approaches in each reference. In particular, when there are drawbacks and benefits to the proposed combination, the Petitioner must first show why there would be a motivation to combine despite drawbacks that the combination might present. *Winner Int'l Realty Corp. v. Wang,* 202 F.3d 1340, 1349 (Fed. Cir. 2000).

Then, the Board must weigh the benefits and drawbacks of the modifications

against each other to determine whether there would be a motivation to combine.

*Winner*, at 1349; *Henny Penny Corp. v. Frymaster LLC*, 938 F. 3d 1324, 1331-32

(Fed. Cir. 2019). Despite the evidence presented as to drawbacks, the Board did

not conduct this analysis. *See* Sentius Response at 42-44 (Appx0384-0386) and

Sentius Sur-Reply at 15-16 (Appx0455-0456). *But see,* Final Written Decision.

(Appx0029-0031).

To summarize, Dr. Madisetti testified in this regard that:

- van Hoff's annotation directories are not databases because they do not accept data or output data into a data object. Ex. 2002, ¶ 131 (Appx1597-1598);

- van Hoff did not disclose an architecture that used data objects syndicated from a database. *Id.*, ¶ 132 (Appx1598-1599);

- Rodkin describes a database-to-database synchronization system and not one as claimed in the '985 patent in which local data objects syndicated from a database are directly used by the linking engine. *Id.*, ¶¶ 135-136 (Appx1599-1600);

- Modifying van Hoff in light of Rodkin would require eliminating van Hoff's annotation directories and instead substituting them with a local database, an extensive redesign with no clear benefit. *Id.*, ¶¶ 137 (Appx1600); and

- Because change would also conflict with van Hoff's teachings of using annotation directories that are small and relevant to the client computer's need, a person of ordinary skill in the art would not have been motivated to eliminate them for Rodkin's synchronized databases. *Id.*, ¶¶ 138 (Appx1600-1601).

Because substantial evidence did not support that van Hoff and Rodkin in combination disclose an architecture that uses data objects syndicated from a database, as claimed in the "985 patent, nor supported a motivation to combine them, it was erroneous for the Board to conclude to the contrary. See, e.g., *Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) ("A party seeking to invalidate a patent based on obviousness must demonstrate … that a skilled artisan would have been motivated to combine the teachings of the prior art references *to achieve the claimed invention,* and that the skilled artisan would have had a reasonable expectation of success in doing so.'") (internal citation omitted, emphasis supplied); *Eli Lilly*, *supra,* 8 F.4th at 1344 (not enough to have shown that a skilled artisan would have pursued the claimed method but also that the skilled artisan would have reasonably expected to achieve success in arriving at the claimed method.)

Because substantial evidence did not support the finding that van Hoff and Rodkin combined to produce the claimed systems and methods of claims 21, 26 and 41, nor that a skilled artisan would have been both motivated to combine those references with a reasonable expectation of success in arriving at the claimed methods, the Board's conclusion in this regard should be reversed.

**G.    The Board's Finding That Claims 5, 15, 39 and 43 Would Have Been Obviousness Was Erroneous**

**1.    The Board's Analysis of Claims 5, 15, 39 and 43 is in Conflict With the Claim Language**

Claim 5 of the '985 patent depends from claim 1 and recites "wherein the content comprises one or more of definitions, related products, related services, sponsorship information, translation, and reference works." Ex. 1001, '985 patent, 14:32-34. (Appx0616). Claim 15 depends from claim 11, and shares the same additional limitation as claim 5. '985 patent, 15:8-10. (Appx0617). Claims 39 and 43 also share the same limitation, but they depend from claims 2 and 12, respectively, rather than claims 1 and 11. '985 patent, 16:46-48 and 55-57. (Appx0617). The other difference is that in claims 39 and 43, the word "source" follows the wherein clause rather than the word "content." *Id.* As discussed in detail below, these differences in claim language are important, but the Board overlooked them in its analysis of these claims in the Final Written Decision. The Board also erred by conflating van Hoff's links with the targets of the links rather than the specific types of content or source recited in these dependent claims.

In the Board's Institution Decision, it found that van Hoff did not disclose the additional limitation quoted above and rejected Apple's argument that a person of ordinary skill in the art would have understood that the "documents linked via the hypertext link annotations [in van Hoff] 'contain supplemental information

related to the topic of the received document by way of the linked term.'" Decision Granting Institution. (Appx0035-0036). The Board proceeded to agree with Sentius and noted that Apple's expert's analysis only points to links, and not content, such as that recited in claim 5. *Id.* (Appx0036). Because the categories of content recited in claim 5 (and the other 3 dependent claims) do not include links, and van Hoff discloses only cross-link references, rather than those specific categories of content, the Board concluded that Apple was not reasonably likely to prevail in showing that claim 5 is unpatentable.  *Id.* (Appx0036). The Board similarly concluded that Apple had not satisfied its burden with respect to claims 15, 39 and 43. Decision Granting Institution. (Appx0040-0041).

In its Final Written Decision, the Board reversed its reasoning and held claims 5, 15 and 39 and 43 would have been obvious over van Hoff in view of Rodkin. (Appx0046). The Board's analysis was erroneous for several reasons.

First, the Board did acknowledge that the content categories in claims 5, 15, 39 and 43 are narrower than the content recited in the independent claims from which they depend.(Appx0046). However, the Board nevertheless proceeded to conclude that a person of ordinary skill in the art "would have understood that either a link or the target of the link can be considered the identified or linked content." *Id.* (Appx0046). As an example, the Board stated that a link to a reference work (one of the enumerated examples in these dependent claims) and

the reference work itself "would equivalently have been considered the 'identified content' within the scope of Claim 5." *Id*. (Appx0046). This conclusion constituted legal error on the part of the Board and also impacted its patentability analysis, as discussed above. .

The categories set forth in claims 5 and 15 are subsets of content and links are not listed as a category of content in these claims. If links are not one of the enumerated categories of content, then it is irrelevant whether a link to a reference work is assumed to be included in the broader terms "identified content" and "linked content". Claims 5 and 15 are limited to specific categories of content other than links. *See* Sentius's Sur-Reply (Appx0449-0450). Sentius's expert, Dr. Madisetti, made this point in his declaration and opined that Apple's expert, Dr. Terveen, did not show that any of the content types listed in claim 5 are contained in any database maintained by van Hoff for processing and that van Hoff failed to disclose claim 5. Ex. 2002, Madisetti Decl., ¶ 126 and footnote 4 (agreeing with the Board's initial finding on this issue in its Institution Decision. (Appx1596, Appx1608). See also Madisetti Declaration at ¶ 137 (same opinion on claim 15) (Appx1600). Notably, Dr. Madisetti's testimony in this point was not challenged by Dr. Terveen and is unrebutted in the record. Madisetti Decl., ¶ 127 (Appx1595-1596). (indicating that if Dr. Terveen later supplemented his opinions to include a modification of van Hoff to store and maintain claim 5's specific

content types in a database, he reserved the right to supplement his opinion. That turned out to be unnecessary as Dr. Terveen did not modify his opinion on this point.)

Notwithstanding this unrebutted evidence in the record, the Board reasoned that because it found that links should be included in the construction of the terms identified content and linked content (which Sentius separately challenges as discussed in previous sections), links should be imported into the limited categories of content specified in claims 5 and 15. In doing so, the Board improperly expanded the claim scope of claims 5 and 15 and that constituted legal error requiring reversal. *Phillips, supra.*

Second, the Board relied on a passage in the specification in its construction of identified content as sponsored content that can take almost any form, such as texts, images, mixed media, banner ads, surveys, links, and email requests. Ex. 1001, '985 patent, 13:65-67. (Appx0616). *See* Final Written Decision (Appx0014). Apple relied on that passage of the specification, and another ('985 patent, 11:35-38), to support its claim differentiation argument. Petitioner's Reply (Appx0414-0415). On that point, Apple argued that because dependent claims 37, 41 and 45 explicitly require that the identified content is displayed, and that limitation is missing from claims 1, 11 and 20, principles of claim differentiation require the conclusion that the construction of identified content does not included

an "is displayed" component. Petitioner's Reply (Appx0414-0415); Final Written Decision (Appx0013). The Board agreed with Apple on its claim differentiation argument and cited to *Phillips, supra*, 415 F.3d at 1315 for the proposition that "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Final Written Decision (Appx0015, Appx0017).

However, the Board declined to apply the same claim differentiation principles when it analyzed claims 5, 15, 39 and 43. The Board correctly noted that the content categories in these claims were narrower than the "content" recited in the independent claims, but inexplicably failed to apply claim differentiation to claims 5, 15, 39 and 43. Final Written Decision (Appx0046). Instead, the Board skipped that application in its reasoning altogether and summarily concluded that a link to a reference work, and the reference work itself, would "equivalently" have been considered the "identified content" within the scope of claim 45 by one of ordinary skill in the art. *Id.*

This omission by the Board was clearly erroneous. *Phillips, supra*, 415 F.3d at 1315; *InterDigital Communications, LLC v. Int'l Trade Commission*, 696 F.3d 1318, 1324-25 (Fed. Cir. 2012) (determining that the "presumption [that each claim in a patent has a different scope] is especially strong in this case, because the limitation in dispute is the only meaningful difference between an independent and

dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim"). Claim differentiation principles should not be selectively applied and certainly not in the same Final Written Decision of the Board.

Here, claims 5 and 15 limit content to six (6) discrete categories and claims 39 and 43 limit sources to four (4) discrete categories and links appears as a listed category in none of these claims. The only differences between claims 5, 15, 39 and 43 and the independent claims from which they depend are the limitations of content (and source) to narrow specifically defined categories that do not include links. Those are not only meaningful differences; they are the only differences. The presumption in favor of claim differentiation applies in the present case and the Board committed legal error in not doing so in its Final Written Decision. *InterDigital, supra*, at 1324-25.

Third, Apple argued in its Reply that because van Hoff's URLs lead to "supplemental Information" related to the topic of the received document by way of the linked term," claims 5, 15, 39 and 43 are obvious over van Hoff. Petitioner's Reply at 14 (Appx0424). This argument fails as well as it rests on the improper premise that the content (and source) categories in these dependent claims are contained in databases maintained by van Hoff for processing. As Dr. Madisetti pointed out, this is not the case and that evidence was unrebutted. Ex. 2002,

Madisetti Decl., ¶ 126 (Appx1595). Notably, Dr. Madisetti's opinion on this lack

of disclosure in van Hoff is independent of whether or not the content of webpages

that van Hoff's URLs point a browser to comprise these content types. *Id.*

### 2. Claims 39 and 43 are Not Obvious Over van Hoff in View of Rodkin

The Board completely overlooked the differences between claims 5 and 15,

on one hand, and claims 39 and 43 on the other. There are several material

differences. The limitation in claims 5 and 15 is for content while the limitation in

claims 39 and 43 is for source. The Board essentially treated the limitations as

interchangeable by simply indicating that the source in claims 39 and 43 was the

source [of the identified content]. Final Written Decision (Appx0044-0045). They

are not. Claims 39 and 43 depend from claims 2 and 12, respectively, and claims 2

and 12 recite that the content is provided by a source. The presence and use of

source documents is described in the patent specification.

The specification explains that terms from the database are tagged in source

documents using the RichLink Processor or other automated method Ex.1001 '985

patent, 7:35-37. (Appx0613). The RichLink Processor takes normal source pages

and automatically enhances them through links to content from a variety of

sources, such as authoritative reference works and dictionaries and then interacts

with the Lexicon Object to identify what terms should be tagged in the source text.

'985 patent, 8:36-43 and 51-54.(Appx0613). The RichLink Template Manager is a module that allows the creation of rules by which source files are processed and defines parameters such as source page tag structure. '985 patent, 10: 20-25. (Appx0614). Needless to say, van Hoff and Rodkin do not disclose the use and processing of source documents and materials and the Board made no findings to the contrary in the Final Written Decision. There is no evidence in the record that would support a finding that claims 39 and 43 are obvious over van Hoff. Moreover, the Board provided no reasoning for its conclusion of obviousness which is a separate point of error. *Rovalma, S.A., supra*, 856 F.3d at 1021.

## VI.    CONCLUSION

There were serious errors of law in the Board's Final Written Decision ranging from claim construction to improper interpretation of claim scope to selective and incorrect application of principles of claim differentiation. The Board's findings that the claims specifically addressed in this Brief were obvious over van Hoff in view of Rodkin was based on the erroneous application of principles of law and were not supported by substantial evidence. For all of the reasons set forth in this Brief, the Board's Final Written Decision should be reversed.

Dated: November 10, 2022                 Respectfully submitted,

By   /s/ *Sandeep Seth*
         Sandeep Seth (Reg No. 37,537)
         Seth Law
         Two Allen Center
         1200 Smith Street, Suite 1600
         Houston, TX 77002
         Telephone: (713) 244-5017
         Facsimile:  (713) 244-5018
         Email: ss@sethlaw.com

         /s/ *Robert J. Yorio*
         Robert J. Yorio
         Carr & Ferrell LLP
         411 Borel Avenue, Suite 603
         San Mateo, CA 94402
         Telephone: (650) 812-3400
         Facsimile:  (650) 812-3444
         Email: yorio@carrferrell.com

*Counsel for Appellant*
*Sentius International, LLC*

**ADDENDUM**

# ADDENDUM

## TABLE OF CONTENTS

| Docket/ Paper No. | Document Description | File Date | Page |
|---|---|---|---|
| Paper No. 18 | Judgment and Final Written Decision (IPR2020-01646) | 05/04/2022 | Appx0001 |
| Ex. 1001 | U.S. Patent No. 7,672,985 | | Appx0599 |

Trials@uspto.gov                                      Paper 18
571-272-7822                                  Date: May 4, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Apple,

v.

SENTIUS INTERNATIONAL, LLC,
Patent Owner.

_____

IPR2020-01646
Patent 7,672,985 B2

_____

Before DAVID C. McKONE, CHRISTOPHER L. OGDEN, and
STEVEN M. AMUNDSON, *Administrative Patent Judges*.

OGDEN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01646
Patent 7,672,985 B2

# I. INTRODUCTION

In response to a Petition (Paper 1, "Pet.") by Petitioner Apple Inc. ("Apple"),[1] the Board instituted an *inter partes* review of claims 1–23, 25–29, 31, 32, and 35–46 of U.S. Patent No. 7,672,985 B2 (Ex. 1001, "the '985 patent"). Paper 6. Patent Owner Sentius International, LLC ("Sentius")[2] filed a Patent Owner Response (Paper 8, "PO Resp."), Apple filed a Reply to the Patent Owner Response (Paper 10, "Pet. Reply"), and Sentius filed a Sur-reply (Paper 11, "PO Sur-reply").

We held an oral hearing on February 3, 2022, and the transcript is entered on the record. Paper 17 ("Tr.").

This is a Final Written Decision under 35 U.S.C. § 318(a) as to whether the claims challenged in the *inter partes* review are unpatentable. For the reasons below, we conclude that Apple has shown that all the challenged claims are unpatentable on the grounds of the Petition.

# II. BACKGROUND

A.    RELATED PROCEEDINGS

The parties identify the following as related matters: *Sentius Int'l, LLC v. Apple Inc.*, No. 4:20-cv-00477-YGR (N.D. Cal. filed Jan. 22, 2020), *transferred from* No. 1:19-cv-01444-MN (D. Del. filed July 31, 2019); and *Zoho Corp. v. Sentius Int'l, LLC*, No. 4:19-cv-00001-YGR (N.D. Cal. filed Jan. 1, 2019); *Sentius Int'l, LLC v. Microsoft Corp.*, No. 5:13-cv-00825-PSG (N.D. Cal. filed Feb. 22, 2013, terminated Feb. 5, 2015). Pet. 10–13, 68;

---

[1] Apple identifies itself as the real party in interest. Pet. 68.

[2] Sentius identifies itself as the real party in interest. Paper 3, 1.

Paper 3, 1; Ex. 1007 (claim construction order in *Sentius v. Microsoft*);
Ex. 1008 (claim construction order in *Zoho v. Sentius*).

### B. THE '985 PATENT (EX. 1001)

The '985 patent relates to a system that automatically builds a term
database that associates potential terms of interest within a set of documents
with expert-provided content related to those terms. Ex. 1001, code (57);
1:16–17, 2:21–22, 2:31–32. The system also "syndicates content from that
database to remote application installations." *Id.* at 1:18–19.

The main example of such a term database, called the "RichLink Term
Database," "is a library that contains all terms and associated content that
can be sorted and queried, using business criteria to organize into
dictionaries or similar information," and may include content types "such as
text, image, sound, video, mixed media, [or] forms." Ex. 1001, 4:13–18; *see
also id.* at 12:67–13:2 ("The content comes from types such as text, images,
movies, sounds, forms (including eCommerce transactions, surveys, or
polls), or a mixture of the above."). In this example, "there is a one-to-many
relationship . . . between matching terms and content associated with
matching terms." *Id.* at 4:18–20.

The system identifies terms of interest by parsing the documents
according to a set of rules. *See* Ex. 1001, 6:51–7:18, Fig. 7. Each term that
the parser identifies "can be assigned manually or automatically to an expert
based on the expert's area of knowledge," who "submits content for the
terms assigned to them." *Id.* at 11:21–24. These experts may, for example,
be from a marketing team of a "content sponsor" who builds a dictionary of
product information associated with the identified terms. *See id.* at 11:25–34.

3

An expert who is "assigned terms in this way will have an editing interface that enables them to submit content for their list of terms," and this content may include "text, links, images, movies, sound files, response forms, or mixtures of some or all of these." *Id.* at 11:37–39. Third parties may also sponsor content, and this content "can take almost any form, such as text, images, mixed media, banner ads, surveys, links, and email requests." *See id.* at 13:65–67.

The system then annotates source documents by tagging the identified terms and creating links to the associated content. *See* Ex. 1001, 7:35–44, 8:35–9:17. Ultimately, when a user reads the document that has been annotated with this system, the user may click on the annotated term and bring up a window showing the content associated with that term. *See* Ex. 1001, 7:45–51; 12:6–15.

### C. CHALLENGED CLAIMS AND GROUNDS

Independent claim 1, which exemplifies the other challenged claims, is as follows:

> 1. A computer implemented method for processing database content, the method comprising the steps of:

[1(a)]    syndicating one or more data objects associated with a term database to one or more remote computers, wherein the one or more data objects contain data associated with one or more terms;

[1(b)]    parsing one or more documents to identify at least one term based on at least one rule;

[1(c)]    identifying content for the at least one term; and

[1(d)]    associating the at least one term with the identified content;

4

IPR2020-01646
Patent 7,672,985 B2

> [1(e)]   wherein the one or more data objects associated with
> the term database provide a representation of at
> least a portion of the term database at the one or
> more remote computers and are used to link the
> identified content with the at least one term.

Ex. 1001, 14:8–22 (Apple's reference letters added). Claims 11, 20, 21,

and 36 are also independent, and the remaining challenged claims depend

directly or indirectly from the independent claims. *See id.*, cols. 14–16.

Apple argues two grounds for *inter partes* review, as summarized in

the following table:

| Claim(s) Challenged | 35 U.S.C. § | References(s)/Basis |
|---|---|---|
| 1–23, 26–29, 31, 32, 35–46 | 103(a)[3] | van Hoff,[4] Rodkin[5] |
| 25 | 103(a) | van Hoff, Rodkin, Ingram[6] |

Pet. 4.

D.   DECLARATORY TESTIMONY

In its Petition, Apple relies on the declaration of Dr. Loren Terveen,

who is a Professor at the University of Minnesota in the Department of

Computer Science and Engineering. Ex. 1003 ¶ 6, App'x A (curriculum

---

[3] 35 U.S.C. § 103(a) (2006), *amended by* Leahy–Smith America Invents Act,
Pub. L. No. 112-29 § 103, sec. (n)(1), 125 Stat. 284, 287, 293 (2011)
(effective Mar. 16, 2013). The '985 patent issued on March 2, 2010, which is
before the effective date of this amendment to section 103. *See* Ex. 1001,
code (45).

[4] Van Hoff, US 5,822,539, issued Oct. 13, 1998 (Ex. 1004).

[5] Rodkin et al., US 6,092,074, issued July 18, 2000 (Ex. 1005).

[6] Ingram et al., US 6,925,496 B1, filed June 16, 2000, issued Aug. 2, 2005
(Ex. 1006). Apple contends that Ingram is prior art because its filing date
preceded the '985 patent's earliest priority date. *See* Pet. 63 (citing 35 U.S.C.
§ 102(e) (2006)). Sentius does not contest this. *See* PO Resp. 35–37, 61–62.

IPR2020-01646
Patent 7,672,985 B2

vitae). Supporting its Patent Owner Response, Sentius submits a declaration by Dr. Vijay Madisetti, who is a Professor in Electrical and Computer Engineering at the Georgia Institute of Technology. Ex. 2002 ¶ 8, Ex. A (curriculum vitae).

Apple contends that we should give Dr. Madisetti's testimony minimal weight because "the vast majority of his declaration is simply a verbatim copy of the attorney arguments in the [Patent Owner Response]," and because his "long and lucrative career testifying against Apple calls into question the independent nature of his opinions." Pet. Reply 22–23 (citing Ex. 1014, 40:22–42:7, 43:5–50:24, 64:3–20; Ex. 2002 Ex. A; Ex. 1015).

We disagree that these are persuasive reasons for us to diminish the weight we give Dr. Madisetti's testimony. In this decision, we consider his testimony and give it appropriate weight based solely on its merits.

## III. GROUNDS OF THE PETITION

For the reasons below, we determine that Apple has shown, by a preponderance of the evidence, that claims 1–23, 26–29, 31, 32, and 35–46 of the '985 patent are unpatentable under the ground based on the combination of van Hoff and Rodkin, and that claim 25 is unpatentable under the ground based on the combination of van Hoff, Rodkin, and Ingram. Before analyzing these grounds in detail, we address two matters that will underlie our analysis: the level of ordinary skill in the art and the construction we will apply to the claim terms.

IPR2020-01646
Patent 7,672,985 B2

A.    LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the pertinent art at the time of the invention is a factor in how we construe the patent claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). It is also one of the factors we consider when determining whether a patent claim is obvious over the prior art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To assess the level of ordinary skill, we construct a hypothetical "person of ordinary skill in the art," from whose vantage point we assess obviousness and claim interpretation. *See In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998). This legal construct "presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan." *Id.* (citing *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1993)).

Relying on Dr. Terveen's testimony, Apple argues that a person of ordinary skill in the art would have had "at least a Bachelor's degree in computer science and/or software engineering, or an equivalent degree with one year of experience in database management and creation. Additional education may substitute for lesser work experience and vice versa." Pet. 3 (citing Ex. 1003 ¶¶ 23–25).

Sentius does not contest this, "but would add that a [person of ordinary skill in the art] would also have experience with web-based systems and design." *See* PO Resp. 18–19 (citing Ex. 2002).

Apple's and Sentius's proposed articulations of the level of ordinary skill are slightly different than those proposed by their experts. On Apple's behalf, Dr. Terveen, opines that an ordinarily skilled artisan would have had "multiple years of experience in the fields of software engineering or

7

IPR2020-01646
Patent 7,672,985 B2

computer engineering," as well as "experience with data structures, user interface design, and database management and creation systems, or their equivalent." Ex. 1003 ¶ 24. On behalf of Sentius, Dr. Madisetti states that he has "no substantial disagreement" with Dr. Terveen's opinion on the level of ordinary skill, except that he would add "that such a person would have between 2–4 years of experience rather than leave it unspecified." Ex. 2002 ¶ 44.

We find Apple's articulation reasonable in light of the subject matter involved in the '985 patent except for a couple of caveats. Both experts appear to agree that an ordinarily skilled artisan would have at least two years of experience, and we find their testimony persuasive. *See* Ex. 1003 ¶ 24; Ex. 2002 ¶ 44. We also agree with Sentius that an ordinarily skilled artisan would have had experience in web-based systems and design. While the '985 patent "relates generally to database building and delivery of database content" (Ex. 1001, 1:14–15), it also discusses linking the database content to words and phrases in a web document (*see id.* at 2:7–59, 4:33–39, 5:54–58, 6:51–7:18, 8:22–29).

Thus, for our decision, we adopt a level of ordinary skill consistent with both parties' proposals and the expert testimony: we find that a person of ordinary skill in the art would have had at least a Bachelor's degree in computer science, software engineering, or an equivalent degree with 2–4 years of experience in database management and creation as well as web-based systems and design. *See* Pet. 3; PO Resp. 18–19.

8

IPR2020-01646
Patent 7,672,985 B2

### B. CLAIM CONSTRUCTION

In an *inter partes* review, we construe a patent claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2021). This generally includes "construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* The ordinary and customary meaning of a claim term "is its meaning to the ordinary artisan after reading the entire patent," and "as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313, 1321. There are only two circumstances in which a construction departs from the ordinary and customary meaning: "1) when a patentee sets out a definition and acts as [their] own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Any such special meaning of a term "must be sufficiently clear in the specification that any departure from common usage would be so understood by a person of experience in the field of the invention." *Multiform Desiccants Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

To construe the claim terms, "we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006). We also consider "[a]ny prior claim construction determination concerning a term of the claim in a civil action . . . that is timely made of record" in this proceeding. 37 C.F.R. § 42.100(b) (2020).

IPR2020-01646
Patent 7,672,985 B2

We address the parties' claim construction arguments below.

### 1.    Uncontested Proposed Constructions

Apple proposes constructions below for the following terms, as construed in two related litigations (*see supra* Section II.A; Exs. 1007, 1008):

| Claim Term(s) | Apple's Proposed Construction |
|---|---|
| *syndicated / syndicating* | "making content available for automatic download over a network to one or more remote subscribed computers" |
| *database* | "a collection of data with a given structure for accepting, storing and providing, on demand, data for at least one user" |
| *linking the identified content with the at least one term / linking to the supplemental content* | "[create/creating] a pointer to data or information or the location of data or information that is external to the source material" |
| *term module for parsing / means for parsing* | A means-plus-function-limitation:<br>function: "parsing one or more documents to identify at least one term based on at least one rule"<br>corresponding structure: "a computer processor in conjunction with executable code for instructing the computer processor to parse one or more documents to identify at least one term based on at least one rule, and equivalents thereof" |
| *processing module for identifying / means for identifying* | A means-plus-function-limitation:<br>function: "identifying content for the at least one term"<br>corresponding structure: "a computer processor in conjunction with executable code for instructing the computer processor to identify content for the at least one term, and equivalents thereof" |

10

Appx0010

IPR2020-01646
Patent 7,672,985 B2

| *data objects associated with a term database / data objects associated with the term database / data objects associated with a database* | "computer readable data structures that include data from [a/the] [term] database" |
|---|---|
| *parsing one or more documents to identify at least one term based on at least one rule / parsing one or more source documents to identify at least one term based on one or more predetermined rules* | "breaking one or more documents into segments to identify at least one term based on [at least one rule] / [one or more predetermined rules]" |
| *lexicon object* | "computer-readable data structure that provides a local representation of the content of the term database" |

Pet. 10–13 (alterations in original) (citing Ex. 1007; Ex. 1008, 31–33).

Sentius does not contest these proposed constructions. *See* PO Resp. 20; *id.*

at 25–26 (citing Ex. 2002 ¶¶ 95–97) (accepting the District Court's

constructions of *database* and the variations of *data objects associated with*

*a term database*). We adopt these constructions for purposes of this decision.

Apple also proposes that we construe the term *template object* to

mean "computer-readable data structure that identifies the rules that should

be used in processing." Pet. 13. And Apple proposes that we construe *means*

*for associating* as a means-plus-function limitation with the function of

"associating the at least one term with the identified content," and the

corresponding structure of "a computer processor in conjunction with

executable code for instructing the computer processor to associate the at

least one term with the identified content." Pet. 14. Sentius does not include

these terms among those it contends need to be construed. *See* PO Resp. 20.

11

Because the meanings of all the above terms are not in controversy, and do not affect the contested issues raised in this proceeding, we do not need to construe these terms. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

> 2.    *"content," "identified/linked content," and "identifying content for the at least one term"*

Sentius proposes that we construe the term *content* to mean "data, including data to be displayed." PO Resp. 31 (citing Ex. 2002 ¶¶ 107–109). According to Sentius, the '985 patent uniformly describes procuring content "for display" and then displaying content in a content window. *Id.* at 30–31 (citing Ex. 1001, 12:6–15, 12:57–65). Similarly, Sentius contends that we should construe the terms *identified content* (found in independent claims 1, 11, and 20) and *linked content* (found in independent claims 21 and 36) as "database content for display." PO Resp. 29–30 (citing Ex. 2002 ¶¶ 105–106). And Sentius argues that we should construe the term *identifying content for the at least one term* (found in all independent claims) as requiring that the identified content be "for display." *Id.* at 23 (citing Ex. 2002 ¶ 90); PO Sur-reply 1–2.

Sentius distinguishes between such content, which Sentius argues is "for display," and metadata, which is not. Sentius argues that "[i]n the parlance of the '985 patent, the display content curated in the system was also referred to as 'supplemental information,'" which the patent treats and

12

discusses separately from metadata. *See* PO Resp. at 23–24 (citing Ex. 1001, 2:7–19, 11:55–67).

Apple replies that Sentius's proposed construction is inconsistent with principles of claim differentiation because dependent claims 37, 41, and 45 explicitly require that the identified content "is displayed," which is missing in their respective independent claims 1, 11, and 20. Pet. Reply 4–5. Apple also contends that the '985 patent describes embodiments, including "links," in which the identified content is not displayed. *Id.* at 5 (citing Ex. 1001, 11:35–38, 13:65–67).

Sentius acknowledges that the '985 patent includes links among the possible "identified content," but contends that these links are still "identified for display (and displayed)," so there is no inconsistency between the '985 patent specification and its proposed construction. PO Resp. 25 (citing Ex. 2002 ¶ 94); *see also* PO Sur-reply 3 (citing Ex. 2002 ¶¶ 103–109). In its Sur-reply, Sentius also clarifies that it is distinguishing between identified content that is "*for display*" in independent claims 1, 11, and 20, and identified content that "*is displayed*" in dependent claims 37, 41, and 45. PO Sur-reply 2. Sentius also argues that Dr. Madisetti's opinion on the claim-differentiation issue is unrebutted. *See* PO Sur-reply 11–12.

We disagree with Sentius that a person of ordinary skill in the art would have understood the terms *identified content*, *linked content*, or *identifying content for the at least one term* to require that the content is "for display." First, Sentius does not specifically argue that the meaning of the term departs from its ordinary and customary meaning, and we find no clear evidence of such a departure in the '985 patent or its prosecution history. *See generally* Exs. 1001, 1002; *see also* Pet. Reply 7–8 (arguing that neither

13

IPR2020-01646
Patent 7,672,985 B2

Sentius nor Dr. Madisetti had suggested that the '985 patent applicant
disavowed claim scope or defined any terms) (citing Ex. 1014, 18:22–19:6,
22:16–23:15, 24:3–18 (Dr. Madisetti's cross-examination testimony)).[7] For
example, there is nothing in the plain language of independent claims 1, 11,
or 20 that explicitly mentions that the content is intended "for display." Nor
do we find in the '985 patent or its prosecution history any commentary on
the meaning of any of the above terms, let alone any definitional statements
or disavowals of claim scope. Indeed, the '985 patent takes an expansive
view of what the identified or linked content can be, suggesting that it "*can
take almost any form*, such as text, images, mixed media, banner ads,
surveys, links, and email requests." Ex. 1001, 13:65–67 (emphasis added).

Next, although we understand the term *supplemental information* in
the '985 patent to be an example of identified or linked content, we find no
persuasive evidence that an ordinarily skilled artisan would have understood
the '985 patent's descriptions of supplemental information to be definitional.
In particular, Dr. Madisetti points to passages in the '985 patent referring to
supplemental information, but fails to provide a basis for his opinion that
these passages are definitional of the terms *identified content* or *linked*

---

[7] For the first time in its Sur-reply, Sentius raises an alternative argument
that the '985 patent applicants acted as their own lexicographers by
including dependent claims 37, 41, and 45 to clarify that claims 1, 11, and 20
refer to "display content." PO Sur-reply 13. This is an improper late
argument not entitled to consideration. *See* 37 C.F.R. § 42.23(b).
Nevertheless, we disagree with this argument because it turns the idea of
claim differentiation on its head, and there is nothing in claims 37, 41, or 45
that would have clearly indicated to an ordinarily skilled artisan that the
applicants were acting as their own lexicographers.

*content*, rather than (as we interpret the passages) merely descriptive of an embodiment. *See* Ex. 2002 ¶ 92 (citing Ex. 1001, 2:7–19, 11:55–67).

Finally, we consider Sentius's argument that *identified content* or *linked content* only includes content "for display" to be inconsistent with the explicit requirement in claims 37, 41, and 45 that content "is displayed." Ex. 1001, 16:42, 51, 61. This limitation in the dependent claims suggests that there are examples of identified content that are never displayed, and thus are not "for display."[8] *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)).

Thus, considering the evidence of record, we determine that the terms *content*, *identified content*, *linked content*, and *identifying content for the at least one term* have their ordinary and customary meanings, which do not require that the content necessarily be "for display" or include data "to be displayed."

---

[8] We note that the '985 patent explicitly includes "sound files" as potential identified content. *See* Ex. 1001, 11:38; *see also* Tr. 20:14–24. At the hearing, Sentius's counsel argued that a sound file would still be "displayed" in the sense that a window would appear in which a user could start and stop the sound file. *See* Tr. 43:6–46:14. Although a sound file might be associated with a displayable control window, we disagree that the underlying sound file, itself, would be "for display." *See id.* Thus, a sound file would be an example of identified or linked content not "for display."

>    3.    *"term database"*

Similarly to the above terms, Sentius contends that we should construe *term database* to mean a database that "collects the content that will be displayed to a user." PO Resp. 26. As evidence for this construction, Sentius cites passages in the '985 patent disclosing that "supplemental information" for a given term is inserted into, or merged into, a central "term database." *Id.* (citing Ex. 1001, 2:8–14, 3:39–40; Ex. 2002 ¶ 99). Sentius also points to passages in the '985 patent describing a "RichLink Term Database module," which is "a library that contains *all terms and associated content* that can be sorted and queried, using business criteria to organize *into dictionaries of similar information*." PO Resp. 26–27 (quoting Ex. 1001, 4:14–17). According to Sentius, the '985 patent "uniformly describes that the content stored in the term database is for display," and includes mechanisms for controlling its display format or composition. *Id.* at 27–28 (citing Ex. 1001, 10:53–62, 12:7–15, 12:58–61; Ex. 2002 ¶¶ 101–102).

Apple disagrees that either "all the identified content must be stored in the database" or "all the identified content must be for display." Pet. Reply 3. Apple first argues that dependent claims 38, 42, and 46 add to the independent claims a requirement that "the identified content is stored in the term database," suggesting that the independent claims include no such requirement. *Id.* at 3 (citing Ex. 1001, claims 38, 42, 46). Apple makes a similar claim-differentiation argument as to dependent claims 37, 41, and 45, which require that "the identified content is displayed on a user interface." *See id.*; *see supra* Section III.B.2.

16

IPR2020-01646
Patent 7,672,985 B2

Sentius contends that its argument about the phrase *term database* "do[es] not violate any claim differentiation principles because claims 1, 11, and 20 do not require that the identified content be specifically stored in a term database," as opposed to, for example, "a data object associated with a term database (and therefore still database content)." PO Resp. 26 (citing Ex. 2002 ¶ 98); *see also* PO Sur-reply (arguing that the "identif[ied] content in claims 1, 11, and 20 is a specific subset of the total content of the term database" (alteration in original) (citing Ex. 2002 ¶¶ 105–106)); *see also* PO Sur-reply 11 (arguing that Dr. Madisetti's opinion on the claim-differentiation issue is unrebutted).

We find Apple's claim-differentiation arguments persuasive. We address claim differentiation as to claims 37, 41, and 45 above. *See supra* Section III.B.2. Apple has persuasively shown that the phrase *term database* does not convey a database that must necessarily include content "for display." The '985 patent disclosure supports this determination because it broadly discloses the types of permissible content that may be stored in the RichLink Term Database, without any indication that the content is necessarily "for display."[9] *See* Ex. 1001, 11:37–39, 13:65–67.

---

[9] Sentius contends that "the presence in a term database of other content beyond display content does not mean that display content is not included," and "even when the entered content is a link to be linked to a parsed term, there is nothing in the '985 patent to suggest that it is not also displayed." PO Resp. 28–29 (citing Ex. 2002 ¶¶ 103–104); *see also id.* at 58–59 (citing Ex. 1001, 12:61–13:7). We agree, and it does not appear to be disputed (*see* Tr. 16:16–24, 23:7–10), that a link to other content can itself be displayed. But we disagree that anything in the '985 patent suggests that links or other content types associated with a term database must necessarily be "for display."

17

We also agree with Apple that the explicit requirement in claims 38, 42, and 46 that "the identified content is stored in the term database" suggests to a person of ordinary skill in the art that respective independent claims 1, 11, and 20 do not include that requirement.[10] *See Phillips*, 415 F.3d at 1315. We also find persuasive Apple's argument that the '985 patent specification only suggests storing the identified content in the term database as an option, not a requirement. *See* Pet. Reply 4 (citing Ex. 1001, 4:17–18 ("Content types . . . *may* be stored in [the RichLink Term] database." (emphasis added))). Thus, we agree that a person of ordinary skill in the art would not have understood, from the '985 patent's description of the Richlink Term Database, that storing the identified content is part of the meaning of the phrase *term database*.

For the above reasons, we determine that the phrase *term database* has its ordinary and customary meaning in light of the '985 patent specification, and that this meaning does not require that the database necessarily include the identified content, or that its identified content necessarily be for display.

### 4.    *"database content"*

Sentius argues that the preambles of the challenged claims are limiting because the preambles "define[] that content recited in [the] claimed method or system is 'database content.'" PO Resp. 23. According to Sentius, each

---

[10] Unlike the other independent claims, claim 11 recites "a term database for storing the identified content." Ex. 1001, 14:57. Thus, although claim 11 does not require identified content to actually be stored, it explicitly requires that the term database is "for storing" such content. That the applicants found it necessary to add "for storing the identified content" is further evidence that an ordinarily skilled artisan would not have understood the phrase *term database*, alone, to require storing the identified content.

claim refers to "identifying content" for various terms, and this "identified content is database content." *Id.* at 21. Sentius argues that in the '985 patent specification and its preferred embodiment, content associated with terms is stored in databases, which are necessary for the claimed invention to function. *Id.* (citing Ex. 2002 ¶¶ 85–86). Thus, according to Sentius, we should treat the preambles including the term *database content* as limiting. *Id.* at 22–23.

As to the meaning of *database content*, Sentius argues that it "probably needs no construction," but Sentius offers that its plain and ordinary meaning is "content that is accepted into, stored by, and provided from the database." *Id.* at 21.

Apple does not specifically contest Sentius's proposed construction of *database content*, but argues that the preambles are not limiting. *See* Pet. Reply 1–2. Apple contends that, "contrary to [Sentius's] assertions, the bodies of the claims do not rely on the recited 'database content' for antecedent basis—that phrase does *not* appear once in the body of the independent claims." *Id.* at 2. According to Apple, "[t]he bodies of each of the claimed methods and systems define a complete invention that can be performed or made without reference to the preamble. And in each instance, the preamble simply states a purpose: 'processing database content.'" *Id.* (citing Ex. 1001, cols. 14–16).

We agree with Apple that none of the challenged claims rely on the term *database content* for antecedent basis. Although the claims refer to "content" and "identified content," these terms are introduced in the bodies of the independent claims without any apparent reference to an antecedent. *See* Ex. 1001, 14:16–17, 14:55, 15:26, 15:41, 16:28. Because the bodies of

IPR2020-01646
Patent 7,672,985 B2

the independent claims define a complete method or structure without reference to their respective preambles, we determine that a person of ordinary skill in the art would have understood that the preambles merely express the purpose of the claimed invention, and are not limiting.

Nevertheless, as we discuss below, we find that van Hoff discloses the preambles of the challenged claims. *See infra* Section III.C.3(a). Thus, our decision would be the same if we were to agree with Sentius that the preambles of the challenged claims are limiting.

C.    OBVIOUSNESS GROUND BASED ON VAN HOFF AND RODKIN
       (CLAIMS 1–23, 26–29, 31, 32, 35–46)

We now consider Apple's grounds of the Petition. First, Apple contends that claims 1–23, 26–29, 31, 32, and 35–46 are unpatentable under § 103(a) as obvious over van Hoff in view of Rodkin. Pet. 4, 14–62.

A claim is unpatentable under § 103(a) for obviousness if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). When a ground in a petition is based on a combination of references, we consider "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

We base our obviousness inquiry on factual considerations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and

20

IPR2020-01646
Patent 7,672,985 B2

(4) any objective indicia of obviousness or non-obviousness that may be in evidence. *See Graham*, 383 U.S. at 17–18.

Considering these factors,[11] we determine that Apple has shown, by a preponderance of the evidence, that each of the claims challenged under the first ground would have been obvious over the combination of van Hoff and Rodkin. We begin our analysis with a brief overview of van Hoff and Rodkin, and then we address the parties' contentions with respect to the challenged claims.

### 1.    *Overview of van Hoff*

Van Hoff describes a distributed, automated document annotation system that adds hypertext cross-references to documents "in such a way that the merged document is displayable by existing Web browsers." Ex. 1004, code (57). An overview of this system is depicted in Figure 2, reproduced below:

---

[11] Neither party has submitted evidence of objective indicia of obviousness or non-obviousness, so our analysis does not consider any such indicia.

21

IPR2020-01646
Patent 7,672,985 B2



**FIG. 2**

Figure 2 is a block diagram showing the relationship between a web client (102), multiple web servers (104), and a plurality of annotation proxy servers (118, 119) between web client 102 and web servers 104. Ex. 1004, 3:49–52, 4:25–30, 4:57–62.

Web servers 104*a–c* store various documents to be annotated (164–167, 171–173). *See* Ex. 1004, 4:62–5:3. Each annotation proxy server 118 or 119 includes a plurality of paired entries 191*a–e*, 192*a–d*, which each

22

include cross-reference document source field 194 and match pattern field 195. *Id.* at 5:32–37. "Each cross-reference source field 194 identifies the unique location of a cross reference document, and each match pattern field 195 defines a character pattern." *Id.* at 5:37–39. When a character pattern appears within a source document, "that indicates that an annotation linking the portion of the document associated with the matching pattern to the paired cross reference source should be added to the requested document." *Id.* at 5:41–45.

Web client 102 includes web browser 110. *See* Ex. 1004, 4:9–14, Fig. 1. In operation, a user uses browser 110 to request a stored document (e.g., 166) from a web server (e.g., 104*b*), and also specifies an annotation proxy server (e.g., 118) and an annotation directory (e.g., 191). *Id.* at 5:56–61. In this example, web server 104*b* responds by providing document 166 to proxy server 118, which parses the document by comparing it with match patterns 195 found in annotation directory 191. *Id.* at 6:44–46, 7:2–5. Proxy server 118 then provides the merged document to client computer 102 for display in browser 110. *Id.* at 6:46–48.

Figure 1 is another view of van Hoff's system, showing additional details of web client 102 and web server 104, as reproduced below:

IPR2020-01646
Patent 7,672,985 B2



**FIG. 1**

Figure 1, above, depicts distributed computer system 100 having two client computers 102 and at least one remotely located information server computer 104. Ex. 1004, 3:66–4:1. In addition to web browser 110 and annotation proxy server 118 (as also shown in Figure 2), client computer 102 also includes two additional cross-reference directories: internal cross-

24

reference ("Xref") directory 1 (112), and a URL pointing to cross-reference directory 2 (114) "located on a remotely located computer." *Id.* at 4:9–18.

Remote cross-reference directories 114 can be prepared by "information service providers, educational institutions, publishers, good Samaritans, and the like." Ex. 1004, 9:59–67. Local cross-reference directories 112 are prepared by the client and may be "user maintainable." *Id.* at 10:1–8. In that case, the user may "instruct[] the directory generator 116 via the Web browser 110 to 'add a reference to this particular document to my personal cross-reference directory', or by editing the match pattern criteria if the user doesn't like the default matching pattern provided in an existing annotation directory." *Id.* at 10:11–16.

Cross-reference directories 112 can also be self-generating, and in that case, directory generator 116 analyzes documents statistically to identify and store links. Ex. 1004, 10:20–34. "The cross-reference dictionary 112, 191, 192 is built-up and improved over time as the number of documents read and contributing to the directory increases." *Id.* at 10:34–36.

### 2. Overview of Rodkin

Rodkin describes "[a] system for automatically providing hypertext for character strings of a text file at a content server." Ex. 1005, code (57). The system includes a central server that stores "a master annotation database which stores character strings which are associated with preferred destination addresses." *Id.* at 11:55–57. The system also includes "a large network of content servers" which process online text articles to automatically associate hypertext with various character strings found in the article. *Id.* at 12:28–34, 13:33–35. When a content server annotates a

25

document file, it "scans the file to determine matching strings from the annotation database." *Id.* at 14:66–15:1.

Under the control of this central server, the destination addresses in each content server are intermittently updated "to ensure that the destination addresses remain current." Ex. 1005, 1:8–11, 13:35–39.

In one embodiment, the central server can "pre-assign a preferred destination address to a character string," so that links associated with that string go to the web page of a fee-paying organization. Ex. 1005, 14:3–13.

       3.    *Claim 1*

       (a)    <u>Claim 1 Preamble</u>

The preamble of claim 1 recites "A computer implemented method for processing database content." Ex. 1001, 14:8–9. Apple argues that, to the extent the preamble is limiting, van Hoff discloses such a method of using a database to annotate documents to add hypertext cross-references to content. Pet. 20 (citing Ex. 1004, code (57), 3:11–18; Ex. 1003 ¶¶ 36–37).

Sentius contends, for reasons outlined above, that the preamble is limiting and that van Hoff does not disclose "database content." PO Resp. 20–23, 38; *see supra* Section III.B.4. For the reasons given above in the context of that discussion, we disagree with Sentius that the preamble is limiting.

Nevertheless, even if the preamble were limiting, Apple persuasively shows that van Hoff discloses the preamble, including "database content," because it discloses a document annotation system that stores a directory of hypertext links to supplemental information as well as rules for merging with a document. *See* Pet. 20–21; Ex. 1004, code (57), 3:11–18. The '985

patent, like van Hoff, uses the term "dictionary" to describe the contents of a database. *See, e.g.*, Ex. 1001, 4:13–17, Fig. 12. And as Apple notes in the Petition, van Hoff uses the terms "dictionary" and "directory" interchangeably. Pet. 16 (citing Ex. 1004, 4:19–21, 5:27–28, 10:34–36; Ex. 1003 ¶ 31).

Also, we determine below that van Hoff discloses a "term database" as recited in limitation 1(a), in the form of annotation directories 191 and 192 and cross-reference dictionaries 112 and 114. *See infra* Section III.C.3(b). Thus, even under Sentius's proposed construction of *database content*, van Hoff discloses "content that is accepted into, stored by, and provided from the database." PO Resp. 21.

> (b)  Limitation 1(a): "syndicating one or more data
>       objects associated with a term database . . ."

Limitation 1(a) recites "syndicating one or more data objects associated with a term database to one or more remote computers, wherein the one or more data objects contain data associated with one or more terms." Ex. 1001, 14:10–13.

First, Apple argues that the "one or more data objects associated with a term database" correspond to paired entries 191*a–e* and 192*a–d* within annotation directory 191 or 192 as shown in van Hoff's Figure 2 (reproduced above). Pet. 21–23 (citing Ex. 1004, 5:32–37, 5:50–54, 7:12–17, Fig. 2; Ex. 1003 ¶¶ 38–40). Apple also argues that these data objects "contain data associated with one or more terms" because the "data" are Xref Sources 1–4 in cross-reference source field 194, and the "terms" are the "characters, words, phrases or the like found in a document" which are associated to each corresponding Xref Source listed in the directory based on

27

match patterns 195. Pet. 21, 23 (citing Ex. 1004, 5:37–40, 7:1–5, 7:17–23, Fig. 2).

Second, Apple argues that the recited "remote computers" each correspond to a "[c]omputer different from . . . both the client computer 102 and information server 104 that contains the proxy server 119." Pet. 21 (citing Ex. 1004, 5:3–10, Fig. 1). According to Apple, van Hoff "teaches the proxy server is what contains annotation directories 191/192 and that proxy server 119 may be located remotely from both the client and information server computers (i.e., a remote computer)," and that the annotation directory "may originate from various entities external from the system." Pet. 24 (citing Ex. 1004, 4:22–35, 5:3–10, 6:27–32, 9:59–64, Fig. 1).

Apple points to a subroutine in van Hoff's system, called the "Install Cross-Reference Directory" procedure, that is responsible for retrieving and adding a directory to a set of dictionaries used by the annotation proxy server, and argues that a person of ordinary skill in the art would have understood that this subroutine "would result in transmission of an annotation directory located at a known URL to the proxy server." Pet. 24–25 (citing Ex. 1004, 9:34–43, 9:59–64, 11:35–58; Ex. 1003 ¶¶ 45–49). According to Apple, this results in syndicating the data objects (paired entries 191*a–e* and 192*a–d*) to remote computers (e.g., remote proxy server 119). *See* Pet. 25.

Alternatively, to the extent that the Install Cross-Reference Directory subroutine is not "automatic" and the annotation directory is not sent to "subscribed computers," as required by the uncontested interpretation of *syndicating* (*see supra* Section III.B.1), Apple argues that Rodkin teaches an automated "system for providing hypertext links for character strings in text

28

IPR2020-01646
Patent 7,672,985 B2

files utilizing a central server that intermittently updates remote content servers with character strings and/or destination addresses (i.e. URLs)." Pet. 25 (citing Ex. 1005, code (57), 1:6–14); *see also id.* at 25–26 (citing Ex. 1005, 4:7–10, 10:25–32, 11:18–30, 23:25–30, Fig. 4; Ex. 1003 ¶¶ 50–52).

According to Apple, a person of ordinary skill in the art would have incorporated Rodkin's automated updates into van Hoff's system to "accomplish *Rodkin's* stated need of 'ensur[ing] that the destination addresses remain current.'" Pet. 26–27 (alteration in original) (quoting Ex. 1005, 1:9–11) (citing Ex. 1005, 9:40–43; Ex. 1003 ¶¶ 53–55).

In response, Sentius first argues that "[v]an Hoff does not teach that the annotation directories are databases because it does not disclose expressly or inherently that the annotation directories *accept data on demand*, which is a requirement for a database per [the District Court's] prior construction." PO Resp. 39. According to Sentius, van Hoff's "user maintainable directories" have to be recreated before the data they contain can be edited, and the resulting new dictionary has different contents. *See id.* (citing Ex. 2002 ¶ 131); *see also id.* at 43–44 (arguing that "a database is not synonymous with a dictionary because a dictionary does not necessarily accept data" (citing Ex. 2002 ¶¶ 140–144)); PO Sur-reply 15–16 (citing Ex. 2002 ¶¶ 131, 146).

Apple counters that its contentions regarding van Hoff's "user maintainable directories" were in the context of claim 2, "which requires 'a source' to provide the content." Pet. Reply 9 (citing Ex. 1003 ¶ 65). But even then, according to Apple, van Hoff expressly teaches that its user-maintainable directories 112 can allow the client to modify the dictionary,

29

IPR2020-01646
Patent 7,672,985 B2

either to "add a reference to a particular document" or to "edit the match pattern criteria." *Id.* (emphasis omitted) (quoting Ex. 1004, 10:12–14).

We disagree with Sentius that a person of ordinary skill in the art would have understood that van Hoff's "user maintainable" embodiment of cross-reference directory 112 would have to recreate the directory and thus would be unable to provide data to a user "on demand." The only portion of van Hoff that Sentius and Dr. Madisetti point to for this is column 10, lines 6–16. *See* PO Resp. 39 (citing Ex. 1004, 10:6–16); Ex. 2002 ¶¶ 130–131, 146 (citing Ex. 1004, 10:6–16). But we find nothing in this passage implying what Sentius infers. Rather, we agree with Apple that in the "user maintainable" embodiment, dictionary generator 116 directly modifies dictionary 112 at the user's instruction. *See* Pet. Reply 9; Ex. 1004, 10:10–11. Moreover, Sentius does not directly address the other embodiments of dictionary 112 and annotation directories 191 and 192, such as where dictionary 112 is provided by a third party, or where dictionary 112 is built up automatically over time by dictionary generator 116. *See* Pet. 21–25; Pet. Reply 8–9; Ex. 1003 ¶¶ 38–49, 65; Ex. 1004, 9:59–10:39. Considering the record as a whole, the evidence supports Apple's arguments that van Hoff teaches a term database that provides data to a user on demand.

Next, Sentius argues that van Hoff fails to teach a system that syndicates "data objects" because van Hoff's annotation database is missing a "paired entity structure that is apart from the structure of the annotation directory itself," and van Hoff only syndicates the entire directory, not distinct entities within the directories. *See* PO Resp. 39–40 (citing Ex. 2002 ¶ 132); *see also* PO Sur-reply 16 (citing Ex. 2002 ¶ 157). Moreover, according to Sentius, Rodkin fails to remedy this deficiency because it "does

30

IPR2020-01646
Patent 7,672,985 B2

not syndicate database content via data objects," but simply synchronizes a master database with local copies of the database, and combining van Hoff with Rodkin would have been unmotivated and beyond the level of ordinary skill in the art. *See id.* at 40–42; *see also* PO Sur-reply 16–17.

Apple counters that Sentius misunderstands its argument, which is that annotation directories 191 and 192 are the recited "term database" and paired entities 191*a–e* and 192*a–d* are the associated "data objects." *See* Pet. Reply 10 (citing Pet. 21). Apple also argues that it is relying on van Hoff, not Rodkin, for teaching limitation 1(a), except for the "automatic" aspect of the uncontested construction for the term *syndicating*, which Sentius did not address.[12] Pet. Reply 10–11; *supra* Section III.B.1.

We find Apple's arguments persuasive. Limitation 1(a) merely recites "syndicating one or more data objects associated with a term database," and does not limit the number of data objects within a given term database that can be syndicated. Thus, there is nothing in the claim to exclude a method that involves syndicating the entire term database, including every data object within it. This is also consistent with the parties' uncontested construction of *data objects associated with a term database*, which is "computer readable data structures that include data from [a term] database." Ex. 1008, 30.

We also find persuasive Apple's argument combining van Hoff and Rodkin which relies on van Hoff for the syndication method (including

---

[12] Sentius does mention this issue in its Sur-reply, but reiterates its argument in the Response and makes no argument specifically addressing why an ordinarily skilled artisan would not have used van Hoff's syndication method, as modified in the more limited way as Apple has clarified. *See* PO Sur-reply 16–17.

IPR2020-01646
Patent 7,672,985 B2

installing a remote term database using the Install Cross-Reference Directory subroutine) but relying on Rodkin for making van Hoff's syndication method "automatic" on a periodic basis. *See* Pet. 25–27. Although there are differences between the systems of van Hoff and Rodkin, we are persuaded that the modification to van Hoff that Apple proposes would have been within the level of ordinary skill in the art. *See* Pet. 27 (citing Ex. 1003 ¶¶ 54–55) ("[T]he modification requires only simple programming techniques well within a [person of ordinary skill in the art]'s expertise.")[13] We also find persuasive Apple's arguments that a person of ordinary skilled in the art would have been motivated to modify van Hoff in this way to ensure that links remain current. *See* Pet. 26–27.

For the above reasons, we find Apple's arguments persuasive that a person of ordinary skill in the art would have had reason and the ability to combine van Hoff with Rodkin, and that the resulting combination teaches limitation 1(a).

        (c)    Limitation 1(b): "parsing one or more documents to identify at least one term based on at least one rule"

Limitation 1(b) recites "parsing one or more documents to identify at least one term based on at least one rule." Ex. 1001, 14:14–15. Apple argues that van Hoff discloses this limitation by teaching that "after receiving the requested document from the information server, the 'proxy server *parses the requested document* and compares the characters, words, phrases, and

---

[13] We note that, at least in the "self-generating" embodiment of cross-reference directory 112, van Hoff already teaches how to update and improve a directory automatically over time. *See* Ex. 1004, 10:20–39.

IPR2020-01646
Patent 7,672,985 B2

the like with match patterns 195 in the selected annotation directory.'" Pet.
27–28 (quoting Ex. 1004, 7:1–5) (citing Ex. 1004, 6:54–57, 7:1–5). Apple
also argues that this parsing operates to identify terms based on a set of rules
comprising match patterns 195. Pet. 28 (citing Ex. 1004, 5:37–40, 7:24–41,
Figs. 2, 3; Ex. 1003 ¶¶ 57–60).

Sentius does not dispute that van Hoff teaches limitation 1(b). PO
Resp. 42. We find Apple's arguments persuasive, and find that van Hoff
discloses limitation 1(b).

> (d)    Limitations 1(c): "identifying content for the at
>        least one term"

Limitation 1(c) recites "identifying content for the at least one term."
Ex. 1001, 14:16. Apple argues that in van Hoff, this limitation corresponds
to using the paired entries in annotation directory 191 or 192 to match
particular terms found in a source document with corresponding URL links
194. Pet. 29–30 (citing Ex. 1004, 5:32–40, 7:34–41, Figs. 2, 3; Ex. 1003
¶ 61).

Sentius argues that van Hoff "does not disclose this step because the
URLs [that] van Hoff identifies are inserted as metadata (hyperlinks) into the
document's HTML code. They are not identified for display and Apple
makes no argument that they are displayed" as dependent claim 37 further
requires. PO Resp. 43 & n.3. Specifically, Sentius contends that "[i]n van
Hoff, the proxy server acts as an intermediary between the browser
requesting a webpage and the responding server," and "[t]he proxy server
inserts the . . . hyperlink into the webpage and sends it to the browser which
renders the webpage. The text of the URL 'URLX1' is not displayed in the
rendered webpage." *Id.* at 43.

33

As we discuss above, we disagree with Sentius that the term *identifying content* and other "content" terms in the challenged claims are limited to content "for display." *See supra* Section III.B.2. We find persuasive Apple's argument that van Hoff discloses identifying content for the identified terms, which is reflected in the entries of annotation directories 191 and 192. Thus, Apple has persuasively shown that van Hoff discloses limitation 1(c).

        (e)    <u>Limitation 1(d): "associating the at least one term with the identified content"</u>

Limitation 1(d) recites "associating the at least one term with the identified content." Ex. 1001, 14:17. Apple argues that van Hoff discloses this limitation because it teaches "associating a term within a document with the identified cross-link references (i.e., content) by having the proxy server insert a hyperlink annotation into the document in association with the term." Pet. 30–31 (citing Ex. 1004, 7:29–32, 7:34–41, 7:66–8:3, Fig. 4; Ex. 1003 ¶ 62). Apple regards both the URL and the "cross-reference document" to which the URL links, equivalently, as the "identified content." *See* Pet. 30 ("the identified cross-link references (i.e., content)"); *id.* at 31 ("a cross reference document (i.e., identified content)"); Pet. Reply 14.

In response, Sentius argues, for the reasons we discuss above in the context of limitation 1(c), that "the hypertext added by the van Hoff system prior to the browser rendering the requested document is not displayed in the browser-rendered webpage." Thus, Sentius contends that the identified content is not "for display." *Id.*

As we discuss above, we determine that the term *identified content* has its ordinary and customary meaning, and this meaning does not require

the content to be "for display." *See supra* Sections III.B.2 and III.C.3(d). Based on this interpretation, we find Apple's arguments persuasive that van Hoff discloses limitation 1(d) because the system inserts term-related hyperlink annotations into the document being processed.

(f)     Limitation 1(e)

Limitation 1(e) recites "wherein the one or more data objects associated with the term database provide a representation of at least a portion of the term database at the one or more remote computers and are used to link the identified content with the at least one term." Ex. 1001, 14:18–22.

Apple argues that van Hoff discloses this limitation because van Hoff's "proxy server 119 (i.e., remote computer) contains an annotation directory (i.e., term database) which is further comprised of paired entries (i.e., data objects)." Pet. 31. According to Apple, a person of ordinary skill in the art "would have understood paired entries provide a representation of at least a portion of the annotation directory because *Van Hoff* teaches the annotation directory is comprised of the paired entries." *Id.* (citing Ex. 1003 ¶ 63).

Apple also argues that in van Hoff, "one of the fields contained in the paired entries is field 194 which contains the location of a cross-reference document (i.e., URL)," and "[w]hen a term from a requested document is identified via match pattern field 195, the corresponding cross-reference source field 194 is added to the document as a hyperlink." Pet. 31–32 (citing Ex. 1004, 5:32–40, 7:24–41; Ex. 1003 ¶ 63). Thus, according to Apple, a person of ordinary skill in the art "would have understood [that the] cross-

35

reference source field is used to link the identified content with a term." Pet. 32 (citing Ex. 1003 ¶ 64).

In response, Sentius argues, for essentially the same reasons we address above, that Apple has not shown that van Hoff's annotation directories are "databases," or that identified content is or should be displayed. PO Resp. 45.

As discussed above, we disagree with Sentius on these points. *See supra* Sections III.B.2, III.C.3(b). We find that Apple has persuasively shown that van Hoff discloses limitation 1(e), and in particular that a person of ordinary skill in the art would have understood that van Hoff's proxy server 119 corresponds to the recited "remote computer" and paired entries 191*a–e* and 192*a–d* correspond to the recited "data objects."

(g)     Conclusion for claim 1

For the above reasons, Apple has shown, by a preponderance of the evidence of record, that claim 1 of the '985 patent would have been obvious over van Hoff as modified by Rodkin. We therefore conclude that claim 1 is unpatentable under 35 U.S.C. § 103(a).

4.     *Independent Claims 11 and 20*

Independent claim 11 is similar to claim 1, except that it is directed to "[a] computer implemented system for processing database content." Ex. 1001, 14:51–52. The claim includes the following: a module for carrying out "parsing" analogous to limitation 1(b); "a processing module for identifying content for the at least one term" analogous to limitation 1(c); a "term database for storing the identified content in association with the at least one term" analogous to limitation 1(d); and a "wherein" clause that

36

IPR2020-01646
Patent 7,672,985 B2

requires syndicating data objects to a remote computer for providing a
remote representation of at least a portion of the term database, analogous to
limitations 1(a) and 1(e). *Compare id.* at 14:53–65, *with id.* at 14:10–22.
Apple's arguments for claim 11 are essentially the same as its arguments for
claim 1. *See* Pet. 42–45.

Likewise, Sentius's arguments are essentially the same as its
arguments for claim 1, except Sentius notes that the parties agree that the
phrase *a processing module for identifying content for the at least one term,*
is a means-plus-function limitation where the function is "identifying
content for the at least one term" and the corresponding structure is "a
computer processor in conjunction with executable code for instructing the
computer processor to identify content for the at least one term, and
equivalents thereof." PO Resp. 55 (quoting Ex. 1007, 2); *see supra* Section
III.B.1. Sentius contends that "[v]an Hoff does not show a processing
module that is used to identify database content for display, and therefore
does not meet claim [11]." PO Resp. 55.

As we discuss above, we do not agree with Sentius that the term
*identify content,* whether in claim 1 or claim 11, requires that the content be
"for display." And we find Apple's arguments for claim 11 persuasive for the
reasons discussed above in the context of claim 1. *See supra* Section III.C.3.

Independent claim 20, like claim 11, is directed to [a] computer
implemented system for processing database content." Ex. 1001, 15:22–23.
The claim comprises three means-plus-function limitations in which the
function is essentially the method steps of limitations 1(b), 1(c), and 1(d),
and a "wherein" clause that is substantially the same as the "wherein" clause
of claim 11. *Compare id.* at 15:24–34, *with id.* at 14:14–17, *and id.* at 14:59–

37

IPR2020-01646
Patent 7,672,985 B2

65. Apple's arguments for claim 20 are essentially the same as its arguments for claim 1. *See* Pet. 46–49.

Sentius contends that the recited "means for identifying content . . . is properly construed with substantially the same construction as was given for the term 'processing module' in claim 11." PO Resp. 57. And, like for claim 11, Sentius contends that van Hoff does not disclose the "means for identifying content" because the van Hoff's alleged "content" is not "for display." *See* PO Resp. 56–57.

Again, we do not agree with Sentius that the term *identifying content*, or similar terms in claim 1 or 11, requires that the content be "for display." Thus, we find Apple's arguments for claim 20 persuasive for the reasons discussed above in the context of claim 1. *See supra* Section III.C.3.

For the above reasons, we determine that Apple has shown, by a preponderance of the evidence, that claims 11 and 20 would have been obvious over van Hoff in view of Rodkin.

> 5.    *Independent Claims 21 and 36 and Dependent Claims 37, 41, and 45*

Independent claim 21 is a method claim substantially the same as claim 1, except that it adds the following "wherein" limitation: "wherein the linked content is displayed on a user interface based upon a user interaction with at least a portion of the one or more source documents." Ex. 1001, 15:50–52; *compare id.* at 15:35–49, *with id.* at 14:8–22. Similarly, independent claim 36 is a system claim substantially the same as claim 11, except that it also adds the same "wherein" limitation reproduced above. *See id.* at 16:38–40; *compare id.* at 16:23–37, *with id.* at 14:51–65. A similar "wherein" limitation also appears in claim 37 (which depends from claim 1),

Appx0038

IPR2020-01646
Patent 7,672,985 B2

claim 41 (which depends from claim 11), and claim 45 (which depends from claim 20). *See id.* at 16:50–52, 16:60–62.

Apple's arguments for claims 21 and 36 are essentially the same as its arguments for claims 1 and 11, respectively, except as to the added "wherein" clause. *See* Pet. 49–53, 58–59. For that clause, and for claims 37, 41, and 45, Apple argues that a person of ordinary skill in the art "would have understood [that] the historical purpose of inserting hyperlinks into a document was to provide the reader with a link to another source of information pertaining to the topic of said hyperlink," and that when interacting with a hyperlink, "the user would be requesting to be directed to the data the hyperlink pointed to, to view said data." Pet. 51–52 (claim 21), 59 (claims 36 and 37), 61 (claim 41), 62 (claim 45). Thus, according to Apple, "interacting with a hyperlink would necessarily cause the displaying of the associated data for viewing." Pet. 52 (citing Ex. 1003 ¶ 88).

Apple acknowledges that van Hoff does not expressly disclose that the linked content is displayed on a user interface based on interacting with a portion of the source document, but Apple argues that Rodkin teaches this. Pet. 52. According to Apple, Rodkin teaches that "when a user clicks on or otherwise selects the hypertext link in the on-line article, the user's browser communicates with a third-party server which then delivers the relevant designated webpage to the user's browser in the form of a designated Web page." Pet. 52–53 (citing Ex. 1005, 1:27–30, 13:3–12, 15:56–60, 16:22–24; Ex. 1003 ¶¶ 88–90). Thus, Apple contends that a person of ordinary skill in the art "would have been motivated to apply the technique of *Rodkin* for delivering the relevant destination webpage to the browser of *Van Hoff* for display upon the user clicking the hypertext link to yield the predictable

39

IPR2020-01646
Patent 7,672,985 B2

result of displaying on a user's interface the linked content." Pet. 53. And, according to Apple, "[t]his application would have yielded the predictable result of displaying the related content in the user's browser when the user clicks the hyperlink." *Id.* (citing Ex. 1003 ¶ 90).

Sentius argues that, according to Apple's argument, "it is the resource pointed to by the URL that is displayed in response to the user input, not the text of the URL itself." PO Resp. 58–59. Sentius contends that this is different than in the '985 patent, where, "even if the display content is the text of a link, that link text is displayed in the content window." *Id.* at 59 (citing Ex. 1001, 12:61–13:7 (disclosing that when viewing a document, "[l]inks are present within both panes of [a content window], and the user may navigate the links as with a mini-browser")).

We agree with Sentius that the '985 patent discloses that navigable links, themselves, are displayable in a content window. *See* Tr. 16:16–24, 23:7–10 (counsel for Apple agreeing that links are displayed when they appear in an HTML document). But we disagree with Sentius's interpretation that Apple only maps "the resource pointed to by the URL" to the content displayed based on a user interaction. As Apple clarified in its Reply, Apple's argument is that the URL hyperlink and what the hyperlink points to are, equivalently, the identified or "linked content." *See* Pet. 30–31; Pet. Reply 14 ("[T]he 'content' as claimed in Claim 1 is broad enough to include both the URL stored in Van Hoff's annotation directory . . . *and* the document linked via the hypertext link annotation . . . ."). We find that argument persuasive and consistent with how claims 21 and 36 refer to the content as "linked content," while the '985 patent also regards "links" to

40

IPR2020-01646
Patent 7,672,985 B2

content as, itself, a category of identified or linked "content." *See* Ex. 1001, 11:37–39, 13:65–67, 15:50–52, 16:38–40.

For the above reasons, we determine that Apple has shown, by a preponderance of the evidence, that claims 21, 36, 37, 41, and 45 would have been obvious over van Hoff in view of Rodkin.

6.    *Claims 2, 3, 12, and 13*

Claim 2 depends from claim 1 and recites "wherein the content is provided by a source." Ex. 1001, 14:23–24. Claim 12 depends from claim 11 and adds essentially the same limitation. *See id.* at 14:66–67. Apple argues that van Hoff teaches several embodiments in which the content (i.e., the cross-linked references) are provided by a source, such as a directory generator, "various entities," or a "user maintainable directory." Pet. 32–33, 45 (citing Ex. 1004, 7:39–42, 9:59–67, 10:6–16, 10:20–36; Ex. 1003 ¶ 65).

Claim 3 depends from claim 2 and recites "wherein the source comprises at least one expert who provides the content for the at least one term through an interface." Ex. 1001, 14:25–27. Claim 13 depends from claim 12 and adds essentially the same limitation as claim 3. *Id.* at 15:1–3. Apple argues that van Hoff teaches, in particular, that the source of the content may include "information service providers, educational institutions, or workgroups associated with the client" Pet. 33, 45 (citing Ex. 1004, 9:59–60; Ex. 1003 ¶ 66). According to Apple, a person of ordinary skill in the art "would have understood the at least one entity provides this content via an interface, e.g., browser." *Id.* (citing Ex. 1003 ¶ 66).

In its response for these claims, Sentius argues that van Hoff only discloses storing URL links in its directories and not "display content" or "content to display"; that van Hoff's directories are not "databases" because

41

IPR2020-01646
Patent 7,672,985 B2

they must be regenerated before they can be edited; and that a person of ordinary skill in the art would not have been motivated to add Rodkin's synchronization scheme to van Hoff's system. PO Resp. 45–47 (citing Ex. 2002 ¶¶ 65–66, 146–149).

We address Sentius's arguments above, and we disagree. *See supra* Sections III.B.2, III.C.3(b). We also find Apple's arguments persuasive because van Hoff clearly discloses that cross-reference directories may be provided by a variety of sources. *See, e.g.*, Ex. 1003, 9:59–67. Thus, we determine that Apple has shown, by a preponderance of the evidence, that claims 2, 3, 12, and 13 would have been obvious over van Hoff in view of Rodkin.

### 7.    Claims 4, 14, and 23

Claim 4 depends from claim 1 and recites a further step of "providing a sponsorship opportunity to at least one entity to sponsor the at least one term, wherein a content window is associated with the at least one term." Ex. 1001, 14:28–31. Claim 14 depends from claim 11 and further recites a substantially similar limitation. *See id.* at 14:4–7. Claim 23 depends from claim 21 and further recites "wherein the supplemental content is displayed in a content window." *Id.* at 15:54–55.

Apple acknowledges that van Hoff "does not explicitly disclose providing a sponsorship opportunity," but argues that Rodkin provides this teaching by disclosing "assigning destination addresses a preferred status upon payment of a fee." Pet. 34–35 (citing Ex. 1005, 1:34–36, 13:3–12, 13:65–14:2, 14:10–20, 17:51–55, 23:42–46; Ex. 1003 ¶¶ 67–70). According to Apple, a person of ordinary skill in the art "would understand the sponsorship opportunities of *Rodkin* could easily be offered with *Van Hoff*'s

42

system," and "would have been motivated to allow sponsorship opportunities . . . to provide greater customization and advance the commercial purposes of the Web." Pet. 35–36 (citing Ex. 1005, 1:56–66, 2:46–50; Ex. 1003 ¶ 70).

In response, Sentius "does not dispute that Rodkin allows the sponsorship of a term," but argues that "Rodkin does not disclose a content window that is associated with the at least one term" because "[i]n the '985 patent, a content window is a system generated window," unlike in van Hoff and Rodkin, where according to Apple, content appears in a display browser. PO Resp. 48 (citing Ex. 2002 ¶¶ 150–152). Sentius also argues that the term *content window* in claim 4 is narrower than the term *user interface* that appears in claims 21, 36, 37, 41, and 46. *Id.* (citing Ex. 1001, claims 23–25).

Apple counters that the '985 patent expressly discloses that content appearing in a "RichLink Content Window may be returned in multiple formats" including HTML or transformed XML, and can be sent to "the browser or to an application, an embedded pop-up window, or using technologies such as Flash to build a display environment." Pet. Reply 12–13 (quoting Ex. 1001, 12:16–20). Thus, Apple argues that a person of ordinary skill in the art would have understood that a browser window meets the '985 patent's description of a "content window." *See id.* at 13 (citing Ex. 1003 ¶¶ 68–69; Ex. 1005, 1:18–22, 13:3–12). As to Sentius's claim-differentiation argument distinguishing *content window* from *user interface*, Apple argues that Sentius has not explained why a common browser would not fall within the scope of either term. *See id.* at 12.

In its Sur-reply, Sentius contends that the '985 patent's description of the RichLink Content Window "only highlights that the content window is

43

something created by the system (in a format that the browser can render onto a screen) and is not the browser window." PO Sur-reply 18 (citing Ex. 2002 ¶ 152).

Based on the evidence of record, we disagree that the recited "content window" cannot be a browser window. As Apple persuasively argues, the '985 patent contemplates that the returned content could be displayed in either a "browser" or a custom, system-created window as Sentius contemplates (e.g., "an application, an embedded pop-up window," or a display environment based on technologies such as Flash). Ex. 1001, 12:16–20. We do agree with Sentius that the term *content window* is narrower than the term *user interface*. *See* Ex. 1001, 15:54–55 (narrowing claim 21's requirement of displaying linked content in a "user interface" by specifying that "the supplemental information is displayed in a content window"). But we find persuasive Apple's argument that a browser window would fall within the scope of either term. *See* Pet. Reply 12. In other words, a browser would still be a "content window" even though the browser is part of a broader "user interface" that also includes other applications.

Thus, we determine that Apple has shown, by a preponderance of the evidence, that claims 4, 14, and 23 would have been obvious over van Hoff in view of Rodkin.

### 8.    *Claims 5, 15, 39, and 43*

Claim 5 depends from claim 1 and recites "wherein the content comprises one or more definitions, related products, related services, sponsorship information, translation, and reference works." Ex. 1001, 14:32–34. Claim 15 depends from claim 11 and recites essentially the same limitation. *See id.* at 15:8–10. Claim 39 depends from claim 2 and recites

44

IPR2020-01646
Patent 7,672,985 B2

"wherein the source [of the identified content] comprises one or more of a dictionary, customer created data, advertising content and reference work." *Id.* at 16:46–48. Claim 43 depends from claim 12 and further recites essentially the same limitation as claim 39. *See id.* at 16:55–57.

Apple contends that van Hoff discloses these limitations because the documents linked via the hypertext link annotations "contain supplemental information related to the topic of the received document by way of the linked term." Pet. 36 (quoting Ex. 1004, 7:66–8:3). According to Apple, a person of ordinary skill in the art "would have understood a document containing supplemental information related to a topic is considered a reference work" or, alternatively, the content could be the sponsorship information taught by Rodkin, as in claim 4. *Id.* (citing Ex. 1004, 7:66–8:3; Ex. 1003 ¶ 71); *id.* at 45 (claim 15), 59 (claim 39), 62 (claim 43).

In response, Sentius argues that "the URLs identified by van Hoff (or Rodkin) are not these content types." PO Resp. 49 (citing Ex. 2002 ¶¶ 153–154).

Apple counters that "the 'content' as claimed in Claim 1 is broad enough to include both the URL stored in Van Hoff's annotation directory (as Petitioner identified in its mapping for Claim 1) *and* the document linked via the hypertext link annotation (as Petitioner identified in its mapping for Claim 5)." Pet. Reply 14.

In its Sur-reply, Sentius argues that Apple's argument depends on van Hoff storing URL links in its directories, but "the categories of content claimed in claim 5 do not include links." PO Sur-reply 19–20; *see also id.* at 21–22 (specifically arguing for claim 39). Sentius also argues, on claim-differentiation principles, that the specific content categories recited in

45

IPR2020-01646
Patent 7,672,985 B2

claims 5, 15, 39, and 43 must be narrower than the "identified content" in claim 1. *See id.* at 20.

We agree with Sentius that the content categories in claims 5, 15, 39, and 43 are narrower than the "content" recited in the independent claims. But Apple persuasively argues that a person of ordinary skill in the art, upon reading the '985 patent, would have understood that *either* a link or the target of the link can be considered the identified or linked content. *See* Pet. Reply 14. For example, a link to a reference work, and the reference work itself, would equivalently have been considered the "identified content" within the scope of claim 5.

Thus, on the full trial record including Apple's arguments in its Reply and Sentius's arguments in the Sur-reply, we determine that Apple has shown, by a preponderance of the evidence, that claims 5, 15, 39, and 43 would have been obvious over van Hoff in view of Rodkin.

### 9.    *Claims 6 and 16*

Claim 6 depends from claim 1 and recites "wherein the one or more remote computers access data associated with the term database for linking to the supplemental content,[14] without a connection to the term database." Ex. 1001, 14:35–38. Claim 16 depends from claim 11 and adds essentially the same limitation. *See id.* at 15:11–14.

---

[14] Although there does not appear to be an antecedent basis for "the supplemental content," Apple reasonably interprets this as referring to the "content" recited in claim 1. *See* Pet. 37. We similarly interpret the appearance of "the supplemental content" in claims 22, 23, and 29. *See* Ex. 1001, 15:53, 55, 16:4.

46

Apple contends that, according to van Hoff, "the annotation directory (i.e., term database) may originate from various entities external from the system," and the proxy server (the remote computer) may install such a directory, located at a known URL, by invoking an "install Cross-Reference Directory subprocedure." Pet. 37 (citing Ex. 1004, 9:34–43). According to Apple, van Hoff meets the limitation of claim 6 because "the proxy server utilizes the dictionary stored locally within the proxy server containing a cross-reference source field (i.e., data associated with the term database for linking to the supplemental content)," and uses this locally stored data to "provid[e] links to related content for terms found in a requested document." Pet. 37 (citing Ex. 1003 ¶¶ 73–75), 45–46 (claim 16).

In response, Sentius argues that in the '985 patent, "system internal references are used to link and identify the display content contained in the term database or a data object for the given term," and Dr. Terveen's explanation of how he believes van Hoff meets the limitation of claim 6 is not consistent with this. *See* PO Resp. 50 (citing Ex. 1001, 9:19–29). Sentius also argues that "Dr. Terveen conflates a database with a data object," and in the '985 patent, unlike in van Hoff, "syndicated data objects . . . are a read data structure for high speed access to metadata needed to identify the display content, and may also include the display content itself so that it need not be retrieved from the term database." *Id.* at 50–51. Sentius also alleges that claim 6 requires "that the linking engine would have to be connected to a system database if it could not access the database content for identification and display in a data object," which van Hoff does not disclose. *Id.* at 51 (citing Ex. 2002 ¶¶ 155–158).

47

In its Reply, Apple argues that Sentius does not clearly explain why its criticism of Dr. Terveen's testimony impacts Apple's arguments in the Petition. *See* Pet. Reply 16. And Apple argues that none of the requirements that Sentius derives from the '985 patent disclosure are recited in claim 6. *See id.*

We agree with Apple that Sentius's arguments ascribe requirements to claims 6 and 16 that are neither explicitly found within the claim language nor required by the '985 patent disclosure. We find Apple's arguments persuasive that van Hoff's remote computer accesses a local version of an annotation directory and therefore accesses links to supplemental content without being connected to the term database. That van Hoff does not accomplish this disconnected access the same way as embodiments of the '985 patent has no bearing on our application of the plain language of claim 6 to van Hoff's disclosure, and Sentius has not pointed to any evidence suggesting that the language in claim 6 has anything other than its ordinary and customary meaning.

In its Sur-reply, Sentius also argues that van Hoff's annotation directories are not "databases," and "Apple therefore cannot argue Van Hoff can function without access to the 'database' (*i.e.*, the annotation directories in which the URLs are contained)." *See* PO Sur-reply 21. As we discuss above, we disagree that van Hoff's directories are not "databases" as that term appears in the claims. *See supra* Section III.C.3(b).

Thus, we determine that Apple has shown, by a preponderance of the evidence, that claims 6 and 16 would have been obvious over van Hoff in view of Rodkin.

48

          *10.    Claims 7, 8, 10, 17, and 18*

Claim 7 depends from claim 1 and recites "wherein the one or more data objects comprise a template object for identifying at least one rule for processing the source page." Ex. 1001, 14:39–41. Claim 17 depends from claim 11 and further recites essentially the same limitation as claim 7. *See id.* at 15:14–16. Apple contends that van Hoff discloses this limitation because a requesting user can define rules for parsing and linking a file. Pet. 37–39 (citing Ex. 1004, 6:65–7:1, 9:36–51, 8:9–26; Ex. 1003 ¶¶ 77–78), 46 (claim 17).

Claim 8 depends from claim 1 and recites "wherein the one or more data objects comprise a lexicon object for identifying at least one term for tagging in a source page." Ex. 1001, 14:42–44. Claim 18 depends from claim 11 and further recites essentially the same limitation as claim 8. *See id.* at 15:17–19. Apple contends that van Hoff discloses this limitation because "the proxy server contains a cross-reference directory that may be downloaded from an external URL (i.e., a local representation of the content of the term database)." Pet. 39 (citing Ex. 1004, 5:32–45). According to Apple, a person of ordinary skill in the art would have understood this cross-reference directory to be a "lexicon object" because it "contain[s] match pattern field 195 defining a character pattern, which if found in a requested document, results in associated cross-reference source field 194 being added to said document." *Id.* at 39 (citing Ex. 1003 ¶¶ 79–80), 46 (claim 18).

Claim 10 depends from claim 1, reciting "[a] computer program of instructions configured to be readable by at least one programmed computer processor to execute a computer process for performing the method as recited in claim 1." Ex. 1001, 14:47–50. Apple argues that the combination

IPR2020-01646
Patent 7,672,985 B2

of van Hoff and Rodkin teaches every limitation of claim 10 for the same reasons the combination teaches every limitation of claim 1, and because the method takes place on a computer as part of a computer program. Pet. 41–42 (citing Ex. 1004, 3:11–18, 4:22–26, 5:3–10; Ex. 1003 ¶¶ 82–83).

Sentius states that it does not dispute that van Hoff teaches the added limitations of the above claims, but relies on its arguments addressed above for claim 1. PO Resp. 51–53. However, as we discuss above, we disagree with those arguments. *See supra* Section III.C.3.

Thus, we determine that Apple has shown, by a preponderance of the evidence, that claims 7, 8, 10, 17, and 18 would have been obvious over van Hoff in view of Rodkin.

### 11.    Claims 9 and 19

Claim 9 depends from claim 1 and recites "wherein the one or more data objects are synchronized with at least the term database." Ex. 1001, 14:45–46. Claim 19 depends from claim 11 and recites essentially the same limitation. *See id.* at 15:20–21.

Apple relies on Rodkin, arguing that Rodkin teaches that "the central server periodically updates each content server with particular character strings and destination addresses." Pet. 40 (citing Ex. 1005, 11:20–30, 12:28–31). And in particular, "during the central server's maintenance mode, annotation database 535 and destination and expiration database 540 will receive and store character strings and updated destination addresses." *Id.* (citing Ex. 1005, 14:21–25, 17:56–18:2; Ex. 1003 ¶ 81). According to Apple, a person of ordinary skill in the art would have modified van Hoff to incorporate Rodkin's "maintenance mode" to "accomplish Rodkin's need for 'updat[ing] the content servers with any new character strings or new or

50

updated destination addresses.'" Pet. 40–41 (alteration in original) (quoting Ex. 1005, 11:31–33) (citing Ex. 1003 ¶¶ 53–55). Apple contends that an ordinarily skilled artisan would have understood that this modification would enhance van Hoff's reliability and accuracy, and "would reduce the potential of hyperlinking a term within a requested document with an outdated or invalid webpage." Pet. 41 (citing Ex. 1003 ¶¶ 53–55). Finally, Apple argues that "the modification requires only simple programming techniques well within a [person of ordinary skill in the art]'s expertise." *Id.* (citing Ex. 1003 ¶¶ 53–55).

Like in response to Apple's arguments for limitation 1(a), Sentius argues that "van Hoff's annotation directories do not inherently include database content, as the term 'data object' requires." PO Resp. 52. Sentius also argues that "Rodkin[']s database-to-database synchronization scheme syndicates entire databases thereby eliminating the advantage of syndicating using smaller targeted objects that only need to include a relevant portion of the database such as an English dictionary." *Id.* at 52–53 (citing Ex. 2002 ¶ 161); PO Sur-reply 21.

Apple counters that Sentius "is conflating the term 'synchronizing' recited in Claim 9 with the term 'syndicating' as recited in Claim 1." Pet. Reply 16–17. Apple argues that for claim 9's "synchronization" requirement, it "mapped Rodkin's teachings regarding the central server 450 periodically updating remote content servers with particular character strings and destination addresses via a maintenance mode." *Id.* at 17 (citing Pet. 40–41; Ex. 1003 ¶¶ 50–55, 81). Thus, according to Apple's arguments for claim 9, the system synchronizes particular data objects to ensure that the contents of the databases are the same in both locations. *Id.* (citing Ex. 1003 ¶ 81).

51

IPR2020-01646
Patent 7,672,985 B2

We agree with Apple, on claim-differentiation principles, that the term *synchronizing* in claim 9 is not simply a repetition of the "syndicating" requirement in limitation 1(a). *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of . . . different terms in the claims connotes different meanings."). Apple's reliance on Rodkin for claim 9 is somewhat different from its reliance on Rodkin for limitation 1(a), and we find Apple's arguments persuasive that modifying van Hoff by implementing a "maintenance mode" similar to that of Rodkin would have been within the ordinary skill in the art at the time of the claimed invention.[15] *See* Ex. 1003 ¶ 81. We also find Apple's arguments persuasive that there would have been a motivation for this modification, to ensure that the character strings and destination addresses in related annotation directories are kept synchronized and up to date. *See* Pet. 40–41; Pet. Reply 17.

Thus, we determine that Apple has shown, by a preponderance of the evidence, that claims 9 and 19 would have been obvious over van Hoff in view of Rodkin.

### 12. Claims 22, 26–29, 31, 32, and 35

Claims 22, 26–29, 31, 32, and 35 each depend from claim 21. *See* Ex. 1001, 15:53–16:22. Because Sentius does not specifically contest

---

[15] As we note above (*supra* note 13), van Hoff already discloses that directories 112 can be updated and improved automatically over time. *See* Ex. 1004, 10:20–39. This automatic updating also occurs on a link-by-link basis. *See id.*

IPR2020-01646
Patent 7,672,985 B2

Apple's contentions regarding the added limitations for these dependent claims, we address them together.

Claim 22 recites "wherein the supplemental content is transmitted from a remote computer." Ex. 1001, 15:53–54. Relying on its arguments for the "wherein clause" of claim 21, Apple argues that Rodkin teaches that "a third-party server (i.e., remote computer) delivers the relevant webpage (i.e., supplemental content) in response to a user clicking on a hypertext link." Pet. 53. We find this argument persuasive.

Claim 26 recites "wherein the user interaction comprises a user selecting the at least one term with a mouse cursor." Ex. 1001, 15:60–62. Claim 27 is nearly identical except that it uses the word *clicking* rather than *selecting*. *See id.* at 15:63–65. Relying on its arguments for claim 21, Apple argues that "it would have been obvious to modify Van Hoff to allow a user to select the at least one term with a mouse cursor as taught by Rodkin," and that Rodkin specifically teaches that "a user may click or otherwise select a hyperlink by clicking on said link with a mouse or pointing device." Pet. 54 (citing Ex. 1005, 13:3–12, 1:27–30; Ex. 1003 ¶ 91). We find this argument persuasive.

Claim 28 recites "wherein the at least one term is visibly enhanced to notify the user of available supplemental content." Ex. 1001, 16:1–3. Relying on its arguments for claim 21, Apple argues that Rodkin teaches visibly enhancing a term in a document to indicate that it is a navigable link. *See* Pet. 54–55 (citing Ex. 1003 ¶¶ 92–93). We find this argument persuasive.

Claim 29 recites "wherein the supplemental content comprises at least one advertisement." Ex. 1001, 16:4–6. Relying on its arguments for claim 4,

Apple argues that the van Hoff–Rodkin combination teaches providing a sponsorship opportunity, and that van Hoff specifically mentions advertising and sales. Pet. 55–56 (citing Ex. 1004, 1:59–66). Thus, according to Apple, a person of ordinary skill in the art "would have found it obvious to provide supplemental content comprising at least one advertisement." Pet. 56 (citing Ex. 1003 ¶ 94). We find this argument persuasive.

Claim 31 recites "wherein one or more of the predetermined rules are based on manner of linguistic usage of a term." Ex. 1001, 16:9–11. Apple argues that van Hoff teaches that its "proxy server can include a neural language processor for parsing the source document." Pet. 56 (citing Ex. 1004, 7:52–56). According to Apple, this works by "determining the grammatical usage of a term in a document" and "including only terms used as nouns in the annotation." *Id.* (quoting Ex. 1004, 8:31–38). Thus, Apple contends that a person of ordinary skill in the art would have recognized that van Hoff discloses the added limitation of claim 31. *Id.* (citing Ex. 1003 ¶ 95). We find this argument persuasive.

Claim 32 recites "wherein one or more of the predetermined rules are based on presence or lack thereof of an entry in a database." Ex. 1001, 16:12–14. Relying on its arguments for limitation 1(b), Apple argues that in the course of parsing a document, van Hoff's proxy server "compares the characters, words, phrases, and the like with match patterns 195 in the selected annotation directory" and, if there is a match, "that indicates that an annotation linking the portion of the document associated with the matching pattern to the paired cross reference source should be added to the requesting document." Pet. 57 (emphasis omitted) (quoting Ex. 1004, 7:1–5; and then quoting *id.* at 5:37–45). Thus, Apple argues that an ordinarily skilled artisan

54

IPR2020-01646
Patent 7,672,985 B2

would have understood that "a term within a requested document could only be identified if the corresponding match pattern field 195 (i.e., a rule) was stored as an entry within the annotation directory (i.e., present in the database)." *Id.* (citing Ex. 1003 ¶¶ 96–97). We find this argument persuasive.

Claim 35 recites "wherein one or more of the predetermined rules are based on one or more financial incentives." Ex. 1001, 16:20–22. Relying on its argument for claim 4, Apple argues that Rodkin teaches that "a company may pay to have their webpage linked via a hypertext link associated with a character string in an online article and the browser communicates with a third-party server to retrieve the destination webpage when a user clicks on the hypertext link." Pet. 58 (citing Ex. 1005, 13:3–12, 17:51–55). Thus, according to Apple, the van Hoff–Rodkin combination discloses the added limitation of claim 35. *Id.* We find this argument persuasive.

Apart from its arguments for claim 21, Sentius does not challenge Apple's arguments for the above claims. We determine that Apple has shown, by a preponderance of the evidence, that claims 22, 26–29, 31, 32, and 35 would have been obvious over van Hoff in view of Rodkin.

### 13. *Claims 38, 42, and 46*

Claim 38 depends from claim 1 and further recites "wherein the identified content is stored in the term database." Ex. 1001, 16:44–45. Essentially the same limitation appears in claim 42, which depends from claim 11, and in claim 46, which depends from claim 20. *See id.* at 16:53–54, 63–64.

For these claims, Apple relies on its arguments for limitation 1(a) and the corresponding limitation in claim 11. Pet. 59 (claim 38), 61 (claim 42), 62 (claim 46).

55

IPR2020-01646
Patent 7,672,985 B2

In response, Sentius reiterates its previous arguments directed to the independent claims, including that Apple has not shown that van Hoff or Rodkin "maintains database content that is identified and displayed." PO Resp. 53–54, 56 (citing Ex. 2002 ¶¶ 165, 168–171).

We note that, as Apple clarified in the context of claim 5, Apple's position (which we find persuasive) is that "the 'content' as claimed in Claim 1 is broad enough to include both the URL stored in Van Hoff's annotation directory (as Petitioner identified in its mapping for Claim 1) *and* the document linked via the hypertext link annotation (as Petitioner identified in its mapping for Claim 5)." Pet. Reply 14; *see supra* Section III.C.8. We find this persuasive, and agree that, as claims 1 and 11 are applied to van Hoff, the "identified content" (in the form of a link) would be stored in van Hoff's annotation directory (the term database).

Thus, we determine that Apple has shown, by a preponderance of the evidence, that claims 38, 42, and 46 would have been obvious over van Hoff in view of Rodkin.

### 14.    Claims 40 and 44

Claim 40 depends from claim 1 and further recites "wherein the content comprises one or more of a text, image, sound, video and mixed media." Ex. 1001, 16:48–49. Claim 44 depends from claim 11, and includes essentially the same limitation. *See id.* at 16:58–59.

Relying on its arguments for claim 5, Apple argues that van Hoff teaches that hypertext link annotations are "supplemental information related to the topic of the received document," and a person of ordinary skill in the art would have understood that it "by its very nature must contain one of text, image, sound, video, or mixed media." Pet. 60 (citing Ex. 1005, 7:66–

56

8:3; Ex. 1003 ¶ 98). Alternatively, Apple argues that Rodkin teaches hyperlinking to a corresponding webpage containing at least text and images, and a person of ordinary skill in the art would have been motivated to adopt Rodkin's known technique of linking to textual information to improve van Hoff's supplemental information. Pet. 60–61 (citing Ex. 1005, 16:9–14; Ex. 1003 ¶ 100); *see also* Pet. 62 (claim 44).

In response, Sentius reiterates its previous arguments directed to the independent claims, including that Apple has not shown that van Hoff or Rodkin "maintains database content that is identified and displayed." PO Resp. 54, 56 (citing Ex. 2002 ¶¶ 167–171). As discussed above in Sections III.B.2 and III.C.3(d), we find Sentius's arguments unavailing.

Thus, we determine that Apple has shown, by a preponderance of the evidence, that claims 40 and 44 would have been obvious over van Hoff in view of Rodkin.

### 15.    *Conclusion as to Ground 1*

For the above reasons, we find that Apple has shown, by a preponderance of the evidence, that claims 1–23, 26–29, 31, 32, and 35–46 are unpatentable as obvious over the combination of van Hoff and Rodkin.

### D.    OBVIOUSNESS GROUND BASED ON VAN HOFF, RODKIN, AND INGRAM (CLAIM 25)

Apple contends that dependent claim 25 is unpatentable as obvious over the combination of Hoff, Rodkin, and Ingram. Pet. 4, 62–66. For the reasons below, we find Apple's arguments persuasive.

Claim 25 depends from claim 23 and further recites "wherein the content window is embedded in the source document." Ex. 1001, 15:58–59.

Apple relies on Ingram as teaching this limitation. *See* Pet. 62–66. Ingram describes an "enhanced hyperlink" that shows a toolbar allowing the user to "[o]pen the Hyperlinked Page in a new browser window at a predetermined and/or smaller size than the original window," which "enables users to view the page referenced by the hyperlink while keeping the original web page visible in the background for instant re-visiting." Ex. 1006, code (57), 4:57–64.

According to Apple, a person of ordinary skill in the art would have been motivated to use Ingram's enhanced hyperlink in van Hoff's system because the modification "would improve the functionality of the hyperlinks . . . and accomplish *Ingram*'s stated need for providing a user with the benefit of not losing their train of thought or getting lost in the pages available via hyperlinks." Pet. 66 (citing Ex. 1006, 1:53–63, 2:46–51, 4:61–64).

In its Response, Sentius argues, as with the other claims, that "Apple does not demonstrate that any content maintained by van Hoff's (or Rodkin's) system is identified and displayed in any form. Nor does Apple argue for a modification of van Hoff (or Rodkin's) system to display such internally maintained content to the user." PO Resp. 62 (citing Ex. 2002 ¶¶ 183–186).

We address these issues above. *See, e.g.*, *supra* Sections III.B.2, III.C.3(b). Based on the evidence of record, we find Apple's arguments persuasive in showing that an ordinarily skilled artisan would have been motivated to further modify van Hoff's and Rodkin's combined teachings to display the supplemental content in a content window that is separate from the source document. We also agree that this modification would have been

58

IPR2020-01646
Patent 7,672,985 B2

within the ordinary skill in the art. Thus, we find that Apple has shown, by a preponderance of the evidence, that claim 25 is unpatentable as obvious over van Hoff in view of Rodkin and Ingram.

## IV. CONCLUSION[16]

For the reasons above, Apple has shown by a preponderance of the evidence that claims 1–23, 26–29, 31, 32, and 35–46 of the '985 patent are unpatentable under § 103(a) as obvious over van Hoff and Rodkin, and that claim 25 is unpatentable under § 103(a) as obvious over van Hoff, Rodkin, and Ingram.

## V. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–23, 25–29, 31, 32, and 35–46 of the '985 patent are unpatentable;

FURTHER ORDERED that parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[16] Should Sentius wish to pursue amendment of claims in a reissue or reexamination proceeding after this decision, we draw Sentius's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Sentius chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Sentius of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01646
Patent 7,672,985 B2

In summary:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–23, 26–29, 31, 32, 35–46 | 103(a) | van Hoff, Rodkin | 1–23, 26–29, 31, 32, 35–46 | |
| 25 | 103(a) | van Hoff, Rodkin, Ingram | 25 | |
| **Overall Outcome** | | | 1–23, 25–29, 31, 32, 35–46 | |

60

IPR2020-01646
Patent 7,672,985 B2

For PETITIONER:

Adam Seitz
Cliff Brazen
Paul Hart
ERISE IP, P.A.
Adam.seitz@eriseip.com
Cliff.brazen@eriseip.com
Paul.hart@eriseip.com

For PATENT OWNER:

Sandeep Seth
SETHLAW
ss@sethlaw.com

John Ferrell
CARR & FERRELL LLP
jsferrell@carrferrell.com

1



US007672985B2

(12) **United States Patent**
Bookman et al.

(10) Patent No.: **US 7,672,985 B2**
(45) Date of Patent: **Mar. 2, 2010**

(54) **AUTOMATED CREATION AND DELIVERY OF DATABASE CONTENT**

(75) Inventors: **Marc Bookman**, Palo Alto, CA (US); **David Kurtz**, Redwood City, CA (US); **Niket Patwardhan**, San Jose, CA (US)

(73) Assignee: **Sentius International Corporation**, McLean, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 450 days.

(21) Appl. No.: **11/554,241**

(22) Filed: **Oct. 30, 2006**

(65) **Prior Publication Data**

US 2008/0133591 A1    Jun. 5, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 10/218,738, filed on Aug. 15, 2002, now Pat. No. 7,130,861.

(60) Provisional application No. 60/313,041, filed on Aug. 16, 2001.

(51) **Int. Cl.**
*G06F 17/30* (2006.01)

(52) **U.S. Cl.** .............................. **707/755**; 704/9; 704/10

(58) **Field of Classification Search** .................... 704/9, 704/10; 715/709; 707/3, 6, 10, 102, 104.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,872,448 A    3/1975   Mitchell Jr. et al.
4,136,395 A    1/1979   Kolpeck et al.

4,318,184 A    3/1982   Millett et al.
4,384,288 A    5/1983   Walton
4,651,300 A    3/1987   Suzuki et al.
4,674,065 A    6/1987   Lange et al.
4,689,768 A    8/1987   Heard et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP            0 093 250    11/1983

(Continued)

OTHER PUBLICATIONS

Allen, "Introduction to Natural Language Understanding", Natural Language Understanding, Chapter 1, p. 1-19, The Benjamin/Cummings Publishing Company, Inc., 1988.

(Continued)

*Primary Examiner*—Leslie Wong
(74) *Attorney, Agent, or Firm*—Hunton & Williams, LLP

(57)    **ABSTRACT**

A method and apparatus are disclosed which automatically build a database by automatically identifying a term of interest and building a term database with supplemental content from an assigned source for that term. A term can be selected by applying various rules. An advertiser can sponsor the term, for example, by having an advertisement window automatically pop-up on a keyword search. Content windows can be attached to the term, the content window containing information such as definitions, related products or services, sponsorship information, information from content syndicators, translations and reference works. Data objects that represent the contents of the database and templates are syndicated to remote servers running a processing engine. The processing engine uses these data objects to execute linking rules without requiring a connection to the database.

46 Claims, 7 Drawing Sheets



**US 7,672,985 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,742,481 A | 5/1988 | Yoshimura | |
| 4,773,009 A | 9/1988 | Kucera et al. | |
| 4,817,050 A | 3/1989 | Komatsu et al. | |
| 4,837,797 A | 6/1989 | Freeny, Jr. | |
| 4,864,501 A | 9/1989 | Kucera et al. | |
| 4,868,743 A | 9/1989 | Nishio | |
| 4,868,750 A | 9/1989 | Kucera et al. | |
| 4,887,212 A | 12/1989 | Zamora et al. | |
| 4,893,270 A | 1/1990 | Beck et al. | |
| 4,914,586 A | 4/1990 | Swinehart et al. | |
| 4,945,476 A | 7/1990 | Bodick et al. | |
| 4,958,283 A | 9/1990 | Tawara et al. | |
| 4,980,855 A | 12/1990 | Kojima | |
| 4,982,344 A | 1/1991 | Jordan | |
| 4,994,966 A | 2/1991 | Hutchins | |
| 5,020,019 A | 5/1991 | Ogawa | |
| 5,065,315 A | 11/1991 | Garcia | |
| 5,088,052 A | 2/1992 | Spielman et al. | |
| 5,128,865 A | 7/1992 | Sadler | |
| 5,146,439 A | 9/1992 | Jachmann et al. | |
| 5,146,552 A | 9/1992 | Cassorla et al. | |
| 5,151,857 A | 9/1992 | Matsui | |
| 5,157,606 A | 10/1992 | Nagashima | |
| 5,204,947 A | 4/1993 | Bernstein et al. | |
| 5,214,583 A | 5/1993 | Miike et al. | |
| 5,218,697 A | 6/1993 | Chung | |
| 5,222,160 A | 6/1993 | Sakai et al. | |
| 5,226,117 A | 7/1993 | Miklos | |
| 5,233,513 A | 8/1993 | Doyle | |
| 5,241,671 A | 8/1993 | Reed et al. | |
| 5,253,362 A | 10/1993 | Nolan et al. | |
| 5,256,067 A | 10/1993 | Gildea et al. | |
| 5,267,155 A | 11/1993 | Buchanan et al. | |
| 5,289,376 A | 2/1994 | Yokogawa | |
| 5,297,249 A | 3/1994 | Bernstein et al. | |
| 5,303,151 A | 4/1994 | Neumann | |
| 5,319,711 A | 6/1994 | Servi | |
| 5,329,446 A | 7/1994 | Kugimiya et al. | |
| 5,331,555 A | 7/1994 | Hashimoto et al. | |
| 5,337,233 A | 8/1994 | Hofert et al. | |
| 5,349,368 A | 9/1994 | Takeda et al. | |
| 5,351,190 A | 9/1994 | Kondo | |
| 5,361,202 A | 11/1994 | Doue | |
| 5,367,621 A | 11/1994 | Cohen et al. | |
| 5,375,200 A | 12/1994 | Dugan et al. | |
| 5,377,323 A | 12/1994 | Vasudevan | |
| 5,392,386 A | 2/1995 | Chalas | |
| 5,404,435 A | 4/1995 | Rosenbaum | |
| 5,404,506 A | 4/1995 | Fujisawa et al. | |
| 5,408,655 A | 4/1995 | Oren et al. | |
| 5,416,901 A | 5/1995 | Torres | |
| 5,418,942 A | 5/1995 | Krawchuk et al. | |
| 5,434,974 A | 7/1995 | Loucks et al. | |
| 5,438,655 A | 8/1995 | Richichi et al. | |
| 5,455,945 A | 10/1995 | VanderDrift | |
| 5,459,860 A | 10/1995 | Brunett et al. | |
| 5,491,783 A | 2/1996 | Douglas et al. | |
| 5,491,784 A | 2/1996 | Douglas et al. | |
| 5,500,859 A | 3/1996 | Sharma et al. | |
| 5,506,984 A | 4/1996 | Miller | |
| 5,515,534 A | 5/1996 | Churah et al. | |
| 5,517,409 A | 5/1996 | Ozawa et al. | |
| 5,530,852 A | 6/1996 | Meske, Jr. et al. | |
| 5,530,853 A | 6/1996 | Schell et al. | |
| 5,537,132 A | 7/1996 | Teraoka et al. | |
| 5,537,590 A | 7/1996 | Amado | |
| 5,541,836 A | 7/1996 | Church et al. | |
| 5,546,447 A | 8/1996 | Skarbo et al. | |
| 5,546,529 A | 8/1996 | Bowers et al. | |
| 5,564,046 A | 10/1996 | Nemoto et al. | |
| 5,576,955 A | 11/1996 | Newbold et al. | |
| 5,581,460 A | 12/1996 | Kotake et al. | |
| 5,583,761 A | 12/1996 | Chou | |
| 5,603,025 A | 2/1997 | Tabb et al. | |
| 5,606,712 A | 2/1997 | Hidaka | |
| 5,608,900 A | 3/1997 | Dockter et al. | |
| 5,617,488 A | 4/1997 | Hong et al. | |
| 5,629,981 A | 5/1997 | Nerlikar | |
| 5,640,565 A | 6/1997 | Dickinson | |
| 5,644,740 A | 7/1997 | Kiuchi | |
| 5,646,416 A | 7/1997 | Van de Velde | |
| 5,649,222 A | 7/1997 | Mogilevsky | |
| 5,657,259 A | 8/1997 | Davis et al. | |
| 5,659,676 A | 8/1997 | Redpath | |
| 5,666,502 A | 9/1997 | Capps | |
| 5,694,523 A | 12/1997 | Wical | |
| 5,708,804 A | 1/1998 | Goodwin et al. | |
| 5,708,822 A | 1/1998 | Wical | |
| 5,708,825 A | 1/1998 | Sotomayor | |
| 5,724,593 A | 3/1998 | Hargrave, III et al. | |
| 5,724,597 A | 3/1998 | Cuthbertson et al. | |
| 5,727,129 A | 3/1998 | Barrett et al. | |
| 5,729,741 A | 3/1998 | Liaguno et al. | |
| 5,732,229 A | 3/1998 | Dickinson | |
| 5,740,252 A | 4/1998 | Minor et al. | |
| 5,745,360 A | 4/1998 | Leone | |
| 5,745,908 A | 4/1998 | Anderson et al. | |
| 5,754,847 A | 5/1998 | Kaplan et al. | |
| 5,754,857 A | 5/1998 | Gadol | |
| 5,761,436 A | 6/1998 | Nielsen | |
| 5,761,656 A | 6/1998 | Ben-Shachar | |
| 5,761,659 A | 6/1998 | Bertoni | |
| 5,761,689 A | 6/1998 | Rayson | |
| 5,764,906 A | 6/1998 | Edelstein et al. | |
| 5,778,363 A | 7/1998 | Light | |
| 5,781,189 A | 7/1998 | Holleran et al. | |
| 5,781,900 A | 7/1998 | Shoji et al. | |
| 5,781,904 A | 7/1998 | Oren et al. | |
| 5,787,386 A | 7/1998 | Kaplan et al. | |
| 5,793,972 A | 8/1998 | Shane | |
| 5,794,050 A | 8/1998 | Dahlgren et al. | |
| 5,794,228 A | 8/1998 | French et al. | |
| 5,794,259 A | 8/1998 | Kikinis | |
| 5,799,267 A | 8/1998 | Siegel | |
| 5,799,302 A | 8/1998 | Johnson et al. | |
| 5,802,559 A | 9/1998 | Bailey | |
| 5,805,886 A | 9/1998 | Skarbo et al. | |
| 5,805,911 A | 9/1998 | Miller | |
| 5,806,079 A | 9/1998 | Rivette et al. | |
| 5,815,830 A | 9/1998 | Anthony | |
| 5,819,092 A | 10/1998 | Ferguson et al. | |
| 5,822,539 A | 10/1998 | van Hoff | |
| 5,822,720 A | 10/1998 | Bookman et al. | |
| 5,826,257 A | 10/1998 | Snelling, Jr. | |
| 5,832,496 A | 11/1998 | Anand et al. | |
| 5,835,059 A | 11/1998 | Nadel et al. | |
| 5,835,089 A | 11/1998 | Skarbo et al. | |
| 5,845,238 A | 12/1998 | Fredenburg | |
| 5,855,007 A | 12/1998 | Jovicic et al. | |
| 5,859,636 A | 1/1999 | Pandit | |
| 5,860,073 A | 1/1999 | Ferrel et al. | |
| 5,862,325 A | 1/1999 | Reed et al. | |
| 5,864,848 A | 1/1999 | Horvitz et al. | |
| 5,870,702 A | 2/1999 | Yamabana | |
| 5,870,746 A | 2/1999 | Knutson et al. | |
| 5,873,107 A | 2/1999 | Borovoy et al. | |
| 5,875,443 A | 2/1999 | Nielsen | |
| 5,875,446 A | 2/1999 | Brown et al. | |
| 5,878,421 A | 3/1999 | Ferrel et al. | |
| 5,884,247 A | 3/1999 | Christy | |
| 5,884,302 A | 3/1999 | Ho | |
| 5,884,309 A | 3/1999 | Vanechanos, Jr. | |
| 5,892,919 A | 4/1999 | Nielsen | |
| 5,893,093 A | 4/1999 | Wills | |

**US 7,672,985 B2**

Page 3

| | | |
|---|---|---|
| 5,895,461 A | 4/1999 | De La Huerga et al. |
| 5,896,321 A | 4/1999 | Miller et al. |
| 5,896,533 A | 4/1999 | Ramos et al. |
| 5,897,475 A | 4/1999 | Pace et al. |
| 5,900,004 A | 5/1999 | Gipson |
| 5,905,866 A | 5/1999 | Nakabayashi et al. |
| 5,905,991 A | 5/1999 | Reynolds |
| 5,907,838 A | 5/1999 | Miyasaka et al. |
| 5,913,214 A | 6/1999 | Madnick et al. |
| 5,920,859 A | 7/1999 | Li |
| 5,924,090 A | 7/1999 | Krellenstein |
| 5,926,808 A | 7/1999 | Evans et al. |
| 5,930,471 A | 7/1999 | Milewski et al. |
| 5,940,843 A | 8/1999 | Zucknovich et al. |
| 5,946,647 A | 8/1999 | Miller et al. |
| 5,953,718 A | 9/1999 | Wical |
| 5,963,205 A | 10/1999 | Sotomayor |
| 5,963,940 A | 10/1999 | Liddy et al. |
| 5,963,950 A | 10/1999 | Nielsen et al. |
| 5,970,505 A | 10/1999 | Ebrahim |
| 5,974,413 A | 10/1999 | Beauregard et al. |
| 5,983,171 A | 11/1999 | Yokoyama et al. |
| 5,987,403 A | 11/1999 | Sugimura |
| 5,987,460 A | 11/1999 | Niwa et al. |
| 5,987,475 A | 11/1999 | Murai |
| 5,999,938 A | 12/1999 | Bliss et al. |
| 6,006,218 A | 12/1999 | Breese et al. |
| 6,006,242 A | 12/1999 | Poole et al. |
| 6,014,677 A | 1/2000 | Hayashi et al. |
| 6,021,403 A | 2/2000 | Horvitz et al. |
| 6,022,222 A | 2/2000 | Guinan |
| 6,026,088 A | 2/2000 | Rostoker et al. |
| 6,026,393 A | 2/2000 | Brown et al. |
| 6,028,605 A | 2/2000 | Conrad et al. |
| 6,031,537 A | 2/2000 | Hugh |
| 6,038,573 A | 3/2000 | Parks |
| 6,047,252 A | 4/2000 | Kumano et al. |
| 6,055,531 A | 4/2000 | Bennett et al. |
| 6,061,675 A | 5/2000 | Wical |
| 6,067,565 A | 5/2000 | Horvitz |
| 6,076,088 A | 6/2000 | Paik et al. |
| 6,085,201 A | 7/2000 | Tso |
| 6,085,226 A | 7/2000 | Horvitz |
| 6,092,074 A | 7/2000 | Rodkin et al. |
| 6,094,649 A | 7/2000 | Bowen et al. |
| 6,108,674 A | 8/2000 | Murakami et al. |
| 6,122,647 A | 9/2000 | Horowitz et al. |
| 6,126,306 A | 10/2000 | Ando |
| 6,128,635 A | 10/2000 | Ikeno |
| 6,137,911 A | 10/2000 | Zhilyaev |
| 6,151,624 A | 11/2000 | Teare et al. |
| 6,154,738 A | 11/2000 | Call |
| 6,178,434 B1 | 1/2001 | Saitoh |
| 6,182,133 B1 | 1/2001 | Horvitz |
| 6,185,550 B1 | 2/2001 | Snow et al. |
| 6,185,576 B1 | 2/2001 | McIntosh |
| 6,223,570 B1 | 5/2001 | Horvitz et al. |
| 6,260,035 B1 | 7/2001 | Horvitz et al. |
| 6,262,730 B1 | 7/2001 | Horvitz et al. |
| 6,272,505 B1 | 8/2001 | De La Huerga |
| 6,289,342 B1 | 9/2001 | Lawrence et al. |
| 6,292,768 B1 | 9/2001 | Chan |
| 6,308,171 B1 | 10/2001 | De La Huerga |
| 6,311,177 B1 | 10/2001 | Daucer et al. |
| 6,311,194 B1 | 10/2001 | Sheth et al. |
| 6,323,853 B1 | 11/2001 | Hedloy |
| 6,338,059 B1 | 1/2002 | Fields et al. |
| 6,373,502 B1 | 4/2002 | Nielsen |
| 6,438,545 B1 | 8/2002 | Beauregard et al. |
| 6,442,545 B1 | 8/2002 | Feldman et al. |
| 6,516,321 B1 | 2/2003 | De La Huerga |
| 6,519,603 B1 | 2/2003 | Bays et al. |
| 6,556,984 B1 | 4/2003 | Zien |

| | | | |
|---|---|---|---|
| 6,571,241 B1 | 5/2003 | Nosohara | |
| 6,601,026 B2 * | 7/2003 | Appelt et al. | .................. 704/9 |
| 6,618,733 B1 | 9/2003 | White et al. | |
| 6,625,581 B1 | 9/2003 | Perkowski | |
| 6,629,079 B1 | 9/2003 | Spiegel et al. | |
| 6,651,059 B1 * | 11/2003 | Sundaresan et al. | ............ 707/6 |
| 6,697,824 B1 | 2/2004 | Bowman-Amuah | |
| 6,732,090 B2 | 5/2004 | Shanahan et al. | |
| 6,732,361 B1 | 5/2004 | Andreoli et al. | |
| 7,003,522 B1 | 2/2006 | Reynar et al. | |
| 7,032,174 B2 | 4/2006 | Montero et al. | |
| 7,130,861 B2 | 10/2006 | Bookman et al. | |
| 7,287,218 B1 * | 10/2007 | Knotz et al. | ................ 715/209 |
| 7,496,854 B2 | 2/2009 | Hedloy | |
| RE40,731 E | 6/2009 | Bookman et al. | |
| 2002/0035581 A1 | 3/2002 | Reynar et al. | |
| 2002/0036654 A1 | 3/2002 | Evans et al. | |
| 2002/0062253 A1 | 5/2002 | Konno et al. | |
| 2002/0065891 A1 | 5/2002 | Malik | |
| 2002/0091803 A1 | 7/2002 | Imamura et al. | |
| 2002/0099730 A1 | 7/2002 | Brown et al. | |
| 2002/0184247 A1 | 12/2002 | Jokela et al. | |
| 2003/0004909 A1 * | 1/2003 | Chauhan et al. | ................ 706/45 |
| 2003/0033290 A1 * | 2/2003 | Garner et al. | .................. 707/3 |
| 2003/0154144 A1 | 8/2003 | Pokorny et al. | |
| 2003/0187587 A1 | 10/2003 | Swindells et al. | |
| 2003/0212527 A1 | 11/2003 | Moore et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 725 353 | 1/1996 |
| EP | 0 840 240 | 5/1998 |
| JP | 03-174653 | 7/1991 |
| JP | 04-220768 | 8/1992 |
| JP | 04-288674 | 10/1992 |
| JP | 04-320530 | 11/1992 |
| JP | 04-320551 | 11/1992 |
| JP | 05-012096 | 1/1993 |
| JP | 05-128157 | 5/1993 |
| WO | WO95/04974 | 2/1995 |

OTHER PUBLICATIONS

Almasi, et al., Highly Parallel Computing 2nd Edition, The Benjamin/Cummings Publishing Company, Inc.,Chapter 2, p. 38-51 and 87-95, 1994.

Anonymous, "Hypertext Method", IBM Technical Bulletin, 1 page, Oct. 1989.

Anonymous, Microsoft Corporation, Microsoft Word 97, screen printouts, pp. 1-4,1997.

Baez, et al., "Portable Translator", IBM Technical Bulletin, vol. 37, No. 11, p. 185-188, Nov. 1994.

Brookshear, Introduction to "Computer Science, An Overview", Benjamin/Cummings Publishing, p. 17, 1988.

Cohen, et al., "Method for Automatic Analysis of Meter in (both) Poetry and Prose", IBM Technical Bulletin, vol. 32, No. 9B, p. 224-226, Feb. 1990.

Dunnington, et al., "Methodology and Apparatus for Translation of Text to Sign Language Images", vol. 37, No. 04A, p. 229-230, Apr. 1994.

Eisen, et al., "Multilingual Multimedia Hyperlink Network Design", IBM Technical Bulletin, vol. 36, No. 09B, p. 471-472, Sep. 1993.

Eisen, et al., "OS/2 Presentation Manager Controls Enabled for Hypermedia Link Markers", IBM Technical Bulletin, vol. 34, No. 10B, p. 433-434, Mar. 1992.

Elliott, "Tuning up HyperCard's Database Engine", Supplement to Dr. Dobb's Journal, p. 39s-41s, Apr. 1993.

Foley, et al., Introduction to "Computer Graphics—Principles and Practice 2nd Ed. in C", Addison-Wesley Publishing Company, Inc., p. 1-9, 1996.

Fuger et al., Proceedings of The First IEEE Conference on Evolutionary Computation, IEEE World Congress on Computational Intelligence, Walt Disney World Dolphin Hotel, Orlando, FL., vol. I, p. 229-234, Jun. 27-Jun. 29, 1994.

**US 7,672,985 B2**

Page 4

Germain, et al., "Hypertext Document Update", IBM Technical Bulletin, vol. 34, No. 8, p. 22-23, Jan. 1992.

Glinert, A Pumped-Up Publishing Pro, Computer Shopper, Computer Select, p. 462, Apr. 1997.

Goodman, Web Documents Without HTML, Computer Select, Computer Shopper, Apr. 1997.

Goose, et al., "Unifying Distributed Processing and Open Hypermedia through a Heterogeneous Communication Model", University of Southampton, Technical Report No. 95-6, p. 1-12, Nov. 1995.

Marshall, Acrobat, Common Ground Extend Reach Beyond Document Viewing, InfoWorld, Computer Select, Apr. 21, 1997, p. 105.

Montana, "Automated Parameter Tuning for Interpretation of Synthetic Images", Handbook of Genetic Algorithms, edited by Lawrence Davis, Chapter 19, p. 282-311, 1991.

Nelson, FrenchNow 3.0 Language-Learning Tool, Macworld Reviews, p. 83, Dec. 1995.

Takehi, "Implementing Memory Efficient Hypertext in Online Manual Tool", IBM Technical Bulletin, vol. 33, No. 11, p. 259-263, Apr. 1991.

Weibel, Publish to Paper and the Web, Computer Select, Dec. 1996, PC/Computing, p. 130.

Winston, et al., Finding Patterns in Images, LISP 3rd Edition, Chapter 31, p. 456-483, Addison-Wesley Publishing Company, 1989.

Yankelovich, et al., "Reading and Writing the Electronic Book", Computer, vol. 18, No. 10, p. 15-30, Oct. 1985.

Addressmate Automatic Envelope Addressing Program, User's Manual (1991).

User Manual For AddressMate and AddressMate Plus by AddressMate Software (1994-1995).

Apple Internet Address Detector User's Manual, Aug. 28, 1997.

Microsoft Word 97 Help File entitled Automatically check spelling and grammar as you type (1997).

Developer's Guide to Apple Data Detectors, Dec. 1997.

Novell GroupWise User's Guide for Windows 16-BIT, Version 5.2, 1993, MS 125993, Novell, Inc., Orem, Utah. cited by other (1993).

Haak, Personal Computing—WordPerfect News: WordPerfect for Windows 7.0; A Sneak Preview, Colorado State University, vector Academic Computing & Network Services, vol. 13, No. 3, Jan./Feb. 1996.

Thistlewaite, "Automatic Construction and Management of Large Open Webs", Information Processing and Management, vol. 33, pp. 161-173 (published Mar. 1997).

* cited by examiner

IPR2020-01646
Apple EX1001 Page 4

Appx0602



Figure 1

Appx0603

| 105 | System Databases | |
|-----|------|------|
| | 210 | Templates Database |
| | 220 | Customer Information Database |
| | 230 | Click Information Database |
| | 240 | Term Database |
| | 250 | EMarketing Database |

Figure 2

| 110 | Business Interfaces | |
|-----|------|------|
| | 310 | Sales Force Automation Interface |
| | 320 | Accounts Paid, Accounts Receivable Interface |

Figure 3

| 115 | Account Management and eCommerce | |
|-----|------|------|
| | 410 | Home Page |
| | 420 | View/Edit Account Information |
| | 430 | System Rights Administration |
| | 440 | Activity Reporting |
| | 450 | ECommerce |
| | 460 | Kiosk |

Figure 4

IPR2020-01646
Apple EX1001 Page 6

Appx0604

120

| EMarketing Management | |
|---|---|
| 510 | Term Inventory Manager |
| 520 | Term Purchase |
| 530 | Customer Reporting |
| 540 | Sponsor reporting |

Figure 5

125

| Term Discovery Utilities | |
|---|---|
| 610 | Term Finder |
| 620 | Term List Editor |
| 630 | Term List Site Matcher |

Figure 6

IPR2020-01646
Apple EX1001 Page 7

Appx0605



Figure 7



Figure 8A



Figure 8B



Figure 8C



Figure 8D

Appx0607



| 130 | RichLink Processor System |
|-----|---------------------------|
| 910 | RichLink Processor |
| 920 | Lexicon Object |
| 930 | Template Object |
| 940 | Lexicon and Template Object Manager |

Figure 9A



Figure 9B

IPR2020-01646
Apple EX1001 Page 10

135

| RichLink Contextual Content Server | |
|---|---|
| 1010 | RichLink Template Manager |
| 1020 | RichLink Content Window Editor |
| 1030 | RichLink Content Editor |
| 1050 | RichLink Content Delivery Servlet |
| 1060 | Click Info Capture |
| 1070 | Data Synchronizers |

Figure 10

170

| RichLink Content Window | |
|---|---|
| 1110 | RichLink Content Window |
| 1120 | Floating Toolbar |

Figure 11

240

| Term Database | |
|---|---|
| 1210 | Licensed Dictionaries |
| 1220 | Custom Dictionaries |
| 1230 | Sponsored Dictionaries |

Figure 12

IPR2020-01646
Apple EX1001 Page 11

US 7,672,985 B2

**1**

## AUTOMATED CREATION AND DELIVERY OF DATABASE CONTENT

### RELATED APPLICATIONS

This patent application is a Continuation of U.S. patent application Ser. No. 10/218,738, filed on Aug. 15, 2002, which claims the benefit of U.S. Provisional Patent Application No. 60/313,041, filed Aug. 16, 2001, which are hereby incorporated by reference in their entirety.

### FIELD OF THE INVENTION

The invention relates generally to database building and delivery of database content. More particularly, the invention relates to an apparatus and to a family of methods that automatically builds a central database by automatically assigning links to an expert for notation and then syndicates content from that database to remote application installations.

### DESCRIPTION OF THE PRIOR ART

Today a plethora of systems are available to assist electronic publishers in automating the indexing, searching and organization of their documents. Vendors such as Sopheon have applications that allow organizations to capture knowledge through structured authoring tools, terminology management, and thesauri. Software developer, Trados, identifies linguistic content and extracts sections for translation, references against the translation memory and glossaries to provide relevant information to translators, routes jobs to the appropriate translation teams and content reviewers, assigns users, deadlines, review steps, and special instructions, and provides project management and vendor management tools. Companies such as Xerox, STAR Group, DicoMaker, SDL International, Multi-Corpora, Multisystems, and ATRIL provide terminology and translation memory creation and management tools. And companies such as Semio, Sageware, Quiver, Applied Semantics, Inxight, and Interwoven provide document categorizers that analyze, categorize, and classify documents into human discernable groupings that accelerate the search process.

The patent literature shows that several inventors have worked on the process of database creation over the past decade. VanderDrift in U.S. Pat. No. 5,455,945 (1995) refers to a "system and method for dynamically displaying entering, and updating data from a database". And Wayne et al in EP0840240 refer to "a system for performing intelligent analysis and segmentation of a computer database". And others have worked on a process for aggregating user data across large data sets such as Barrett, et al. in U.S. Pat. No. 5,727,129 (1998) who refer to a "network system for profiling and actively facilitating user activities".

The problem with all current techniques and systems for analyzing and organizing documents is that none can claim the ability to automatically create consistent, high quality links and associations between concepts and pieces of knowledge in a cost effective manner. The invention is based on the premise during the process of aggregating terminology and associating knowledge that human beings will necessarily be involved. Humans may also tend to introduce errors into the process but at a much lower rate than software based automated categorizers or document processors.

The invention is hence an attempt to create a scalable system for managing the process of creating richly linked associations between terms and related content. It also specifies a commercial infrastructure that will enable the costs of production to be managed and for incentives to be generated that will enable experts to invest time and energy in the production of large-scale link databases.

### SUMMARY OF THE INVENTION

A method and apparatus is disclosed which builds a database by automatically assigning terms to an expert, providing an interface and methods for the expert to enter supplemental information for that term, including definitions, explanations, specifications, links, related products or services, sponsorship information, information from content syndicators, translations, and reference works and then merging the expert-created content to a central database. Information from the database needed to create links and the rules for linking to database content are syndicated to remote servers. Tags or other identifiers are inserted within unstructured text which utilize database information in their construction or provide a means to access the database content. Connection to the database is not required at the time linking is performed.

The process begins by identifying terms of interest within a corpus of documents. Term identification may be accomplished by crawling and parsing the corpus to select terms through application of rules, such as, a term was not previously in the database, an unusually frequent use of the term, the term is an article, or the term is an unusual part of speech. Other methods of identifying terms may also be employed, including human effort, the use of search logs, taxonomy nodes, taxonomy evidence terms, meta-tags, existing glossaries or existing filters.

Once a list of terms is assembled, individual terms are assigned to experts to provide supplemental information on the term. A utility is provided to the expert that manages term assignments, allows the expert to analyze the term in context by showing expandable examples of its use in the corpus of documents, and provides the interface for entry of supplemental information as well as meta-data to help characterize the supplemental information.

Utilities are provided to the publisher that allow them to establish the rules for choosing the supplemental information which should appear for a term, for tagging the term on the page, and for designing the presentation window for that supplemental information.

A content publisher wishing to provide links from words and phrases in a document to the supplemental information contained in the database installs an automated tagging engine (the RichLink Processor) within their network. The RichLink Processor automatically downloads, from the central database, the data structures necessary to perform high-speed tagging of the text and to execute the tagging rules without requiring a connection to the database at the time of tagging, although it remains possible to do so. The RichLink Processor performs routine synchronization of its data structures with the database to insure that changes to content within the database, tagging rules, or presentation rules are reflected locally.

Several modules are included to help edit and store user preferences, track and report usage, and manage business processes.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagram illustrating the relationship between modules that comprise the automated database creation and delivery system, according to the invention.

FIG. **2** is a diagram illustrating the databases that comprise the system databases, according to the present invention.

IPR2020-01646
Apple EX1001 Page 12

US 7,672,985 B2

3                                                    4

FIG. **3** is a diagram illustrating the modules that comprise the business interface, according to the present invention.

FIG. **4** is a diagram illustrating the modules that comprise the account management and eCommerce system, according to the present invention.

FIG. **5** is a diagram illustrating the modules that comprise the eMarketing management system, according to the present invention.

FIG. **6** is a diagram illustrating the modules that comprise the term discovery utilities system, according to the present invention.

FIG. **7** is a diagram illustrating the steps performed to automatically create, syndicate, and link to database content, according to the present invention.

FIGS. **8A**, **8B** **8C**, and **8D** are diagrams illustrating the Term Finder Editor List screen, according to the present invention.

FIGS. **9A** and **9B** are diagrams illustrating the modules that comprise the RichLink Processor system and the operation of that system, according to the present invention.

FIG. **10** is a diagram illustrating the modules that comprise the RichLink Contextual Content Server, according to the present invention.

FIG. **11** is a diagram illustrating the modules that comprise the content presentation system, according to the present invention.

FIG. **12** is a diagram illustrating the modules that comprise the term database, according to the present invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. **1** illustrates the network of modules **100**, that along with human expert analysis, performs interrelated functions that automatically create and deliver database content in the environment of online browsing and/or advertising.

The custom **1220** and sponsored **1230** dictionaries are built by automatically assigning terms to an expert, pushing content to an expert, providing expert annotation, and inserting the content into the term database. The modules that perform the interrelated functions include, system databases that store data, business interfaces that interface users with the modules, account management that manages account information, eMarketing management that enables a user to manage marketing related items, utilities that automate the process of term discovery, the RichLink Processor that tags documents, the content delivery system for presenting embedded information and an editing suite for modifying user options.

System Databases **105**

FIG. **2** illustrates the databases in this core component **105** that house system data used by system processes. The databases contain templates (discussed infra), customer information, click information (discussed infra) and the term database (discussed infra).

Templates Database **210**

This module **210** is the central storage location for templates. These templates are used as the foundation for customization. Templates may include combinations of databases and layers and presentation rules for the RichLink Content Window **170**. This module interacts with the Rich-Link Contextual Content Server **135** module when creating new templates.

Customer Information Database **220**

This module **220** serves as a central storage location for customer information. A portfolio for each customer is created and contains customer related information such as customer contact information, customer technical information,

license information, sales tracking information, and prototype files. This module reports to the Account Management module (discussed infra), the Sales Force Automation Interface (discussed infra), and the eMarketing module (discussed infra).

Click Information Database **230**

This module **230** stores data from the Click Info Capture module (discussed infra). Such information includes pages of activity, views of individual terms, views of individual layers, and click-throughs to hyperlink content items. The module reports to the Account Management and eMarketing modules (discussed infra).

RichLink Term Database **240**

This module **240** is a library that contains all terms and associated content that can be sorted and queried, using business criteria to organize into dictionaries of similar information. Content types such as text, image, sound, video, mixed media, and forms may be stored in this database. There is a one-to-many relationship developed between matching terms and content associated with matching terms. Content may be identified in a number of ways to allow automated identification of the dictionary to which it belongs. Examples of identification information are the publisher name, sponsor name, site name, readership, and sponsorship dates. Content may also be associated with metadata to allow automated identification of the category to which it belongs.

Business Interface **110**

FIG. **3** illustrates the modules in this core component group **110** that interfaces with operational business systems to insure smooth handling of customers from sales, services, invoicing, payment, and accounting.

Sales Force Automation (SFA) Interface **310**

The SFA Interface **310** handles interaction with the customer information database and the corresponding online commercial website. Typically, a customer initiates contact online. The customer information is pulled from the database and sent to the SFA module. Customer information, prototype files, and technical information are stored in the customer database **220**.

Accounts Payable (AP)/Accounts Receivable (AR) Interface **320**

This interface **320** handles the exchange of information between the customer database **220** and AP and AR information. Customers are able to access invoicing and account balance information online. Click information data used in eMarketing pricing models are sent to the AP/AR interface and invoices issued and tracked. Online transactions such as subscriptions and license information are stored in the customer database and are sent to the AP/AR interface for invoicing.

Account Management and e-Commerce **115**

FIG. **4** illustrates the modules in this component group **115** that allows customers, partners, and services employees to manage account information and to purchase additional products and services as their needs develop or as additional services and capabilities are offered. Customers using this module are able to update this component according to their needs.

Home Page **410**

A user of the system has a home page portal which links them to parts of the system and provides access to personalized content such as news, products and service announcements and promotional items. The homepage includes features such as focused page content, based on the user's profile and preferences. The homepage also contains user information, such as user rights, events, links to account management and eCommerce modules, links to eMarketing modules, links

IPR2020-01646
Apple EX1001 Page 13

US 7,672,985 B2

5 | 6

to RichLink Contextual Content server modules, links to a support and product website, forum links and news, success stories and product announcements.

View/Edit Account Information **420**

This module enables customer modification of account information, such as contact and technical information. From this module a user is able to view and edit contact information, view and edit technical information, view account balances and invoices, view and edit payment methods, view licenses, select newsletter options, and specify the contents of a user home page.

System Rights Administration **430**

This module enables companies to assign role-based privileges to a user. For example, the role of marketing manager has privileges related to marketing, such as, editing the appearance of the RichLink Content Window. The role of an editor has privileges related to content, such as editing and adding content for terms. Email can be used to notify users of their privileges and of any privilege changes. Error-checking routines are present which ensure the proper privileges are assigned.

Activity Reporting **440**

This module tracks activity, system capacity, and metrics for analysis, planning, and support. Activity statistics include server, file processing and click information. Examples of file processing statistics are, files processed, dictionaries used, errors and links created. Examples of click statistics are clicks per term, number of content views, click-throughs, survey results, page analysis, ID session analysis, most viewed terms and content, and least viewed terms and content. Server statistics include time in certain phases, server logs, uptime and downtime.

Reporting capabilities can be tailored to a user's roles and privileges so different reports are available to employees, customers, and sponsors. A user can customize reports by specifying the date range for the report and modifying other query or sort criteria.

E-Commerce **450**

This module sets up a generic configuration for the online sale of products and services. The module provides a reseller/partner ordering system, options to allow a **20** user to add products and services, a marketplace for the sale of term sponsorships, a quotation tool, and a licensing system for hosted service and software customers that run the service at their site.

A user can add, change and delete dictionaries and services. This module interfaces with the accounts receivable module to keep track of records, and with the term rights purchase module, to track site sponsorships. The module also handles the payment of the sales and/or services purchased, and generates sales quotes.

Kiosk **460**

This module processes files that occur outside of typical hosted service environments. Examples of such occurrences are, submission of documents from the World Wide Web and from a desktop for processing, credit card transactions, one-off processing, uploading, and downloading of documents.

eMarketing Management **120**

FIG. **5** illustrates the modules in this core component group **120** that enable participants to manage eMarketing efforts for both term sponsors and portal sites that have contextual eMarketing.

Term Inventory Manager **510**

This module defines term sponsorship opportunities on contextual eMarketing sites. Sites can customize their term sponsorship opportunities by defining term sponsorship

opportunities variables, defining pricing models, interfacing with the eMarketing database and interfacing with the Click Info module.

Term sponsorship opportunities are defined by editing domain, layer, readership and term periods associated with sponsorship of a term or cluster of terms. Pricing model variables include specifying the terms in a cluster, setting a fixed price for a cluster, having an auction for a cluster, and setting the time period for which a price is active.

This module interfaces with the eMarketing Database to edit and store sponsorship opportunities, and make them available to sponsors. The module interfaces with the Click Information Database to track impressions and interfaces with the Term Database to serve appropriate content and rotate content.

Term Rights Purchase **520**

This module enables a user to search for sponsorship opportunities and buy rights to include contextual marketing material when a term is clicked on. A user searches for a term across sites to determine the availability of sponsorship opportunities. If a sponsorship opportunity is available, the user has the opportunity to purchase the sponsorship opportunity for that site.

This module can process payment for sponsorship opportunities and also handle invoicing. Different pricing systems are available, such as fixed pricing, auctions, discount pricing for multiple ads and pricing based on term length, and pricing based on a guaranteed number of impressions. The eMarketing database stores sponsorship availability notifications and any rights purchased.

Portal Reporting **530**

This module generates sponsorship reports for contextual eMarketing portals.

A user can view what terms on a site are sponsored, see who the sponsor of a term is, the terms of that sponsorship, and click information statistics such as impressions and click-throughs.

Sponsor Reporting **540**

This module generates sponsorship reports for contextual eMarketing sponsors. A user can view what terms they have sponsored for a particular site or across all sites, the terms of that sponsorship, and click information statistics such as impressions and click-throughs.

Term Discovery Utilities **125**

FIG. **6** illustrates the modules in this core component group **125** that automate the process of discovering and collecting terminology. The terms in the list can then be made available for sponsorship or have content associated with them through the Content Manager **1120** module.

Term Finder **610**

FIG. **7** is a flowchart that illustrates the term finder module. The term finder module performs a full text index of a corpus of documents such as a website and generates a list of terms that may be of interest **700**. The term finder is directed to a top-level folder and then recursively crawls through that folder and every sub-folder searching for all files that match a specified file type or types. Files matching the specified types are parsed **710** using natural language processing to tokenize the text into significant objects such as words and phrases until a full index of all words and phrases on the site is created.

From this full index, terms of interest are chosen using a set of rules. These rules include for example, but not by way of limitation, whether or not the term currently exists in a database, whether there is an unusually high frequency of use of the term, the type of term and whether the term is used in an unusual manner. Examples of types of term rules are, product names and company names. An example of a term used in an

IPR2020-01646
Apple EX1001 Page 14

US 7,672,985 B2

7

unusual manner is a verb used as a proper noun. As terms are chosen, a list is created containing terms of interest as well as the rules that led to their selection. The pages and sites on which the terms occur are noted and categorized.

Frequency values are determined by using a normalization factor. The normalization factor is calculated by taking the term in its chain context, and dividing it by its overall appearance in all chains on the site. For example, the chain "Pokemon video on DVD" may appear once on a website, that also mentions Pokemon nineteen other times on the site. The other nineteen times discuss Pokemon trading cards and Pokemon lunch boxes. Thus the normalized frequency would be one in twenty, or 0.05. A normalized threshold such as 0.20 or higher is required by this rule to classify the website as pertaining to a term and thus select this term. Thus, in this example this website is not classified as pertaining to Pokemon videos on DVD and Pokemon videos on DVD is not selected because 0.05 is not greater than or equal to 0.20.

The selected terms are then categorized by field of pertinence **720**. For example, the term Pokemon can be categorized as an animated series, toy, or game. The term is then sent to experts **730** in each field of knowledge. Each expert analyzes the term in context, determines how the term should be categorized by accepting, rejecting, or modifying the categorization choices made by the system, and enters annotation content for the term. In the example, if the term "Pokemon video on DVD" is sent to an expert, then this term is categorized **740** in the animated series section and appropriate annotations added. If the term refers to Pokemon trading cards, then that term is categorized and annotated in the game section. If a term is familiar and/or known it bypasses the experts and goes straight to the Term Database **750** and is associated with existing annotational content as well as being made available for additional expert annotation.

Terms from the database are tagged in source documents **760** using the RichLink Processor or other automated methods such as those disclosed in U.S. Pat. No. 5,822,720, System and method for linking streams of multimedia data for reference material for display, Oct. 13, 1998, Bookman et al. The tag can serve functions such as linking to a RichLink Content Window containing additional information or marking the term for an application performing further processing of the page. The final result **770** is a tagged and annotated enhanced document **175**.

The RichLink Content Window **170**, which displays information related to the term, is available by clicking on a tagged term. The information contained in a RichLink Content Window comes from a multitude of sources including annotations added by experts **740**, related products or services, sponsorship information, information from content syndicators, translations and reference works.

Term List Editor **620**

This module aids an expert to review and edit the list created by the term finder module. Examples of editing features are view list, view term in context, expand terms, truncate terms, add terms, delete terms, sort list, and save list. FIGS. 8A-8D illustrate the term finder list editor screen. A user can click on a Context tab **840** to view the term in the context of the original page inside a Context window **880**, where the occurrence of the term is highlighted as shown in FIG. 8B. The user can drag the highlighted area **860** to change what portion of the term is selected as shown in 8C. Tabs are located to the left **814**, **816** and right **824**, **826** of the term or phrase **830**. A user clicks on the tabs to extend **816**, **826** or reduce **816**, **824** portions of the phrase that surround the term. For example, in FIG. 8D, the user has clicked on the left reduce tab **814**, so the selection reduces one word. These

8

extend and reduce tabs work whether the Context window is open or not. Once the desired term is selected, the Commit tab **870** can be selected to make the changes in the Term database. An Annotations tab **850** is also present. The Annotations tab **850** displays known annotations for the word when selected.

This module interfaces with the Terms Database to create new terms if the term did not previously exist, with the Term Inventory Manager to create sponsorship opportunity definitions for words that have not already been sponsored, and with the Content Builder to request content for a term.

This module also provides list management support for modules that use lists of terminology, such as the Term Rights Purchase module and the Content Manager module. Lists of terminology created in this module can be loaded within other modules to filter to a desired list of terms. User tools include, create list, load list, save list, save list as, and delete list of terms. A saved list may be assigned to a specific module or made available to other users. A comparator function can be used to analyze two or more lists to merge the lists, delete duplicates, or find duplicates.

Term List Site Matcher **630**

This module will accept a list of terms and a top-level folder in a corpus of documents such as a website as inputs. It will recursively crawl through the top-level folder and every sub-folder searching for all files that match a specified file type or types. An index is generated showing occurrences of terms in the list on pages in the site. Statistics such as occurrences, frequency and whether the term is already linked or sponsored are noted.

Richlink Processor System **130**

The modules in this core component group **130** enable the process where in-context information is automatically linked to documents.

RichLink Processor **910**

This module takes normal source pages and automatically enhances them through links to content from a variety of sources, such as authoritative reference works and dictionaries, dictionaries of syndicated content, customer-created dictionaries, and dictionaries of sponsored terminology allowing third parties to attach advertising content to occurrences of terms on sites or through tags which identify and provide information about the terms they surround. The result is an enhanced page **175** that contains links to the additional content. Processing may occur in real-time between page request and page display in a web server environment or it may occur offline as a pre-processing step to publishing documents. The process can be performed on common file types such as XML, HTML, RTF, Word documents, and Adobe Acrobat PDF files.

The RichLink Processor interacts with the Template Object **930** to identify the rules that should be used in processing and the Lexicon Object **920** to identify what terms should be tagged in the source text. Tags in the page identify whether a page should be processed by the RichLink Processor or not, denote sections of a page to be processed, and indicate the template that should be used in processing that page/section.

Tags may be inserted to identify page-level metadata criteria that should be used to limit the result set when tagging the page. For example, a tag may be inserted into the page identifying the page as belonging to the category "Video Games". This tag can then be used to limit matches to terms or annotations that have also been identified as belonging to the category "Video Games". Page-level metadata tags may be inserted ahead of time or when the page is dynamically constructed.

IPR2020-01646
Apple EX1001 Page 15

US 7,672,985 B2

9                                                          10

When a file is sent to the RichLink Processor, several operations can be optionally run on the text. The text may be parsed, the document categorized, and page-level meta data tags added to the page. The document content may be summarized. Matches between terms on the page and terms occurring in the Lexicon Object for dictionaries specified by the template used with this page are identified. A tag is created around matched terms if meta data or other criteria are met. Typically this tag is a hyperlink that leads to additional annotational content, however additional tag structures can be used. Finally, the document may be inserted into the Term Database as annotational content for identified category keywords.

A user interface is provided which allows administrative access to process and queue controls, view, search and sort log data, and process statistics.

Lexicon Object **920**

The Lexicon Object provides a local representation of the content of the Term Database for use by the RichLink Processor **910** so a direct connection to the Term Database is not required and the Term Database may be on a remote server from the RichLink Processor. The Lexicon Object contains data required to match terms and create tags such as a representation of the terms in the database optimized for fast matching by the RichLink Processor, the TermID from the Term Database, the DictionaryID from the Term Database, and other Term Database content for which fast access is required, such as annotation content.

The Lexicon Object may be stored once on a single server and accessed by all active RichLink Processor instances running on that server. Or it may be stored once on a central server and accessed by active RichLink Processor instances on multiple servers. It can contain lexicons for multiple dictionaries in a single object instance.

Template Object **930**

The Template Object provides a local representation of the Template that contains the rules for processing and linking a file so a direct connection to the Template Database is not required and the Template Database may be on a remote server from the RichLink Processor. The Template Object contains the rules required by the RichLink Processor such as dictionaries used for linking or as filters (stop word lists), meta data criteria that must be met when making a match, the format of the tag to be inserted before and after a matched term including macros to be expanded by the RichLink Processor with data specific to the matched term, run-time processing options such as limiting the number of matches found or turning stemming on and off, and any code required to be placed into the page to enable operation of the RichLink Content Window or other applications

The Template Object may be stored once on a single server and accessed by all active RichLink Processor instances running on that server. Or it may be stored once on a central server and accessed by active RichLink Processor instances on multiple servers. It can contain multiple templates in a single object instance.

Lexicon and Template Manager **940**

The Lexicon and Template Manager insures that the Lexicon Object **920** and Template Object **930** are synchronized with the Term and Template Databases. When the server is started, the manager is automatically launched. It accesses the Term Database to obtain the latest version of the Lexicon Object for that server and accesses the Template Database to obtain the latest version of the Template Object for that server, as shown in FIG. **9B**. The Lexicon Object and Template

Object are then stored in the server's memory where they can be accessed by any active RichLink Processor instances running on that server.

The Lexicon and Template Manager must log into the databases. Preferences are enforced based on that login so the server only obtains lexicons and templates for which they have privileges.

The Lexicon and Template Manager may also be triggered via remote request, such as an HTTP request, so manual refreshes of the Lexicon Object and Template Object can occur while the server is running. The Lexicon and Template Manager also includes a timer function to trigger scheduled refreshes of the Lexicon Object and Template Object.

RichLink Contextual Content Server **135**

FIG. **11** illustrates the modules in this core component group **135** that enable end users such as customers, partners, or hosted service team members to create, manage, and modify templates, dictionaries, and content windows.

RichLink Template Manager **1010**

This module provides an environment for creating templates that define the rules by which source files are processed, as well as how templates are managed for each customer. The template defines parameters such as dictionaries and filters, meta data criteria, look and feel of the content window, and source page tag structure.

A user has many options to modify a template including adding, changing or deleting entire templates.

Layout settings include background colors and images for the regions of the content window, custom content to be added before or after system generated information, logo or advertising image files and the location they link to, icons for help, print, or feedback options, and the location they link to.

Layer settings include adding, deleting or modifying layers, setting the order of appearance for layers, styles for text in the layer, and specifying the elements which appear in either the content or navigation area for a layer. Elements that can be used include system generated information like Term, Layer Name, Annotation Title, RichLink Dictionary Content, and Citation. Other elements include user decorative elements like blocks of custom-entered text, images (with or without links), line breaks, and horizontal rules.

RichLink Dictionary Content settings include the dictionaries to be used for linking in that layer. Settings for each dictionary may be further customized such as whether the dictionary should be used as a filter or not, whether page-level metadata criteria will be used with this dictionary by the RichLink Processor **910**, any standard metadata criteria to be used in matching, the Citation string to be used for this dictionary, or a custom query to be used to fetch content for this dictionary. Unless a custom query is specified, a generic query is generated based on RichLink Dictionary Content settings.

RichLink Dictionary Content settings may also include rules-based content generation. An example of a rule would be to use a mix of content types like no more than 60% text, 20% images, 10% audio, and 10% video. Another example of a rule would be to rotate content which matches a given criteria so a different piece of content shows up on subsequent viewings. Another example of a rule would be to only show content during a specified date range or only for a specified number of impressions, as in the case of a marketing campaign.

An option is given to a user so that he may preview an annotation or other linked content.

RichLink Content Window Editor **1120**

This module enables the manual creation of term-specific content windows, which will be added to a processed file in

IPR2020-01646
Apple EX1001 Page 16

US 7,672,985 B2

11

addition to content windows generated by page-level rules specified in the template. This way, a product name such as "Microsoft Word" could have a content window with a different set of links than "Pokemon" inserted during the same processing run.

The user interface controls for the Content Window Editor would be mostly the same as the Template Manager. Inside of the Content Window Editor a user may also make requests to see content available for the term in dictionaries they have privileges for, search other dictionaries for available content and purchase content, and to send a term to the Content Manager module for expert annotation.

RichLink Content Editor **1130**

This module **1130** is a workflow and editing application that enables editing of content within the Term Database, administration of dictionaries, and management of a virtual team of content submitters **150** to build dictionary content. The service host would use this module to gather a group of experts together and expedite content submission when building dictionaries. A list of terms is created using the Term List Editor **620** that define the content to be created. Individual terms from the list can be assigned manually or automatically to an expert based on the expert's area of knowledge. The expert submits content for the terms assigned to them.

For example, content sponsors can use this module to assign lists of terms they are sponsoring to the advertising agencies or internal creative services teams responsible for submitting sponsored content for those terms. A marketing team building a dictionary of product information can assign product names to the managers associated with those products or product lines. Research services building a dictionary of company information can assign company names to the analysts responsible for tracking that company or that market space.

The group or individual assigned terms in this way will have an editing interface that enables them to submit content for their list of terms. The types of content that may be submitted include text, links, images, movies, sound files, response forms, or mixtures of some or all of these. Meta data may be specified for the term and content to categorize it. Searches may be performed to find terms and content or to locate additional resources for a term. For example, an expert could search dictionaries for which they do not have privileges for suitable content and then purchase content to be used with their term.

Workflow rules drive content through submission, review, revision, and acceptance cycles, by notifying, assisting, and providing an interface for responsible parties to take action on submissions. For example, an expert can view a list of terms for which they need to submit new content, view a list of terms and content which was returned for revision along with comments on the desired revisions, and submit new or revised content. A content sponsor can view a list of terms and content that has recently been submitted, review it, and then either accept it, reject it, or return it for revisions with comments.

This module also enables editing access to the Term Database and dictionaries for administrators, content team members, partners, and customers. Individual terms and content can be added, modified, or deleted. Dictionary administration actions may be performed such as adding, changing, or deleting dictionaries, specifying dictionary settings, managing the meta data group and value lists used by RichLink Processor as match criteria, maintenance procedures to clean up tables and indexes, mapping fields from an external database to the Term Database in order to merge data from one to the other or to provide pointers to data from one to the other, and scheduling regular merges of data for synchronization.

12

This module allows users to preview content by displaying text directly within the editor, clicking links to view the page a link leads to, providing thumbnails of images and movies as well as links to the full image or movie, linking to sound files, and displaying file sizes.

RichLink Content Delivery Servlet **1050**

This module retrieves and displays content by constructing and serving the RichLink Content Window **170**. A request is made to the RichLink Contextual Content Server which contains information such as the ID of the term clicked on, the ID of the template used in processing the page, page-level metadata settings, and the customer ID. This module interacts with the Term Database and the Template Manager to select and display the appropriate content, navigation elements, and display elements in the RichLink Content Window.

The RichLink Content Window may be returned in multiple formats such as HTML pages, an XML document which can be transformed as desired before sending it to the browser or to an application, an embedded pop-up window, or using technologies such as Flash to build a display environment.

Click Info Capture **1060**

This module tracks a user's click information by tracking each session within the RichLink Content Delivery Servlet. An anonymous session ID is assigned and information such as the page a click originated from, terms clicked on, layers clicked on, content viewed, start and end times for a session, template IDs, customer IDs, response times, and click throughs are noted.

This module is integrated with the eMarketing module **120** and the Term Database **240** to track, report on, and manage sponsorship opportunities which are based on or expire after a certain number of end-user impressions. It is also integrated with the Click Information Database **230** to store click data and the Activity Reporting module **440** to report on end-user activity.

Data Synchronizers **1070**

This module provides synchronization between customer databases containing terms and content and the Term Database. When customers already maintain relevant databases, this module will map fields from the customers database to fields in the Term Database and migrate data between the two systems. Synchronization of data can be scheduled so transfers between the two databases occur automatically when a change is made in the customer's database or at a scheduled time each day, week, or month.

Tools are provided that assist in creating maps of the fields between databases and synchronization for most commercially-used database formats, such as Oracle, MS SQL, Informix, Sybase, and IBM DB2.

RichLink Content Window **170**

The modules in this core component group enable interaction with annotation content in on-line documents. It includes viewing information within a content window after clicking on a word or phrase, viewing, searching and sorting data in the content window, setting user preferences, and alternate viewing environments, such as a floating toolbar.

RichLink Content Window **1110**

When a user clicks on a word or phrase, content is displayed in a RichLink Content Window that is typically placed in a pop-up window but which can also be embedded into a page. The RichLink Content Window may be formatted for single or multi pane display of content. Menu options listing available content are presented in a Navigation Pane while content associated with the term and menu item chosen appears in a Content Pane.

Content comes from the dictionaries stored in the Term Database. The content comes from types such as text, images,

IPR2020-01646
Apple EX1001 Page 17

US 7,672,985 B2

13

movies, sounds, forms (including eCommerce transactions, surveys, or polls), or a mixture of the above. Content may be saved on the client side so that it may viewed off-line, searched, printed, or sent to someone.

Links are present within both panes of the Knowledge Burst, and a user may navigate the links as with a mini-browser. Some links may be proprietary, requiring a pass-word, payment of fees or both. Ads, logos, text links or other branding and informational elements may appear in the pop-up menus or in the decorative frames surrounding the content and navigation panes and may be served from the RichLink Content Delivery Servlet, the customer's own site, or third-parties such as ad serving companies.

A content window initially appears at the location of the term clicked on, but a user may move the content window to any area of the display.

Multiple touch points exist where a user can view a content window, such as a PDA, cell phone or computer.

Floating Toolbar **1120**

This is an alternative content window menu that offers advanced features, such as, search, sort, credits, about and help on the entire group of RichLink content available on a page. The floating toolbar is similar to the RichLink Content Window in that the same capabilities are available. Addition-ally, all variations of the content can be viewed. A user also has the option to set persistent user options such as linking highlights, collapsible or exploded menus, and which layers are displayed. A user may use the default search and filtering criteria, or may set and save his own. The toolbar also gener-ates content lists that contain suggestions for further research. For example, "users who liked this RichLink content also liked the following information."

Term Database **240**

The modules in the Term Database represent the types of dictionaries of information that may be managed by the sys-tem.

Licensed Dictionaries **1210**

Licensed dictionaries include licensed and/or approved third party information, such as translation dictionaries, ref-erence works, and dictionaries of unbiased and high quality information. The content in these dictionaries is licensed to sites to enhance content for global audiences and/or to enhance a user's depth of knowledge.

Examples of translation dictionaries are Kenkyusha Read-ers or other foreign language dictionaries. Examples of ref-erence works are the American Heritage or Physician's Desk Reference. Examples of unbiased, high quality information sources are Facts and Comparisons which provides drug information, Dun & Bradstreet which provides financial information, and Intelligent Medical Objects which provides links to medical journals, publications, and sites.

Custom Dictionaries **1220**

Custom dictionaries include any kind of dictionary that is created by a customer for use on authorized sites. This com-monly occurs on internal sites where the terms are proprietary information, and are not made available to the general public. Typical terms in a custom dictionary include company-spe-cific terminology with definitions and translations or product names with product information and news.

Sponsored Dictionaries **1230**

Sponsored Dictionaries contain content provided by third parties for use wherever a term that they have purchased appears during a certain period of time or for a number of impressions. Most often this involves companies purchasing rights to provide sponsored content from a site. Sponsored content can take almost any form, such as text, images, mixed media, banner ads, surveys, links, and email requests.

14

Although the invention is described herein with reference to the preferred embodiment, one skilled in the art will readily appreciate that other applications may be substituted for those set forth herein without departing from the spirit and scope of the present invention. Accordingly, the invention should only be limited by the Claims included below.

The invention claimed is:

**1**. A computer implemented method for processing data-base content, the method comprising the steps of:

syndicating one or more data objects associated with a term database to one or more remote computers, wherein the one or more data objects contain data associated with one or more terms;

parsing one or more documents to identify at least one term based on at least one rule;

identifying content for the at least one term; and

associating the at least one term with the identified content;

wherein the one or more data objects associated with the term database provide a representation of at least a por-tion of the term database at the one or more remote computers and are used to link the identified content with the at least one term.

**2**. The method of claim **1**, wherein the content is provided by a source.

**3**. The method of claim **2**, wherein the source comprises at least one expert who provides the content for the at least one term through an interface.

**4**. The method of claim **1**, further comprising the step of:

providing a sponsorship opportunity to at least one entity to sponsor the at least one term, wherein a content window is associated with the at least one term.

**5**. The method of claim **1**, wherein the content comprises one or more of definitions, related products, related services, sponsorship information, translation, and reference works.

**6**. The method of claim **1**, wherein the one or more remote computers access data associated with the term database for linking to the supplemental content, without a connection to the term database.

**7**. The method of claim **1**, wherein the one or more data objects comprise a template object for identifying at least one rule for processing a source page.

**8**. The method of claim **1**, wherein the one or more data objects comprise a lexicon object for identifying at least one term for tagging in a source page.

**9**. The method of claim **1**, wherein the one or more data objects are synchronized with at least the term database.

**10**. A computer program of instructions configured to be readable by at least one programmed computer processor to execute a computer process for performing the method as recited in claim **1**.

**11**. A computer implemented system for processing data-base content, the system comprising:

a term module for parsing one or more documents to iden-tify at least one term based on at least one rule;

a processing module for identifying content for the at least one term; and

a term database for storing the identified content in asso-ciation with the at least one term;

wherein one or more data objects associated with the term database are syndicated to one or more remote comput-ers for providing a representation of at least a portion of the term database at the one or more remote computers and for linking the identified content with the at least one term, wherein the one or more data objects contain data associated with one or more terms.

**12**. The system of claim **11**, wherein the content is provided by a source.

IPR2020-01646
Apple EX1001 Page 18

US 7,672,985 B2

15

**13**. The system of claim **12**, wherein the source comprises at least one expert who provides the content for the at least one term through an interface.

**14**. The system of claim **11**, wherein a sponsorship opportunity is provided to at least one entity to sponsor the at least one term, wherein a content window is associated with the at least one term.

**15**. The system of claim **11**, wherein the content comprises one or more of definitions, related products, related services, sponsorship information, translation, and reference works.

**16**. The system of claim **11**, wherein the one or more remote computers access data associated with the term database for linking to the supplemental content, without a connection to the term database.

**17**. The system of claim **11**, wherein the one or more data objects comprise a template object for identifying at least one rule for processing a source page.

**18**. The system of claim **11**, wherein the one or more data objects comprise a lexicon object for identifying at least one term for tagging in a source page.

**19**. The system of claim **11**, wherein the one or more data objects are synchronized with at least the term database.

**20**. A computer implemented system for processing database content, the system comprising:

    means for parsing one or more documents to identify at least one term based on at least one rule;

    means for identifying content for the at least one term; and

    means for associating the at least one term with the identified content;

    wherein one or more data objects associated with the term database are syndicated to one or more remote computers for providing a representation of at least a portion of the term database at the one or more remote computers and for linking the identified content with the at least one term.

**21**. A computer implemented method for processing database content, the method comprising the steps of:

    syndicating one or more data objects associated with a database to one or more remote computers;

    parsing one or more source documents to identify at least one term based on one or more predetermined rules;

    identifying content for the at least one term;

    linking the content with the at least one term; and

    automatically associating the at least one term in the one or more source documents with at least one link;

    wherein the at least one link denotes an association between the at least one term and the linked content;

    wherein the one or more data objects associated with the database provide a representation of at least a portion of the database at the one or more remote computers; and

    wherein the linked content is displayed on a user interface based upon a user interaction with at least a portion of the one or more source documents.

**22**. The method of claim **21**, wherein the supplemental content is transmitted from a remote computer.

**23**. The method of claim **21**, wherein the supplemental content is displayed in a content window.

**24**. The method of claim **23**, wherein the content window is embedded in the source document.

**25**. The method of claim **23**, wherein the content window is separate from the source document.

**26**. The method of claim **21**, wherein the user interaction comprises a user selecting the at least one term with a mouse cursor.

**27**. The method of claim **21**, wherein the user interaction comprises a user clicking the at least one term with a mouse cursor.

16

**28**. The method of claim **21**, wherein the at least one term is visibly enhanced to notify the user of available supplemental content.

**29**. The method of claim **21**, wherein the supplemental content comprises at least one advertisement.

**30**. The method of claim **21**, wherein one or more of the predetermined rules are based on frequency of a term within a source document.

**31**. The method of claim **21**, wherein one or more of the predetermined rules are based on manner of linguistic usage of a term.

**32**. The method of claim **21**, wherein one or more of the predetermined rules are based on presence or lack thereof of an entry in a database.

**33**. The method of claim **21**, wherein one or more of the predetermined rules are based on availability of supplemental content for a term.

**34**. The method of claim **21**, wherein one or more of the predetermined rules are based on quality or amount of available supplemental content for a term.

**35**. The method of claim **21**, wherein one or more of the predetermined rules are based on one or more financial incentives.

**36**. A computer implemented system for processing database content, the system comprising:

    a term module for parsing one or more source documents to identify at least one term based on one or more predetermined rules; and

    a processing module for identifying content for the at least one term, linking the content with the at least one term, and automatically associating the at least one term in the one or more source documents with at least one link;

    wherein the at least one link denotes an association between the at least one term and the linked content;

    wherein one or more data objects associated with a database are syndicated to one or more remote computers for providing a representation of at least a portion of the database at the one or more remote computers; and

    wherein the linked content is displayed on a user interface based upon a user interaction with at least a portion of the one or more source documents.

**37**. The method of claim **1**, wherein the identified content is displayed on a user interface in response to a selection of the at least one term by a user.

**38**. The method of claim **1**, wherein the identified content is stored in the term database.

**39**. The method of claim **2**, wherein the source comprises one or more of a dictionary, customer created data, advertising content and reference work.

**40**. The method of claim **1**, wherein the content comprises one or more of text, image, sound, video and mixed media.

**41**. The system of claim **11**, wherein the identified content is displayed on a user interface in response to a selection of the at least one term by a user.

**42**. The system of claim **11**, wherein the identified content is stored in the term database.

**43**. The system of claim **12**, wherein the source comprises one or more of a dictionary, customer created data, advertising content and reference work.

**44**. The system of claim **11**, wherein the content comprises one or more of text, image, sound, video and mixed media.

**45**. The system of claim **20**, wherein the identified content is displayed on a user interface in response to a selection of the at least one term by a user.

**46**. The system of claim **20**, wherein the identified content is stored in the term database.

\* \* \* \* \*

IPR2020-01646
Apple EX1001 Page 19

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/  Robert J. Yorio*
Robert J. Yorio (No. 93178)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  22-1980

**Short Case Caption:**  Sentius International, LLC v. Apple Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes ____13,079____ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 11/10/2022          Signature:    /s/ Robert J. Yorio

                          Name:         Robert J. Yorio